## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA

LEAGUE OF WOMEN VOTERS OF
INDIANA; COMMON CAUSE
INDIANA; HOOSIER ASIAN
AMERICAN POWER; and EXODUS
REFUGEE IMMIGRATION,

*Plaintiffs,*

v.

DIEGO MORALES, in his official
capacity as Secretary of State for Indiana;
J. BRADLEY KING, in his official
capacity as Co-Director of the Indiana
Election Division; and ANGELA M.
NUSSMEYER, in her official capacity as
Co-Director of the Indiana Election
Division,

*Defendants.*

Civil Action No. 1:25-cv-02150

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs LEAGUE OF WOMEN VOTERS OF INDIANA, COMMON CAUSE
INDIANA, HOOSIER ASIAN AMERICAN POWER, and EXODUS REFUGEE
IMMIGRATION (collectively, "Plaintiffs") bring this action for declaratory and injunctive relief
against DIEGO MORALES, in his official capacity as Secretary of State for Indiana; and
J. BRADLEY KING and ANGELA M. NUSSMEYER, in their official capacities as Co-Directors
of the Indiana Election Division (collectively, "Defendants"), and allege the following:

### INTRODUCTION

1.    Hoosiers who have become U.S. citizens are needlessly harmed by two new Indiana
election laws. Since July 1, 2025, Indiana has started to enforce laws that rely on stale, error-ridden
data and demand that only certain U.S. citizens produce documentary proof of citizenship

("DPOC") to register or to remain registered to vote. As a result, these laws risk disenfranchising eligible Hoosier voters.

2.      These DPOC requirements are never imposed on individuals who were born U.S. citizens and are only imposed on certain naturalized or derived citizens. Naturalized citizens are individuals who were not born U.S. citizens but have become U.S. citizens through the formal application and naturalization process. Derived citizens are individuals who were not born U.S. citizens but have become U.S. citizens automatically under certain circumstances through their parents' naturalization.

3.      These DPOC requirements are unnecessary. Only U.S. citizens may vote in state and federal elections, and the overwhelming evidence shows that Indiana does not face a problem with voting or attempts to vote by noncitizens. *See, e.g.*, *infra* ¶¶ 84–87.

4.      These DPOC requirements run counter to the purpose of the National Voter Registration Act of 1993 ("NVRA") and the Civil Rights Act of 1964 ("CRA"). The NVRA was enacted to "increase the number of eligible citizens who register to vote," "enhance[] the participation of eligible citizens as voters," "protect the integrity of the electoral process," and "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b). The CRA was enacted to combat discriminatory and arbitrary registration practices and prevents the differential application of standards, practices, or procedures to voter registration and list maintenance processes. 52 U.S.C. § 10101(a)(2)(A).

5.      This lawsuit challenges the following provisions of Indiana law: Section 17 of Indiana Public Law 65-2024 (House Enrolled Act ("HEA") 1264's "Current-Voter Citizenship Crosscheck Requirement"), codified at Indiana Code ("I.C.") § 3-7-38.2-7.3, and Section 9 of

Indiana Public Law 241-2025 (HEA 1680's "New-Registrant Citizenship Crosscheck Requirement"), codified at I.C. § 3-7-26.3-37 (collectively, "Challenged DPOC Provisions").

6.      The Current-Voter Citizenship Crosscheck Requirement directs the Co-Directors of the Indiana Election Division ("IED") as the Indiana "NVRA official[s]" to compare Indiana's statewide voter registration file with the Indiana Bureau of Motor Vehicles' ("BMV") database to identify registrants who were issued a "temporary credential" (*i.e.*, a temporary driver's license or identification card). The BMV issues temporary credentials to certain individuals who are noncitizens and are lawfully in the United States. The Current-Voter Citizenship Crosscheck Requirement specifies that, in order to remain registered to vote, all registered voters identified for having a temporary credential must provide DPOC upon receiving a notice from their county registration office or else they will be removed from the voter rolls. *See* I.C. § 3-7-38.2-7.3.

7.      The New-Registrant Citizenship Crosscheck Requirement applies to individuals who register to vote on or after July 1, 2025, and who provide a temporary credential number on their voter registration application. Like the Current-Voter Citizenship Crosscheck Requirement, the New-Registrant Citizenship Crosscheck Requirement requires these registrants to provide DPOC upon receiving a notice from county officials or else have their voter registration application rejected. *See* I.C. § 3-7-26.3-37.

8.      The impact of these provisions is exacerbated by Section 2 of Public Law 70-2025 (Senate Enrolled Act ("SEA") 10's "48-Hour Requirement"), codified at I.C. § 3-7-26.3-11, which requires all Indiana county voter registration offices to perform list maintenance within 48 hours of receiving certain information, including information that a registered voter has not provided DPOC after being required by the Current-Voter Citizenship Crosscheck Requirement.

9.     The BMV data regarding individuals who have a temporary credential, a form of identification obtained in the past when the individuals were noncitizens, are not an accurate or reliable way to identify Indiana residents who currently may be noncitizens.

10.     Federal and state law do not require Hoosiers who obtain a temporary driver's license or identification card as noncitizens, and who subsequently become U.S. citizens, to update their credentials based on their change in citizenship status or notify the BMV when they gain citizenship. Their previously obtained driver's licenses or identification cards continue to be valid until the credentials expire, even if their citizenship status changes. Many Indiana residents who possess a temporary credential become U.S. citizens before their temporary credential expires but do not update their credential before expiration, because that is not required and also because the BMV charges a fee to do so. Accordingly, some U.S. citizens who are eligible to vote continue to have a valid temporary credential.

11.     The Challenged DPOC Provisions violate the NVRA, 52 U.S.C. § 20501 *et seq.*, and the CRA, 52 U.S.C. § 10101.

12.     Plaintiffs, whose longtime mission is to assist voters and voter registrants, including the individuals harmed by these new requirements, further seek information and records from Defendants to determine the number and identity of Hoosiers whose right to vote is at risk due to these discriminatory and unlawful requirements. On April 2, 2025, Plaintiffs League of Women Voters of Indiana ("LWVIN"), Common Cause of Indiana ("CCIN"), and Hoosier Asian American Power ("HAAP") requested that Defendants produce records relevant to the Current-Voter Citizenship Crosscheck Requirement. On July 1, 2025, these plaintiffs requested similar records for the New-Registrant Citizenship Crosscheck Requirement. Defendants have repeatedly refused to produce all available records, even though these plaintiffs have—at Defendants' request—

narrowed their requests. Defendants are required to provide this relevant voter registration information pursuant to the Public Records Provision, Section 8 of the NVRA, 52 U.S.C. § 20507(i)(1), and their continuing failure to do so violates the NVRA.

13.    Plaintiffs now seek (1) a declaratory judgment and temporary and permanent injunctive relief prohibiting the enforcement of the Challenged DPOC Provisions, and (2) production of records relevant to the Challenged DPOC Provisions pursuant to the NVRA Public Records Provision. Plaintiffs also seek reasonable attorney fees, litigation expenses, and costs. 52 U.S.C. § 20510(c).

## JURISDICTION AND VENUE

14.    This action is brought under the NVRA and the CRA.

15.    This Court has jurisdiction under 28 U.S.C. § 1331 because the claims in this action arise under U.S. laws. This Court also has jurisdiction under 28 U.S.C. §§ 1343(a)(3), 1343(a)(4), and 1357.

16.    This Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

17.    This Court has personal jurisdiction over Defendants because they are citizens of Indiana.

18.    Venue is proper under 28 U.S.C. § 1391(b) because all Defendants are residents of Indiana and because a substantial portion of the events or omissions giving rise to these claims occurred in this District.

## PARTIES

**Plaintiffs**

19.    Plaintiff **LEAGUE OF WOMEN VOTERS OF INDIANA ("LWVIN")** is the Indiana affiliate of League of Women Voters, a national nonpartisan, nonprofit, grassroots, membership organization working to protect and expand voting rights and ensure everyone is represented in U.S. democracy. LWVIN works to ensure all eligible individuals have the opportunity and the information needed to register to vote. Voter education is central to LWVIN's mission. Among LWVIN's members are individuals who have become U.S. citizens. LWVIN is based in Indianapolis, Indiana.

20.    Plaintiff **COMMON CAUSE INDIANA ("CCIN")** is the Indiana operations of Common Cause, a nonprofit, nonpartisan, grassroots organization dedicated to upholding the core values of American democracy. CCIN works to create an open, honest, and accountable government that serves the public interest; promotes equal rights, opportunity, and representation for all; empowers all people to make their voices heard in the political process; and serves voters by breaking down barriers. CCIN is based in Indianapolis, Indiana.

21.    Plaintiff **HOOSIER ASIAN AMERICAN POWER ("HAAP")** is a nonpartisan, nonprofit organization founded in 2019 as the Indiana Chapter of the National Asian Pacific American Women's Forum. Since 2024, it has been called Hoosier Asian American Power. HAAP educates and mobilizes Asian American voters through voter protection and education. Among HAAP's members are individuals who have become U.S. citizens. HAAP is a statewide organization with bases in Indianapolis and Bloomington, Indiana.

22.    Plaintiff **EXODUS REFUGEE IMMIGRATION ("Exodus")** is a nonpartisan, nonprofit organization founded in 1981. Since its inception, Exodus has welcomed and assisted

refugees and humanitarian immigrants to resettle in the United States and establish lives in Indiana. The clients and communities that Exodus serves include individuals who are pursuing U.S. citizenship and who have become U.S. citizens. Exodus has offices in Indianapolis and Bloomington, Indiana.

**Defendants**

23.     Defendant **DIEGO MORALES** is the Indiana Secretary of State ("SOS"). As the SOS, Defendant Morales is responsible for overseeing elections through the IED, which is one of the four main divisions of the SOS's office. I.C. § 3-6-4.2-1 ("The election division is established within the office of the secretary of state."); I.C. § 3-6-4.2-2 ("The secretary of state shall perform all ministerial duties related to the administration of elections by the state" and the "election division shall assist the commission and the secretary of state in the administration of this title."). The SOS is the state's "chief election official," I.C. § 3-6-3.7-1, and implements the voter registration list in coordination with the IED, I.C. § 3-7-26.3-3. As the SOS, Defendant Morales is responsible for the implementation of the challenged statutes. Plaintiffs bring this suit against Secretary Morales in his official capacity.

24.     Defendants **J. BRADLEY KING** and **ANGELA M. NUSSMEYER** are Co-Directors of the IED. Collectively, the Co-Directors of the IED are Indiana's NVRA officials. I.C. § 3-7-11-1. As Indiana's NVRA officials, Defendants King and Nussmeyer are responsible for overseeing the implementation of the challenged statutes. As part of the SOS's office, Defendants King and Nussmeyer share the SOS's authority over voter registration. Plaintiffs bring this suit against Defendants King and Nussmeyer in their official capacities.

## FACTUAL ALLEGATIONS

### Registering to Vote in Indiana

25.     The U.S. Election Assistance Commission has promulgated the National Mail Voter Registration Form ("Federal Form") which all eligible citizens may use to register to vote in elections for federal office in Indiana, 52 U.S.C. § 20508(a)(2); *Register To Vote In Your State By Using This Postcard Form and Guide*, U.S. Election Assistance Commission, https://www.eac.gov/sites/default/files/eac_assets/1/6/Federal_Voter_Registration_ENG.pdf. Hoosiers may also use the Federal Form to register to vote in state and local elections in Indiana.

26.     Indiana has promulgated a state voter registration form ("State Form") which all eligible citizens may use to register to vote in elections for local, state, and federal offices in Indiana. I.C. §§ 3-7-22-2; 3-7-22-3.

27.     Indiana residents who are U.S. citizens, are at least 18 years old (or will turn 18 before the next general, special, or municipal election), and are not disenfranchised by operation of law, I.C. § 3-7-13-4, are eligible to register to vote in local, state, and federal elections, I.C. § 3-7-13-1.

28.     Indiana voters may register for elections using either the Federal Form or the State Form. I.C. §§ 3-7-22-2; 3-7-22-3.

29.     Both the Federal Form and State Form require applicants to affirm that they are a U.S. citizen under penalty of perjury. 52 U.S.C. § 20508(b)(2) (Federal Form); I.C. § 3-7-22-5(1)(A) (State Form).

30.     Voters must complete a voter registration application if they are first-time registrants, have changed residence, have become eligible to vote after disenfranchisement, or have had their registration canceled. I.C. § 3-7-13-8.

31.     Under the NVRA, Indiana must "establish procedures to register to vote in elections for Federal office," including registering when applying for a driver's license, registering by mail, registering in person at sites that accord with applicants' residence location, and registering at designated federal, state, or nongovernmental offices. 52 U.S.C. § 20503(a).

32.     In accordance with the NVRA, Indiana has established procedures for registering to vote when applying for a driver's license or identification card, I.C. § 3-7-14-5, registering to vote by mail, I.C. § 3-7-22-3, and registering to vote at county registration offices, I.C. § 3-7-19-2.

33.     Under the NVRA, Indiana is required to "designate agencies for the registration of voters in elections for Federal office," including "all offices in the State that provide public assistance," and "all offices in the State that provide State-funded programs primarily engaged in providing services to persons with disabilities." 52 U.S.C. § 20506(a).

34.     In accordance with these requirements and state law, the following offices in Indiana are required to provide voter registration services for registering to vote in federal elections: (1) each county office that administers the Temporary Assistance for Needy Families program under I.C. § 12-14 and the Medicaid program under I.C. §§ 12-15, 3-7-15-2(1); (2) each office of the division of family resources that administers the food stamp program under federal law, I.C. § 3-7-15-2(2); (3) each office of the Indiana Department of Health that administers the Special Supplemental Nutrition Program for the Women, Infants, and Children Program under I.C. §§ 16-35-1.5, 3-7-15-2(3); and (4) disability offices designated by an NVRA official, I.C. § 3-7-16-2.5(2).

## The Challenged Statutes

### *The Current-Voter Citizenship Crosscheck Requirement*

35.    On March 11, 2024, HEA 1264 was signed into law by former Governor Eric Holcomb as Indiana Public Law 65-2024.

36.    The Current-Voter Citizenship Crosscheck Requirement (Section 17 of Public Law 65-2024) is codified at I.C. § 3-7-38.2-7.3 and became effective on July 1, 2025.

37.    Beginning July 1, 2025, the Current-Voter Citizenship Crosscheck Requirement requires Defendants King and Nussmeyer, as Indiana's NVRA officials, to compare the statewide voter registration file with the Indiana BMV's file of temporary credentials issued to individuals under I.C. §§ 9-24-11-5(c) or 9-24-16-3(f).

38.    Individuals who obtain a temporary credential (such as a temporary driver's license or identification card) under I.C. §§ 9-24-11-5(c) or 9-24-16-3(f) were noncitizens at the time they obtained their credential.

39.    Individuals with temporary credentials may become U.S. citizens after obtaining that credential, and many do.

40.    A temporary credential may be valid for up to six years and may not expire until after an individual becomes a U.S. citizen. The BMV does not require individuals holding a temporary credential, who became citizens after obtaining the credential, to obtain a new credential due to their change in citizenship status or otherwise update their BMV records before the temporary credential expires.

41.    It may be months or even years between the time that an individual who becomes a U.S. citizen with a temporary credential registers to vote and the time when the citizen returns to

the BMV to update or renew their driver's license or identification card and provides the BMV with their updated citizenship status.

42.     Using the BMV database of temporary driver's licenses and identification cards to identify noncitizens, as required by the Current-Voter Citizenship Crosscheck Requirement, will misidentify numerous U.S. citizens who have a temporary credential as noncitizens.

43.     The Current-Voter Citizenship Crosscheck Requirement requires that "[i]f evidence exists" that a registered voter is not a citizen following the IED Co-Directors' comparison of the registration file with the BMV temporary credential data, the IED Co-Directors must notify the relevant county registrar that the individual may not be a citizen. I.C. § 3-7-38.2-7.3(b). "Evidence" that a registered voter is not a citizen includes the likely outdated BMV information that an individual obtained a temporary credential when they were a noncitizen.

44.     The county registrar who receives that notification must then send a notice to the voter requiring the voter to provide DPOC within 30 days of receiving the notice. I.C. § 3-7-38.2-7.3(c).

45.     DPOC is defined as: (1) the voter's original birth certificate or a legible photocopy thereof; (2) the voter's U.S. passport or a legible photocopy thereof; (3) the voter's naturalization documentation, a legible photocopy of the documentation, or the voter's certificate of naturalization number if the county registrar verifies the number with the United States Citizenship and Immigration Services; (4) a document or method of proof of citizenship established under the Immigration Reform and Control Act of 1986 ("IRCA"), 8 U.S.C. § 1101 *et seq.*, including a Certificate of Citizenship; and (5) the voter's consular report of birth abroad ("CRBA"). I.C. § 3-7-38.2-7.3(a).

46.     The county registrar must cancel the voter's registration if the voter fails to reply and provide DPOC within 30 days of receiving the notice. I.C. § 3-7-38.2-7.3(d).

47.     The voter may appeal the cancellation in person or by mail to the county election board. I.C. § 3-7-38.2-7.3(e).

48.     After receiving an appeal, the county election board is required to (1) conduct a hearing, (2) make a finding about the voter's citizenship status, and (3) send a copy of its decision to the county voter registration office of the county in which the individual resides. *Id.*

49.     The Current-Voter Citizenship Crosscheck Requirement does not provide a timeline or deadline for the voter's appeal or for the county election board's hearing or ultimate decision. It does not specify the process for county registrars or election board to verify that the voter received the initial notice, which starts the 30-day clock to provide DPOC. It also does not specify what the individual's voter registration status is while the appeal is pending and before the county election board issues its decision.

50.     The Current-Voter Citizenship Crosscheck Requirement requires that voter registrations be canceled when targeted registrants do not provide DPOC within the allotted time period, regardless of the amount of time until the next primary or general election for federal office(s) or the voter registration deadline associated with that election.

### *The New-Registrant Citizenship Crosscheck Requirement*

51.     On May 6, 2025, HEA 1680 was signed into law by Governor Mike Braun as Public Law 241-2025.

52.     The New-Registrant Citizenship Crosscheck Requirement (Section 9 of Public Law 241-2025) is codified at I.C. § 3-7-26.3-37 and became effective on July 1, 2025.

53.     Beginning July 1, 2025, the New-Registrant Citizenship Crosscheck Requirement requires county voter registration officials to send a notice requesting DPOC from any individual

whose application to register to vote includes an identification number from a temporary credential issued under I.C. §§ 9-24-11-5(c) or 9-24-16-3(f). The New-Registrant Citizenship Crosscheck Requirement will flag those with temporary credentials who register to vote for the first time, as well as those who re-register to vote after they (1) moved to a new county in Indiana, (2) were previously incarcerated and released, or (3) were removed via list maintenance procedures. *See* I.C. §§ 3-7-39-6; 3-7-13-5; 3-7-38.2-1.

54.     As described above, state and county election officials who rely on temporary credential identification numbers, or who rely on flagging that is based on temporary credential numbers, misidentify numerous U.S. citizens as noncitizens.

55.     The county voter registration official must reject the individual's voter registration application if the flagged individual does not provide DPOC within 30 days of receiving the notice.

56.     The New-Registrant Citizenship Crosscheck Requirement does not allow an appeal by individuals whose voter registration application is rejected.

**Defendants' Implementation of the Challenged DPOC Provisions Disenfranchises Only Those Who Become U.S. Citizens, Not Individuals Born as Citizens**

57.     The Challenged DPOC Provisions unnecessarily impact those who obtain U.S. citizenship who have been issued a temporary credential. According to U.S. Census Bureau data, as of 2023, there were 179,360 Hoosiers who were naturalized U.S. citizens, and an unknown number of derived citizens, many of whom have been issued a temporary credential, who are fully eligible, registered, and qualified to vote or intend to register to vote.

58.     By flagging only naturalized citizens and derived citizens as potential noncitizens if they have been issued a temporary credential, the Challenged DPOC Provisions impact only those citizens, and not those who are born as U.S. citizens.

59.    Likewise, by requiring only naturalized citizens and derived citizens to provide DPOC when registering to vote if they use a temporary credential identification number on their voter registration application, the New-Registrant Citizenship Crosscheck Requirement impacts only naturalized and derived citizens and not individuals born as U.S. citizens.

60.    The expiration dates for Indiana temporary credentials are as follows. If there is no expiration date on the lawful residence authorization a noncitizen used to obtain a temporary credential, their temporary credential expires one year after issuance. If there is an expiration date on that lawful residence authorization, their temporary credential expires either on the date the lawful residence authorization expires or six years after the date of issuance, whichever is earlier. I.C. § 9-24-12-11(c).

61.    Many Hoosiers, especially those with six-year temporary credentials, become U.S. citizens before their credentials expire.

62.    The processes mandated by the Current-Voter Citizenship Crosscheck Requirement and the New-Registrant Citizenship Crosscheck Requirement erroneously identify those who have become U.S. citizens with temporary credentials as noncitizens and require lawfully-registered voters, and lawful citizens seeking to register to vote, to provide DPOC or be denied their right to vote. In contrast, individuals born as U.S. citizens will never be identified and required to provide DPOC under these processes.

63.    Requiring naturalized or derived citizens to provide DPOC to remain registered to vote or to register to vote is discriminatory and may disenfranchise numerous eligible voters.

64.    The harms of the Challenged DPOC Provisions are exacerbated by the absence of any deadline to resolve appeals to county election boards filed by impacted registrants.

65.     Many naturalized or derived citizens in Indiana, who may be members or beneficiaries of the services and educational resources of LWVIN, CCIN, HAAP, and Exodus, either do not possess or do not have readily available access to DPOC. These naturalized or derived citizens face significant financial and practical injuries in obtaining DPOC and submitting it to the State of Indiana.

66.     Naturalized or derived citizens may bear substantial costs in order to comply with the Current-Voter Citizenship Crosscheck Requirement and the New-Registrant Citizenship Crosscheck Requirement. For example, naturalized citizens who do not have their naturalization certificate or their certificate of naturalization number must pay close to $1,385 to receive a new certificate of citizenship or pay $555 to replace or amend the certificate, and the process takes on average seven months, well past the 30-day period during which they must provide DPOC. Derived citizens who do not have a certificate of citizenship must pay more than $1,300 to obtain a certificate of citizenship.

67.     The application and execution fees for a new passport can cost $165, and it can take up to two months to receive a passport. Expedited service for a passport costs an extra $60, and the time to process an expedited request still varies depending on demand, at one point taking up to 12 weeks to process a request.

68.     Naturalized or derived citizens also bear the cost of traveling long distances and taking off or losing hours at work to obtain citizenship documents. Long and unpredictable wait times may make it impossible for many naturalized or derived citizens, including Plaintiffs' members or clients, to comply with the Current-Voter Citizenship Crosscheck Requirement or the New-Registrant Citizenship Crosscheck Requirement, both of which require notified voters to respond with DPOC within 30 days of receiving notice that DPOC is required.

69.    The Current-Voter Citizenship Crosscheck Requirement effectively requires affected voters to register to vote twice, first when they initially registered and again to satisfy the DPOC requirement.

70.    Similarly, the New-Registrant Citizenship Crosscheck Requirement requires affected registrants to take additional steps and spend additional time and expense in satisfying the DPOC requirement to complete their registration.

71.    For many individuals who have become U.S. citizens and who lack DPOC, the costs in time and effort to obtain it, and then provide it to a county election official, will be substantial and result in many voters simply giving up and being disenfranchised.

72.    Notably, during two hearings on the bill, several members of the Indiana House Committee on Elections and Apportionment cautioned that the Current-Voter Citizenship Crosscheck Requirement could violate federal law and prevent naturalized citizens from being able to vote.

73.    Elected officials in Indiana also raised concerns that the Current-Voter Citizenship Crosscheck Requirement could result in the erroneous cancellation of eligible voters' registration. Marion County Clerk Kate Sweeney Bell said the BMV data is often out-of-date and "it might not be an accurate representation of the voter's current citizenship status . . . ."

74.    In her testimony before the committee, Clerk Sweeney Bell also stated that because the BMV data may not be current, she feared that its use would cause problems on Election Day "when voters are erroneously canceled because of the bad data and . . . poll workers will struggle to properly assist the voters and unintentionally turn people away."

75.    During debate about the Current-Voter Citizenship Crosscheck Requirement in the House, others expressed concern that the 30-day timeframe for voters to provide DPOC was too

short to allow eligible voters to obtain the required paperwork, noting the time and expense associated with obtaining DPOC. This concern applies equally to the New-Registrant Citizenship Crosscheck Requirement.

76.    Defendant Nussmeyer has also acknowledged that the temporary credential flag is a "point in time check that may no longer be accurate."

77.    U.S.-citizen voters have already been flagged due to the Challenged DPOC Provisions across the state.

78.    In Monroe County, Indiana, at least one individual voter has been erroneously flagged under the Current-Voter Citizenship Crosscheck Requirement. This individual voter became a U.S. citizen when he was three years old, never had a temporary credential, and yet was required to provide DPOC.

79.    In Marion County, Indiana, upon information and belief, at least two naturalized U.S. citizens have been flagged because of the Current-Voter Citizenship Crosscheck Requirement, and several naturalized U.S. citizens have been flagged because of the New-Registrant Citizenship Crosscheck Requirement.

80.    Upon information and belief, the 92 Indiana counties are implementing the Challenged DPOC Provisions in different ways.

**The Challenged DPOC Provisions Are Redundant and Unnecessary**

81.    Before July 1, 2025, when the Challenged DPOC Provisions went into effect, and continuing to the present day, Indiana law already provided that only U.S. citizens can register to vote. Indiana requires that every Indiana resident affirm their citizenship under penalty of perjury upon registering to vote. The Federal Form for voter registration includes the same requirement.

82.     Before July 1, 2025, and continuing to the present day, Indiana uses list-maintenance programs aimed at removing voters from the registration rolls whom it believes are ineligible. For example, Indiana law requires the county voter registration office to perform list maintenance in accordance with the NVRA, including the removal of deceased voters. I.C. § 3-7-26.3-11.

83.     Indiana's laws and procedures before July 1, 2025, effectively prevented noncitizens from registering for and voting in Indiana state and federal elections.

84.     There is no evidence of anything more than isolated instances of noncitizen attempts to vote or attempts to register to vote in Indiana. The rare or nonexistent proven instances of noncitizens registering or applying to register provides no basis for the Challenged DPOC Provisions, which potentially will exclude numerous eligible citizens from registering to vote and voting. Notably, Defendant Morales has stated that "Indiana has been a model for election laws, and frankly, I don't anticipate learning that many non-citizens have landed on our voter registration rolls."

85.     Instances of noncitizen voting nationwide are incredibly rare. *See* Alex Nowrasteh, *Noncitizens Don't Illegally Vote in Detectable Numbers,* Cato Inst. (Nov. 25, 2020), https://www.cato.org/blog/noncitizens-dont-illegally-vote-detectable-numbers?gad_source=1&gad_campaignid=85808169&gclid=EAIaIQobChMI58guYXjjQMVv09HAR2tYCfqEAAYASAAEgIiUfD_BwE. After the 2016 election, the Brennan Center for Justice surveyed local election officials in 42 jurisdictions with high immigrant populations and found just 30 cases of suspected noncitizens voting out of 23.5 million votes cast, or 0.0001%. *See* Douglas, Keith, Myrna Perez, Chris Famighetti, *Noncitizen Voting: The Missing Millions* at 1, Brennan              Ctr.              (May              5,              2017),

https://www.brennancenter.org/media/256/download/Report_2017_NoncitizenVoting_Final.pdf?inline=1.

86.     More recently, after conducting an extensive review of Louisiana's state voting rolls going back to the 1980s, the Office of the Secretary of State of Louisiana concluded that "non-citizens illegally registering or voting is not a systemic problem in Louisiana." In fact, the office identified *at most* 390 registered voters who *could have* been noncitizens in the last 40 years.

87.     In addition, despite allegations of noncitizen voting asserted in state and federal courts across the country in recent years, courts have overwhelmingly concluded that challenges premised on such allegations have failed to establish any appreciable noncitizen voting problem. *See, e.g.*, *Bednasek v. Kobach*, 259 F. Supp. 3d 1193, 1209 (D. Kan. 2017) ("The sheer magnitude of potentially disenfranchised voters impacted by the DPOC law and its enforcement scheme cannot be justified by the scant evidence of noncitizen voter fraud that occurred in Kansas before the law was passed . . . ."); *Michigan Welfare Rts. Org. v. Trump*, 642 F. Supp. 3d 98, 106–07 (D.D.C. 2022) (noting that a "litany of false claims" of voter fraud, including instances of noncitizens voting, lacked evidence).

**Defendants' Implementation of the Challenged DPOC Provisions Harms Plaintiffs**

***League of Women Voters of Indiana***

88.     Plaintiff League of Women Voters of Indiana ("LWVIN") is the Indiana affiliate of League of Women Voters ("LWV"), a national nonpartisan, nonprofit, grassroots membership organization working to protect and expand voting rights and ensure everyone is represented in U.S. democracy. LWVIN works to ensure all eligible individuals have the opportunity and the information needed to register to vote. Voter education is central to LWVIN's mission.

89.     LWVIN is based in Indianapolis, Indiana.

90.    LWV was founded in 1920 as an outgrowth of the struggle to win voting rights for women and now has more than a million members and supporters nationwide. LWV is organized in more than 750 communities and in every state and the District of Columbia.

91.    The vast majority of the approximately 1,400 members of LWVIN are registered Indiana voters. Among LWVIN's members are individuals who have become U.S. citizens.

92.    LWVIN is interested in eliminating barriers to voting and supporting the right to vote. These interests are germane to the association's mission. Voter registration is LWVIN's signature activity and core to its mission. LWVIN works to register voters across Indiana.

93.    LWVIN conducts voter registration drives, assists individuals who seek accurate information about elections, works to get out the vote, and conducts other activities to boost civic engagement, which has been essential to its mission since its founding.

94.    LWVIN and its 23 local Leagues together work to ensure that voters have access to VOTE411.org, LWV's voter information website that enables voters to register, check their registration, see the election calendar, identify where to cast a ballot, learn who is on their ballot, and compare candidates for each office. Publishing all such information for each election takes considerable volunteer time and resources, but it allows LWVIN to maintain its focus on traditionally underrepresented and underserved communities who benefit the most from additional education and assistance, including voters of color, first-time voters, low-income voters, newly naturalized citizen voters, young voters, and voters impacted by the criminal legal system.

95.    In line with its mission to focus its resources on communities who benefit the most from additional education and information, LWVIN also expends considerable resources educating voters about voter registration requirements and exercising their right to vote. LWVIN tracks changes in election laws and makes that information publicly available to voters in English,

Spanish, and Haitian Creole in print and electronic form. Printed materials are distributed by local Leagues to various local organizations.

96.    To reach different communities, LWVIN makes resources available in multiple languages as well as digital and print versions.

97.    LWVIN has suffered concrete, particularized damages because of Defendants' implementation of the Challenged DPOC Provisions.

98.    Defendants' implementation of the Challenged DPOC Provisions has compelled LWVIN to divert scarce resources away from other core activities and devote substantial time and organizational resources to counteract the harms from the Challenged DPOC Provisions on the populations the organization serves.

99.    The Challenged DPOC Provisions harm the communities LWVIN serves and interfere with its mission by requiring LWVIN members to divert energy and resources to respond to the Challenged DPOC Provisions' impact on the community. To continue to fulfill its longstanding mission, LWVIN has had to expend added time to reaching out to affected communities to offer information and assistance related to the Challenged DPOC Provisions.

100.    LWVIN has also had to investigate BMV and local election official processes to understand the Challenged DPOC Provisions' impact on community members in anticipation of adapting its volunteer training, public education, and outreach.

101.    In taking these actions, of note, LWVIN had to expend resources educating itself to be able to educate voters and community groups about the Current-Voter Citizenship Crosscheck Requirement and the likelihood that citizens may be erroneously flagged as noncitizens, which results in those citizens needing to provide DPOC to avoid removal. The Challenged DPOC Provisions add complexity that must be addressed in training others to do voter

registration and to get local League chapters updated on changes. Because of the risk of the Challenged DPOC Provisions erroneously flagging eligible voters as noncitizens, LWVIN's established mission of serving these voters has required it to focus its efforts more broadly on outreach to organizations serving immigrant communities in Indiana to ensure that they have information about how the Challenged DPOC Provisions may impact them and their communities.

102.    The Challenged DPOC Provisions directly interfere with the trainings and informational materials that LWVIN provides to voters and to local Leagues, forcing LWVIN to spend time and money to amend and adapt its public education and outreach to disseminate its message about the Challenged DPOC Provisions.

103.    LWVIN will need to delay and defer other work for outreach and updating materials to inform the groups and individuals it works with—including newly naturalized citizens—of the changes to the law.

104.    Additionally, the local Leagues in Indiana seek to attend all naturalization ceremonies across the state (with the exception of U.S. Citizenship and Immigration Services and administrative naturalization ceremonies that, as of August 29, 2025, limit public access), including in Indianapolis, Hammond, Evansville, South Bend, Fort Wayne, Hamilton County, and Greater Lafayette (approximately 250 ceremonies per year) to register new citizens to vote (up to 100 per ceremony). In particular, LWV of Indianapolis is on track to register nearly 1,800 new citizens this year and registered nearly 2,500 last year.

105.    After LWVIN registers a voter, volunteers often follow up with the voter, give them other information about elections or remind them of upcoming elections. The Current-Voter Citizenship Crosscheck Requirement will force LWVIN *to take the additional step* of making sure

voters know what to do if they are flagged as noncitizens and receive a notice. This may extend as far as LWVIN helping voters provide DPOC as required.

106.    Inevitably, the Challenged DPOC Provisions will cause the state to erroneously flag citizens as noncitizens, and LWVIN will be forced to spend resources cleaning up the mess by educating and assisting affected voters.

107.    LWVIN had to delay, suspend, and forgo other programs, activities, and priorities to divert resources in response to the Challenged DPOC Provisions.

108.    To ensure the communities that LWVIN works with can register to vote and remain registered to vote, LWVIN has had to create flyers in English, Spanish, and Haitian Creole about steps to take if an individual's registration is challenged under the Challenged DPOC Provisions.

109.    LWVIN must divert volunteer time away from its civic education campaign for 2025–2026 because of the Challenged DPOC Provisions. Internal education on the laws, development of materials and programs to explain the Challenged DPOC Provisions to local Leagues, and development of materials and fliers, both digital and print, for new citizens and others all require volunteer time. LWVIN also must redirect volunteer time to identify and engage the best local points of contact to help disseminate information about needing to provide DPOC and the risk of erroneously being identified as a noncitizen under the Challenged DPOC Provisions. LWVIN plans to provide new U.S. citizens with a short statement about needing to provide DPOC to the voter registration office if flagged under the Challenged DPOC Provisions.

110.    Information about the Challenged DPOC Provisions' implementation is necessary for LWVIN, in accordance with its longstanding mission, to assist naturalized citizens with registering to vote and to advise them about maintaining their registration. In particular, upon information and belief, the 92 counties are implementing the Challenged DPOC Provisions in

different ways, and so information concerning implementation of the law is required to allow LWVIN to help community members address concerns about their voter registration status, regardless of where they reside in the state. The information also allows LWVIN to provide its members and the general public information about the Challenged DPOC Provisions and how impacted voters may preserve their right to vote. LWVIN's mission is to ensure that every eligible citizen has equal and safe access to the ballot box. LWVIN must help voters navigating the Challenged DPOC Provisions to help them exercise their right to vote.

### *Common Cause Indiana*

111.    Plaintiff Common Cause Indiana ("CCIN") is a nonprofit, nonpartisan membership organization incorporated under the laws of the District of Columbia as Common Cause and registered to do business in Indiana. Pursuant to its bylaws, Common Cause is organized and operated as a membership organization and brings this action as an organization and in a representative capacity on behalf of its members.

112.    CCIN is based in Indianapolis, Indiana.

113.    CCIN has approximately 12,788 members and supporters who live and vote in Indiana. Through its members in Indiana, CCIN works to create an open, honest, and accountable government that serves the public interest, including by protecting voting rights and serving voters by breaking down barriers.

114.    Pursuant to its bylaws, CCIN has defined who qualifies as a member. Under its definition, a "member" is any individual who, within the past two years, (a) made a financial contribution to the organization; or (b) has taken meaningful action in support of CCIN's advocacy work. Such meaningful action includes, but is not limited to, signing petitions directed to government officials; participating in letter-writing or phone-banking campaigns; attending town

halls, workshops, or rallies organized by CCIN; or otherwise engaging in activities designed to advance the organization's mission.

115.    CCIN is interested in eliminating barriers to voting and supporting the right to vote. CCIN focuses its voting rights efforts on helping marginalized communities who often have difficulty navigating changes to new voting laws while making sure its work can benefit all Indiana voters. These interests are germane to the organization's mission.

116.    Every state and federal election year, CCIN recruits, trains, and deploys volunteers through its Election Protection project to help voters at risk of being disenfranchised. These volunteers help respond to Hoosiers' questions and concerns around voting and registering to vote.

117.    CCIN has suffered concrete, particularized damages because of Defendants' implementation of the Challenged DPOC Provisions.

118.    Defendants' implementation of the Challenged DPOC Provisions has compelled CCIN to divert scarce resources away from other core activities and devote substantial time and organizational resources to counteract the harms from the Challenged DPOC Provisions on the populations the organization serves.

119.    The Challenged DPOC Provisions harm the communities CCIN serves and interfere with its mission by creating additional barriers to voter registration for new citizens.

120.    The Challenged DPOC Provisions directly interfere with the trainings and informational materials that CCIN provides to voters through CCIN's core voter education efforts, forcing CCIN to spend significantly more time addressing the Challenged DPOC Provisions and how to counteract their harms to ensure voters know how to get registered to vote and to stay registered to vote. CCIN has had to partner with at least 25 organizations, many of which work

with people of color or immigrant communities, to teach them about the Challenged DPOC Provisions and to be a resource to follow up with for assistance.

121.    CCIN has had to delay, suspend, and forgo other programs, activities, and priorities to divert resources in response to the Challenged DPOC Provisions. As such, CCIN has invested significant resources into educating and assisting voters with maintaining their registration if they are affected by the Challenged DPOC Provisions, including by developing informative toolkits translated into multiple languages and coordinating with organizational partners who engage in immigrant communities.

122.    CCIN has also engaged in additional community outreach, education, and training activities to address and counteract the Challenged DPOC Provisions' harms through public information campaigns, including tabling at 15 community events; hosting a public webinar; and holding 18 meetings and engaging in ongoing communications with representatives from 23 community organizations.

123.    CCIN has two full-time employees.

124.    CCIN has had to dedicate one of these staff members to serve as a liaison with organizational partners impacted by the Challenged DPOC Provisions. This staff member works 35 hours per week and spends one hour per week performing these new duties. In addition, prior to the effective date of the Challenged DPOC Provisions, this staff member spent four hours per week developing materials and preparing for outreach in response to the Challenged DPOC Provisions. The staff member is an organizer who would be focusing on a different community organizing project if not having to spend time responding to the Challenged DPOC Provisions.

125.    To adequately respond to the challenges on their membership posed by the Challenged DPOC Provisions, CCIN estimates it will need to divert approximately 5% of its annual budget to responsive programing.

126.    Information about the Challenged DPOC Provisions' implementation is necessary for CCIN to continue to fulfill its established mission by assisting naturalized citizens with registering to vote and advising them about maintaining their registration. In particular, upon information and belief, the 92 counties are implementing the Challenged DPOC Provisions in different ways, and so information concerning implementation of the law is required to allow CCIN to help community members address concerns about their voter registration status, regardless of where they reside in the state. The information also allows CCIN to provide its members and the general public information about individuals' voter registration statuses, the Challenged DPOC Provisions, and how impacted voters may preserve their right to vote.

### *Hoosier Asian American Power*

127.    Plaintiff Hoosier Asian American Power ("HAAP") is a nonpartisan, nonprofit organization founded in 2019 as the Indiana Chapter of the National Asian Pacific American Women's Forum. Since 2024, it has been called Hoosier Asian American Power. HAAP educates and mobilizes Asian American voters through voter protection and education. Among HAAP's members are individuals who have become U.S. citizens.

128.    HAAP is a statewide organization with bases in Indianapolis and Bloomington, Indiana.

129.    HAAP educates and mobilizes Asian American voters and promotes racial equity and voter protection. In Indiana and nationally, most Asian Americans are immigrants. Nationally,

the majority of Asian American immigrants are naturalized U.S. citizens. In Indiana, nearly 60,000 Asian Americans are naturalized U.S. citizens.

130.    HAAP has over 185 members. Among HAAP's members are individuals who have become U.S. citizens.

131.    HAAP is interested in eliminating barriers to voting and supporting the right to vote. These interests are germane to the organization's mission.

132.    In 2024, HAAP spent nearly $30,000 to fund its mission and these voter engagement processes. HAAP intends to have similar budget in 2026.

133.    HAAP works within Indiana communities to register voters and to encourage individuals to register to vote and vote. This work includes phone banking, presenting on college campuses, tabling at community events, and hosting voter education events.

134.    In 2024, HAAP held nine phone banks and contacted over 4,000 individuals to encourage them to vote.

135.    HAAP is particularly interested in registering newly naturalized citizens to vote and encouraging them to do so.

136.    HAAP has suffered concrete, particularized damages because of Defendants' implementation of Challenged DPOC Provisions.

137.    Defendants' implementation of the Challenged DPOC Provisions has compelled HAAP to divert scarce resources away from other core activities and devote substantial time and organizational resources to counteract the harms from the Challenged DPOC Provisions on the populations the organization serves.

138.    The Challenged DPOC Provisions harm the communities HAAP serves and interfere with its mission because a significant portion of Indiana's Asian American population is naturalized citizens, who are disproportionately impacted by the Challenged DPOC Laws.

139.    The Challenged DPOC Provisions directly interfere with HAAP's voter registration and engagement work, prompting HAAP to steer focus on educating the community it serves on the Challenged DPOC Provisions' harmful effects and assisting flagged registrants in obtaining and submitting DPOC.

140.    Because of the Challenged DPOC Provisions, HAAP must take extra steps when providing voter registration assistance to ensure naturalized citizens are registered to vote and understand the process to provide DPOC if a voter is contacted by their county voter registration official. This has produced immense strain on HAAP's core areas of focus.

141.    To prepare for the enactment of the Challenged DPOC Provisions, HAAP has been forced to mitigate the impact against its community of naturalized citizens. Rather than spearheading voter registration campaigns, HAAP has diverted time and money to combat the imminent consequences to be faced by its community members. HAAP has had to search for additional funding to prepare for the additional assistance naturalized citizens will soon require, compile resources from various community partners, identify organizations to support HAAP's capacity during election season work, and map out rapid response plans in the event a naturalized citizen community member is removed from the voter rolls.

142.    Notably, HAAP anticipates having to spend approximately half of its 2026 voter engagement budget responding to the Challenged DPOC Provisions, further demonstrating the serious impact on HAAP's resources in implementing its mission as a result of the Challenged DPOC Provisions.

143.    To carry out its longstanding mission, HAAP has been forced to delay, suspend, and forgo other programs, activities, and priorities to divert resources in response to the Challenged DPOC Provisions.

144.    Through increased education efforts regarding the Challenged DPOC Provisions, HAAP had to devote a greater share of its time and energy to voter protection work in 2024 than it had in previous election cycles, due to concerns from community members.

145.    HAAP also engaged in additional community outreach, education, and training activities to address and counteract the Challenged DPOC Provisions' harms.

146.    Information about the Challenged DPOC Provisions' implementation is necessary for HAAP to assist naturalized citizens with registering to vote and to advise them about maintaining their registration. In particular, upon information and belief, the 92 counties are implementing the Challenged DPOC Provisions in different ways, and so information concerning implementation of the law is required to allow HAAP to help community members address concerns about their voter registration status, regardless of where they reside in the state. Such information would also allow HAAP to provide its members and the general public with information about individuals' voter registration statuses, the Challenged DPOC Provisions, and how impacted voters may preserve their right to vote. Indeed, HAAP has already provided information to its members concerning the Challenged DPOC Provisions through several newsletters and social media posts.

### *Exodus Refugee Immigration*

147.    Plaintiff Exodus Refugee Immigration ("Exodus") is a nonpartisan, nonprofit organization founded in 1981. Since its inception, Exodus has welcomed and assisted refugees and humanitarian immigrants to resettle in the United States and establish lives in Indiana. The clients

and communities that Exodus serves include individuals who are pursuing U.S. citizenship and who have become U.S. citizens. Exodus has offices in Indianapolis and Bloomington, Indiana.

148.    Exodus assists individuals with basic immigration services like naturalization, seeking asylum, and obtaining legal permanent residency, among other services.

149.    In 2024, the organization served over 3,000 refugees and other humanitarian immigrants.

150.    Exodus is interested in eliminating barriers to voting and supporting the right to vote. Through its services, Exodus has assisted clients in becoming naturalized citizens and has encouraged civic participation.

151.    Exodus has suffered concrete, particularized damages because of Defendants' implementation of the Challenged DPOC Provisions. Apart from the myriad other issues Exodus must address with its clients regarding immigration, as a result of the enactment of the Challenged DPOC Provisions, Exodus's legal team has diverted time and energy into training staff members on the Challenged DPOC Provisions to prepare staff members to answer questions regarding voting as a naturalized citizen. Exodus will need to divert additional resources to training staff to help naturalized citizen voters.

152.    Exodus has expended time and resources to proactively educate clients on the process and requirements under the Challenged DPOC Provisions. Exodus will need to divert additional resources to outreach and education for naturalized citizens within its organization.

153.    Defendants' implementation of the Challenged DPOC Provisions will impact Exodus's naturalized clients and community members and compel Exodus to divert scarce resources away from other core activities and devote substantial time and organizational resources to counteract the harms from the Challenged DPOC Provisions.

154.    Information about the Challenged DPOC Provisions' implementation is necessary for Exodus to assist naturalized citizens with registering to vote, to advise them about maintaining their registration, and to assist them in maintaining their registration. In particular, upon information and belief, the 92 counties are implementing the Challenged DPOC Provisions in different ways, and so information concerning implementation of the law is required to allow Exodus to help community members address concerns about their voter registration status, regardless of where they reside in the state. The information also allows Exodus to provide its clients and community members and the general public information about individuals' voter registration statuses, the Challenged DPOC Provisions, and how impacted voters may preserve their right to vote.

**Defendants Received Notice that the Challenged DPOC Provisions and the Refusal to Provide Relevant Records Violate the NVRA**

*NVRA Notice Letters Concerning the Current-Voter Citizenship Crosscheck Requirement and Records Request*

155.    On April 2, 2025, Plaintiffs LWVIN, CCIN, and HAAP sent Defendants a pre-suit NVRA notice letter (hereinafter "April 2 Letter"), attached as Exhibit A, pursuant to 52 U.S.C. § 20501(b). The letter warned Defendants that enforcement of the Current-Voter Citizenship Crosscheck Requirement violates Sections 5, 6, 7, 8, and 9 of the NVRA, and explained the specific reasons for the violations.

156.    Additionally, the April 2 Letter requested records pursuant to the NVRA Public Records Provision, including individualized voter information for all registered voters on the BMV list of temporary credentials, communications within Defendants' offices and with county officials regarding the implementation of I.C. § 3-7-38.2-7.3, and documents reflecting instructions about the same, and records regarding any steps taken by Defendants to determine whether registered voters listed in the temporary credentials list are naturalized or derived citizens.

157.   Information about the Current-Voter Citizenship Crosscheck Requirement's implementation is necessary for Plaintiffs to assist naturalized or derived citizens with registering to vote and to advise them about maintaining their registration, and this information allows Plaintiffs to provide their members and the general public information about individuals' voter registration statuses, the new election law, and how impacted voters may preserve their right to vote.

158.   Defendants King and Nussmeyer responded on April 4, 2025, attached as Exhibit B. Defendants King and Nussmeyer asked that Plaintiffs LWVIN, CCIN, and HAAP narrow their requests for communications with county officials and communications among state officials, but otherwise stated that they did not possess information in response to other requests. Exhibit B at 2.

159.   These plaintiffs wrote Defendants on May 20, 2025, attached as Exhibit C, narrowing and clarifying each request, including by identifying senders, recipients, time frame, and particularized subject matter for requested communications.

160.   Defendants King and Nussmeyer responded on May 22, 2025, attached as Exhibit D. They refused to produce a single record, asserting that the information was either confidential, or that the communications did not exist because the Current-Voter Citizenship Crosscheck Requirement had yet to be implemented. Exhibit D at 2. These blanket objections were available to defendants before they insisted on further specification, strongly suggesting that the demand for specificity was intended to cause delay and not in good faith.

161.   On June 19, 2025, Plaintiffs LWVIN, CCIN, and HAAP's response to Defendants King and Nussmeyer, attached as Exhibit E, explained that their refusal to produce records of those registered voters identified as holding a temporary BMV credential violates the NVRA Records

Provision. Exhibit E at 1–2. On July 1, 2025, Plaintiffs LWVIN, CCIN, and HAAP wrote to Defendants (hereinafter "July 1 Letter"), attached as Exhibit F, to provide formal notice pursuant to 52 U.S.C. § 20510(b) that their failure to provide records relevant to the Current-Voter Citizenship Crosscheck Requirement violated the NVRA Public Records Provision. Exhibit F at 5–6.

162.     Defendants King and Nussmeyer's response on June 24, 2025, attached as Exhibit G, yet again refused to produce records of registered voters identified as having temporary credentials. Exhibit G at 1–2. Although Defendants King and Nussmeyer provided links to the IED's 2025 legislative summary of election-related laws and presentations given to Indiana circuit court clerks, Exhibit G at 2, they provided no further records.

*NVRA Notice Letters Concerning the New-Registrant Citizenship Crosscheck Requirement and Records Request*

163.    The July 1 Letter from LWVIN, CCIN, and HAAP warned Defendants pursuant to 52 U.S.C. § 20501(b) that enforcement of New-Registrant Citizenship Crosscheck Requirement violates Sections 5, 6, 7, 8, and 9 of the NVRA, and explained the specific reasons for this. Exhibit F at 4-5.

164.    The July 1 Letter requested records pursuant to the NVRA Public Records Provision, seeking communications involving Defendants, county officials, and the BMV regarding the implementation of the New-Registrant Citizenship Crosscheck Requirement, records regarding actions by Defendants' and other state, county, and local officials to assess whether the registration applicants to be flagged by the New-Registrant Citizenship Crosscheck Requirement are naturalized citizens, and records documenting the preparation for determining BMV credentials within Defendants' offices. Exhibit F at 7–9.

165.    Information about the New-Registrant Citizenship Crosscheck Requirement's implementation is necessary for Plaintiffs to assist naturalized or derived citizens with registering to vote and to advise them about maintaining their registration, and this information allows Plaintiffs to provide their members and the general public information about individuals' voter registration statuses, the new election law, and how impacted voters may preserve their right to vote.

166.    The July 1 letter further provided notice that the failure to provide records relevant to the New-Registrant Citizenship Crosscheck Requirement violated the NVRA Public Records Provision, noting Defendants' refusal to provide records relevant to the Current-Registrant Citizenship Crosscheck Requirement. Exhibit F at 9.

167.    On July 8, 2025, Defendants King and Nussmeyer responded to the July 1 Letter, attached as Exhibit H. Although Defendants King and Nussmeyer agreed to review and provide documentation of a limited number of the records, they explicitly refused to conduct a search for all requested records.

***Defendant Morales Fails to Produce Requested Records and Defendants King and Nussmeyer Make Incomplete Productions of Requested Records***

168.    To date, Defendant Morales has neither responded to the notice letters nor produced any records.

169.    Defendants King and Nussmeyer have made only incomplete productions of requested records.

170.    On June 24, 2025, Defendants King and Nussmeyer produced presentations given to Indiana circuit court clerks.

171.    On August 12, 2025, Defendants King and Nussmeyer produced 14 documents, including a summary of all election-related legislation enacted by the Indiana State Legislature in 2025, a Summer 2025 Circuit Court Clerk Association conference PowerPoint presentation from Defendant King and Valerie Warycha, copies of the Data Sharing Agreement between the BMV, SOS, and IED, an "Election Division Dispatch" newsletter from the IED providing updates in election law, a list of all publicly available election-related state forms, and a presentation delivered by Defendant Nussmeyer at the 2025 State Board of Accounts Summer Clerks Conference summarizing the changes.

172.    Though Plaintiffs LWVIN, CCIN, and HAAP have requested such, Defendants King and Nussmeyer have not produced *all* communications between the IED, SOS, county election officials, and/or the BMV.

173.    Defendants King and Nussmeyer also have not produced individualized voter information for all registered voters on the BMV list of temporary credentials, requested in the April 2 Letter, and wrote that such records did not exist even though, upon information and belief, prior to August 1, 2025, Defendant Morales had already identified at least 1,600 registrants who have a temporary credential. Marilyn Odendahl, *Registration Requirement: SOS Office Identifies About 1,600 Hoosier Voters Who Need to Verify U.S. Citizenship Status*, Indiana Citizen (August 1, 2025), https://indianacitizen.org/registration-requirement-sos-office-identifies-about-1600-hoosier-voters-who-need-to-verify-u-s-citizenship-status/.

174.    On August 15, 2025, Plaintiffs LWVIN, CCIN, and HAAP wrote to Defendants, attached as Exhibit I, reiterating that Defendants' failure to provide records requested in the April 2 and July 1 Letters violated the NVRA Public Records Provision. These plaintiffs noted, in particular, that Defendant Morales had failed to produce records relating to the recent Memorandum of Agreement ("MOA") between the SOS and the Department of Homeland Security, U.S. Citizenship and Immigration Services ("DHS-USCIS") regarding access to Systemic Alien Verification for Entitlements ("SAVE") data, even though these plaintiffs' requests encompassed such documents.

175.    On August 22, 2025, and again on September 9, 2025, Defendants King and Nussmeyer produced additional documents, including emails circulating public news articles and press releases, a small number of communications between the IED office and county clerks regarding the Challenged DPOC Provisions, the election forms master list, and a memorandum of understanding describing the duties of the BMV, SOS, and IED.

176.    Defendants King and Nussmeyer also produced a limited number of communications between the IED, SOS, county election officials, and/or the BMV but, upon

information and belief, Defendants did not produce all available records. In addition, Defendants did not produce any documents and communications relating to the MOA or individualized voter information for all registered voters on the BMV list of temporary credentials.

177.    Defendants have failed to provide relevant records concerning the Current-Voter Citizenship Crosscheck Requirement and the New-Registrant Citizenship Crosscheck Requirement, in violation of the NVRA Public Records Provision.

### The NVRA's Public Records Provision Requires Indiana to Provide Public Records Upon Request

178.    The NVRA was enacted to "increase the number of eligible citizens who register to vote," "enhance[] the participation of eligible citizens as voters," "protect the integrity of the electoral process," and "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b).

179.    In passing the NVRA, Congress found that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. § 20501(a)(3).

180.    To further its stated goals, the NVRA requires states to comply with baseline standards for the administration of voter registration to "ensure that any eligible applicant is registered to vote." 52 U.S.C. § 20507(a)(1).

181.    The NVRA imposes transparency requirements on states and grants the public the right to request voter list maintenance information under the Public Records Provision. 52 U.S.C. § 20507(i)(1). This Public Records Provision requires Indiana to "maintain for at least 2 years and . . . make available for public inspection and, where available, photocopying at a reasonable cost,

all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters[.]" 52 U.S.C. § 20507(i)(1).

182.    Under the Public Records Provision, Congress expansively mandates states to make available all records related to voter registration list maintenance. 52 U.S.C. § 20507(i)(1).

183.    The statute specifies examples of records required to be provided, including precisely what Plaintiffs seek here: "lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each person has responded to the notice as of the date that inspection of the records is made." 52 U.S.C. § 20507(i)(2). The statute further makes clear that parties are entitled to records beyond those specifically listed examples.

184.    In interpreting the NVRA Public Records Provision, courts have recognized that "all persons" means *"all* persons." As the Fifth Circuit ruled, "the use of the word 'all' [as a modifier] suggests an expansive meaning because 'all' is a term of great breadth." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 336 (4th Cir. 2012) (internal quotation marks omitted). This means, as courts have consistently held, that individual registration records in state registration databases must be produced under the NVRA's Public Records Provision. *See, e.g.*, *Project Vote/Voting for Am., Inc.*, 682 F.3d at 336 (Virginia); *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 47–48 (1st Cir. 2024) (Maine); *Greater Birmingham Ministries v. Secretary of State*, 105 F.4th 1324, 1330–31 (11th Cir. 2024) (Alabama); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 941–42 (C.D. Ill. 2022) (Illinois); *Voter Reference Found., LLC v. Torrez*, 727 F. Supp. 3d 1014, 1218–19 (D.N.M. 2024) (New Mexico); *Pub. Int. Legal Found. v. Chapman*, 595 F. Supp. 3d 296, 306 (M.D. Pa. 2022) (Pennsylvania), overruled on other grounds by *Pub. Int. Legal Found. v. Pennsylvania*, 136 F.4th 456 (3d Cir. 2025).

185.    Only two statutory exceptions exist under the NVRA's transparency requirement. Officials need not disclose records that are "related to a declination to register to vote or the identity of the voter registration agency through which any particular voter registered." 52 U.S.C. § 20507(i)(1).

186.    Any information exempt from public disclosure under the NVRA may be redacted from records that are otherwise not exempt to public disclosure requirements. *See Pub. Int. Legal Found., Inc. v. N. Carolina State Bd. of Elections*, 996 F.3d 257, 267 (4th Cir. 2021) ("[A] district court can order redaction of 'uniquely sensitive information' in otherwise disclosable documents" in congruence with the disclosure provision of the NVRA); *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) ("In addition, nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information" when disclosing information).

187.    State law exemptions from disclosure of records do not protect records from disclosure under the NVRA. *See League of Women Voters of Ind., Inc. v. Sullivan*, 5 F.4th 714, 723 (7th Cir. 2021) (recognizing that where a conflict exists between the NVRA and state law, the NVRA governs).

188.    The Public Records Provision enables the public to monitor compliance with the NVRA's requirements and thereby furthers the purpose of the federal legislation purpose to provide effective, accurate, and non-discriminatory voter registration practices.

189.    The NVRA provides that anyone "who is aggrieved by a [NVRA] violation" may pursue a private right of action to enforce compliance with the NVRA. 52 U.S.C. § 20510(b).

190.    By failing to adequately respond and produce documents despite Plaintiffs LWVIN, CCIN, and HAAP's reasonable requests and without any applicable exemption from

disclosure, Defendants have violated the NVRA Public Records Provision. 52 U.S.C. § 20507(i)(1).

*    *    *

191.    Because of Defendants' violations of the NVRA and CRA, Plaintiffs turn to this Court for relief.

## CLAIMS

## COUNT ONE

**Violation of Section 6 of the NVRA**
**(Federal Form Compliance Provisions)**

192.    Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

193.    Pursuant to Section 6 of the NVRA, 52 U.S.C. § 20508(a)(2), the United States Election Assistance Commission has created a "mail voter registration application form for elections for Federal office," known as the Federal Form.

194.    The NVRA requires states, including Indiana, to "accept and use" the Federal Form for the registration of voters for federal elections. 52 U.S.C. § 20505(a)(1). The Federal Form requires applicants to swear/affirm under penalty of perjury that they are a United States citizen. The Federal Form does not require applicants, whether individuals born as U.S. citizens or who become U.S. citizens, to submit any documentation of their citizenship.

195.    The Supreme Court has held that "a state-imposed requirement of evidence of citizenship not required by the Federal Form is 'inconsistent with' the NVRA's mandate that States 'accept and use' the Federal Form" because "the NVRA forbids States to demand that an applicant submit additional information beyond that required by the Federal Form" for registration for federal elections. *Arizona v. Inter Tribal Council of Arizona (ITCA), Inc.*, 570 U.S. 15 (2013).

196.    The Current-Voter Citizenship Crosscheck Requirement and the New-Registrant Citizenship Crosscheck Requirement violate Section 6 of the NVRA.

197.    The New-Registrant Citizenship Crosscheck Requirement requires DPOC from any registrant who uses a BMV temporary credential in their application. Because the Federal Form does not require DPOC, the New-Registrant Citizenship Crosscheck Requirement imposes additional requirements in direct violation of Section 6.

198.    Similarly, the Current-Voter Citizenship Crosscheck Requirement imposes an additional requirement on Indiana registrants who registered through the Federal Form. Specifically, the provision requires NVRA officials in Indiana to verify voter citizenship by comparing the statewide voter registration file with the BMV list of temporary credentials issued to noncitizens and then requires voters identified as potential noncitizens to provide "proof of citizenship." In requiring such documentary proof of citizenship, the Current-Voter Citizenship Crosscheck Requirement goes beyond compliance with the Federal Form.

199.    Therefore, the Current-Voter Citizenship Crosscheck Requirement and the New-Registrant Citizenship Crosscheck Requirement violates Section 6 of the NVRA.

200.    All Plaintiffs are and will continue to be irreparably harmed by these violations of the NVRA.

## COUNT TWO

### Violation of Sections 5, 6, 7, and 9 of the NVRA
### (State Form Compliance Provisions)

201.    Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

202.    Section 6 of the NVRA allows states, including Indiana, to create their own state form for registering to vote by mail for federal elections, provided that the form complies with Section 9 of the NVRA. 52 U.S.C. § 20505(a)(2).

203.    Section 9 provides that a state by-mail registration form for federal elections "may require *only* such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), *as is necessary* to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. § 20508(b)(1) (emphasis added).

204.    Indiana has created a state voter registration application form that Hoosiers may submit by mail.

205.    Section 4 of the NVRA, 52 U.S.C. § 20503(a)(1), requires states, including Indiana, to enable eligible citizens to register to vote for federal elections "simultaneously with an application for a motor vehicle driver's license" ("motor-voter registration") pursuant to the procedures set forth in Section 5 of the NVRA, 52 U.S.C. § 20503.

206.    Under Section 5(c)(2)(B), these simultaneous applications for voter registration "may require only the minimum amount of information *necessary* to . . . enable state election officials to assess the eligibility of the applicant and to administer the voter registration." 52 U.S.C. § 20504(c)(2)(B)(ii) (emphasis added).

207.    Indiana provides for eligible citizens to register to vote as part of an application for a driver's license or identification card using a state registration form. *See* I.C. § 3-7-14-4.

208.    Section 4 of the NVRA, 52 U.S.C. § 20503(a)(3)(B), requires states, including Indiana, to enable eligible citizens to register to vote for federal elections at designated federal, state, and nongovernmental offices, as specified in Section 7 of the NVRA, 52 U.S.C. § 20506.

209.    Section 7 requires states, including Indiana, to include public assistance offices, disability services offices, and other offices as locations where eligible citizens may register to vote for federal elections. 52 U.S.C. § 20506(a).

210.    Section 7 further requires that, as to those designated offices that "provide[] service or assistance in addition to conducting voter registration," such as public assistance offices and disability services offices, the voter registration form that is distributed is *either the Federal Form or a state registration form that is "equivalent" to the Federal Form*. 52 U.S.C. § 20506(a)(6)(A) (emphasis added).

211.    Indiana law requires that the state provide for Hoosiers to register to vote using a state form at offices that provide service or assistance in addition to conducting voter registration, including public assistance offices and disability services offices. *See* I.C. § 3-7-15 *et seq.*; I.C. § 3-7-16 *et seq.*

212.    The Indiana State Form—both before and after the enactment of the Current-Voter Citizenship Crosscheck Requirement and the New-Registrant Citizenship Crosscheck Requirement—requires voter registration applicants to affirm under penalty of perjury that they are a U.S. citizen.

213.    This affirmation provides the "necessary" information for Indiana election officials to "assess the eligibility of the applicant" as to their citizenship status, in accord with the by-mail registration and motor-voter registration provisions of Sections 5, 6, and 9 of the NVRA.

214.    This affirmation similarly renders the State Form "equivalent" to the Federal Form with regard to verifying the applicant's citizenship status, in according with the registration agency provisions of Section 7 of the NVRA.

215.    By requiring that flagged registrants provide DPOC, even though many registrants with temporary credentials are U.S. citizens, the Current-Voter Citizenship Crosscheck Requirement requires that registrants provide information that is not "necessary" to establish their citizenship status, and that is not "equivalent" to the information required by the Federal Form, and therefore violates Sections 5, 6, 7, and 9 of the NVRA.

216.    By requiring that flagged registration applicants provide DPOC, the New-Registrant Citizenship Crosscheck Requirement requires that applicants provide information that is not "necessary" to establish their citizenship status, and that is not "equivalent" to the information required by the Federal Form, and therefore violates Sections 5, 6, 7, and 9 of the NVRA.

217.    All Plaintiffs are and will continue to be irreparably harmed by these violations of the NVRA.

## COUNT THREE

**Violation of Section 8(b) of the NVRA**
**(Uniform and Nondiscriminatory Provision)**

218.    Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

219.    In enacting the NVRA, Congress found that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. § 20501(a).

220.    To avoid such discrimination and protect eligible voters from wrongful removal, Section 8 of the NVRA requires that "[a]ny State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections to Federal office . . . be uniform [and] nondiscriminatory." 52 U.S.C. § 20507(b)(1).

221.    A state law violates Section 8(b) of the NVRA when it treats similarly situated voters differently, whether in their initial addition to the voter registration rolls or their removal from the rolls. *See, e.g.*, *Mi Familia Vota v. Fontes*, 129 F.4th 691, 714–15 (9th Cir. 2025) (holding that a registration provision that would subject only naturalized citizens to scrutiny was discriminatory and nonuniform in violation of NVRA Section 8(b)); *Ind. State Conf. of Nat'l Ass'n for Advancement of Colored People v. Lawson*, 326 F. Supp. 3d 646, 657–58 (S.D. Ind. 2018), *aff'd sub nom. Common Cause Ind. v. Lawson*, 937 F.3d 944 (7th Cir. 2019) (holding the Interstate Voter Registration Crosscheck program was not uniformly applied and violated NVRA Section 8(b)'s requirements because different counties received different instructions from the Indiana Election Division Co-Directors). *See also Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 703 (N.D. Ohio 2006) (discriminatory requirements applied to certain private individuals who assist Ohio residents to register to vote).

222.    The NVRA's legislative history reflects that Congress enacted the NVRA to prevent discriminatory voter purge mechanisms and subsequently warned of the "disparate impact" that voter purges would have on minority communities. *See Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, 120 F.4th 390, 407 (4th Cir. 2024).

223.    The Current-Voter Citizenship Crosscheck Requirement violates Section 8(b) of the NVRA by requiring DPOC only from registered voters who are naturalized or derived citizens

flagged as having a temporary BMV credential, a requirement that no registered voters who are born as U.S. citizens will be subject to.

224.    The New-Registrant Citizenship Crosscheck Requirement violates Section 8(b) of the NVRA by requiring DPOC only from voter registration applicants who are naturalized or derived citizens and apply using a temporary BMV credential, a requirement that no voter registration applicants who are born as U.S. citizens will be subject to.

225.    All Plaintiffs are and will continue to be irreparably harmed by these violations of the NVRA.

## COUNT FOUR

### Violation of the Civil Rights Act of 1964
### (Different Practices Provision)

226.    Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

227.    Congress enacted the Civil Rights Act of 1964 ("CRA"), 52 U.S.C. § 10101(a)(2)(A), to combat discriminatory and arbitrary registration practices ("Different Practices Provision"). The CRA prevents the differential application of standards, practices, or procedures to voter registration and list maintenance processes.

228.    Title I of the CRA, 52 U.S.C. § 10101(a)(2)(A), provides that: "No person acting under color of law shall—(A) in determining whether any individual is qualified under State law or laws to vote in any election, apply any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote[.]"

229.    The Current-Voter Citizenship Crosscheck Requirement violates the Different Practices Provision of the CRA by requiring DPOC only from registered voters flagged as having a temporary BMV credential, a requirement that no registered voters who are born as U.S. citizens will be subject to.

230.    The New-Registrant Citizenship Crosscheck Requirement violates the Different Practices Provision of the CRA by requiring DPOC only from voter registration applicants who apply using a temporary BMV credential, a requirement that no voter registration applicants who are born as U.S. citizens will be subject to.

231.    The Challenged DPOC Provisions only affect naturalized and derived citizens because they are the only registered Indiana voters who could have had a temporary credential before naturalization, while individuals born as U.S. citizens will never be issued temporary credentials. Because only naturalized and derived citizens will be impacted by this list maintenance process, they are subject to different standards, practices, and procedures for voter registration in violation of the CRA.

232.    52 U.S.C. § 10101(a)(2)(A) prohibits Indiana from "apply[ing] any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county . . . who have been found by State officials to be qualified to vote[.]" *Id.* This is exactly what the Challenged DPOC Provisions require Indiana state officials to do—apply different standards, practices, and procedures to naturalized citizens, violating 52 U.S.C. § 10101(a)(2)(A).

233.    All Plaintiffs are and will continue to be irreparably harmed by this civil rights violation.

## COUNT FIVE

### Violation of the National Voter Registration Act
### (Public Record Provision)

234.    Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations contained in this Complaint.

235.    The records sought by Plaintiffs are within the possession, custody, and control of Defendants. This includes: a list of individualized voter information relating to all (1) registered voters who received a 30-day notice under the Current-Voter Citizenship Crosscheck Requirement and either produced or failed to produce DPOC within the specified 30-day period; (2) registered voters who received a 30-day notice under the Current-Voter Citizenship Crosscheck Requirement who filed an appeal; (3) registered voters who have a pending 30-day notice under the Current-Voter Citizenship Crosscheck Requirement; (4) registered voters who have been flagged pursuant to the Current-Voter Citizenship Crosscheck Requirement but have not yet been sent a 30-day notice; and (5) individuals who attempted to register to vote, received a 30-day notice under the New-Registrant Citizenship Crosscheck Requirement and either provided DPOC or failed to provide DPOC and therefore had their registration application rejected. Plaintiffs also seek communications between Defendants, county officials, and the BMV regarding the implementation of the Challenged DPOC Provisions. In addition, Plaintiffs seek records relating to the MOA regarding access to SAVE data.

236.    The NVRA's Public Records Provision requires that "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," such as those requested, be made available to the public for inspection and, where available, copying. 52 U.S.C. § 20507(i)(1).

237.    Plaintiffs CCIN, LWVIN, and HAAP made the initial request for records relevant to the Current-Voter Citizenship Crosscheck Requirement on April 2, 2025, narrowing and clarifying the request in response to the State on May 20, 2025, and further narrowing and clarifying the request on June 19, 2025. They have repeatedly made clear that the NVRA requires production of the requested materials. On July 1, 2025, these plaintiffs requested records relevant to the New-Registrant Citizenship Crosscheck Requirement.

238.    Plaintiffs LWVIN, CCIN, and HAAP have given formal notice to Defendants that their failure to produce all requested records violates the NVRA.

239.    Defendants' production of documents to date is, upon information and belief, incomplete.

240.    Defendants have violated, and continue to violate, the NVRA by refusing to produce requested public records required to be produced under the NVRA.

241.    All Plaintiffs are and will continue to be irreparably harmed by this violation of the NVRA.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and award the following relief:

242.    Declare that the Challenged DPOC Provisions violate the National Voter Registration Act of 1993;

243.    Declare that the Challenged DPOC Provisions violate the Civil Rights Act of 1964;

244.    Preliminarily and permanently enjoin all Defendants from enforcing the Challenged DPOC Provisions;

245.    Require Defendants to issue and transmit official guidance instructing the registrar of voters in each county that the Challenged DPOC Provisions are enjoined and may not be implemented or enforced;

246.    Order Defendants to promptly produce all requested records. This shall include, but not be limited to, the following:

> (i) Individualized voter information for all registered voters who registered, received a 30-day notice, and provided DPOC;
>
> (ii) Individualized voter information for all registered voters who registered, received a 30-day notice, failed to provide DPOC, and who have now been removed from the rolls;
>
> (iii) Individualized voter information for all registered voters who registered, received a 30-day notice, failed to provide DPOC, and appealed their removal, including the status of these appeals;
>
> (iv) Individualized voter information for all registered voters who registered, received a 30-day notice that has yet to expire, and have yet to provide DPOC;
>
> (v) Individualized voter information for all registered voters who registered, have been flagged to receive a 30-day notice, but that notice has not yet been sent;
>
> (vi) Individualized voter information for all individuals who attempted to register to vote, received a 30-day notice under the New-Registrant Citizenship Crosscheck Requirement and provided DPOC;
>
> (vii) Individualized voter information for all individuals who attempted to register to vote, received a 30-day notice under the New-Registrant Citizenship Crosscheck Requirement and did not provide DPOC and therefore had their registration application rejected;
>
> (viii) Communications between Defendants, county officials, and the BMV regarding the implementation of the Challenged DPOC Provisions; and
>
> (ix) Records relating to the MOA;

247.    Order Defendants to continue to produce responsive records as the Challenged DPOC Provisions are implemented;

248.    Award Plaintiffs their costs, expenses, and reasonable attorneys' fees in this action;

249.    Retain jurisdiction over this matter until all Defendants have complied with all orders and mandates of this Court; and

250.    Grant Plaintiffs such other relief as this Court may deem just and proper.


Dated: October 21, 2025                          Respectfully submitted,

/s/ *William R. Groth*
William R. Groth (Ind. Bar No. 7325-49)
Daniel Bowman (Ind. Bar No. 31691-49)
Bowman Legal Services, LLC
9292 N Meridian Street, Suite 311
Indianapolis, IN 46260
(317) 912-3220
daniel@bowmanlegalservices.com
wgroth@fdgtlaborlaw.com

/s/ *Aneel Chablani*
Aneel Chablani*
Ami Gandhi (Ind. Bar No. 38542-53)
Conner Kozisek*
Chicago Lawyers' Committee for Civil Rights
25 East Washington Street, Suite 1300
Chicago, IL 60602
(312) 630-9744
achablani@clccrul.org
agandhi@clccrul.org
ckozisek@clccrul.org

/s/ *Robert Weiner*
Robert Weiner*
Ryan Snow*
Grace Thomas*
Samantha Heyward*
Lawyers' Committee for Civil Rights Under Law
1500 K Street NW, Suite 900

Washington, DC 20005
(202) 662-8600
rweiner@lawyerscommittee.org
rsnow@lawyerscommittee.org
gthomas@lawyerscommittee.org
sheyward@lawyerscommittee.org

*Counsel for Plaintiffs*

*\*Pro hac vice motion forthcoming*

## CERTIFICATE OF SERVICE

Pursuant to Local Civil Rule 5-2(d), I certify that upon issuance of the attached summons by the Clerk of this Court, counsel for plaintiffs will serve a true and correct copy of this complaint, the civil cover sheet, and the appropriate summons on all defendants via certified mail at the following addresses:

Diego Morales
Indiana Secretary of State
200 West Washington Street, Room 201
Indianapolis, IN 46204

J. Bradley King and Angela M. Nussmeyer
Co-Directors of the Indiana Election Division
302 West Washington Street, Room E-204
Indianapolis, IN 46204

*/s/ Daniel Bowman*