**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF INDIANA; COMMON CAUSE INDIANA; HOOSIER ASIAN AMERICAN POWER; and EXODUS REFUGEE IMMIGRATION,<br><br>*Plaintiffs,*<br><br>v.<br><br>DIEGO MORALES, in his official capacity as Secretary of State for Indiana; J. BRADLEY KING, in his official capacity as Co-Director of the Indiana Election Division; and ANGELA M. NUSSMEYER, in her official capacity as Co-Director of the Indiana Election Division,<br><br>*Defendants.* | Civil Action No. 1:25-cv-02150-MPB-MJD |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**

Unless this Court issues preliminary injunctive relief, thousands of eligible Indiana voters face disenfranchisement in the November 3, 2026, general election because of discriminatory voter registration requirements imposed in violation of federal law. Last year, Indiana changed its voter registration process to single out Hoosiers who have become U.S. citizens. Many naturalized and derived citizens now must produce documentary proof of citizenship ("DPOC") to register or to remain registered to vote—a requirement no U.S.-born citizen will ever be forced to comply with. This process has already demonstrably misidentified hundreds of confirmed eligible U.S. citizens as potential noncitizens, with hundreds more likely to have been misidentified, putting their access to the ballot box in jeopardy.

1

Plaintiffs League of Women Voters of Indiana ("LWVIN"), Common Cause Indiana ("CCIN"), Hoosier Asian American Power ("HAAP"), and Exodus Refugee Immigration ("Exodus") (collectively, "Plaintiffs") seek to enjoin implementation of Indiana Code ("I.C.") § 3-7-38.2-7.3 ("Current-Voter Citizenship Crosscheck Requirement") and I.C. § 3-7-26.3-37 ("New-Registrant Citizenship Crosscheck Requirement") (collectively, the "Challenged DPOC Provisions"). These provisions rely on outdated information in an Indiana Bureau of Motor Vehicles ("BMV") database that does not accurately reflect the current citizenship status of BMV driver's license and identification card holders. Further, they require the systematic flagging of valid voter registrations and new registration applications of naturalized and derived citizens as presumptively unlawful. And they require these citizens alone to take additional steps to submit DPOC to their local registrar in order to be a registered voter. Since the Challenged DPOC Provisions went into effect on July 1, 2025, Indiana has flagged more than 3,200 individuals as potential noncitizens and has canceled and rejected more than 1,200 voter registrations simply because the registrant did not provide DPOC by the 30-day deadline—despite having already attested to their citizenship under penalty of perjury just like every other Indiana registrant.

The Challenged DPOC Provisions violate both the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. §§ 20501-20511, and the Civil Rights Act of 1964 ("CRA"), 52 U.S.C. § 10101, by discriminating against naturalized and derived citizens and contravening the NVRA's requirements for federal and state voter registration forms. Absent an injunction, these violations will continue to unlawfully prevent U.S. citizens from registering to vote and voting. Plaintiffs are likely to succeed on the merits of their claims and satisfy the remaining equitable factors to obtain preliminary relief. Therefore, this Court should enjoin the Defendants from implementing the Challenged DPOC Provisions.

## BACKGROUND[1]

### I.    THE CHALLENGED DPOC PROVISIONS SUBJECT NATURALIZED AND DERIVED U.S. CITIZENS TO DISCRIMINATORY REQUIREMENTS.

The Challenged DPOC Provisions impact only naturalized and derived U.S. citizens. Naturalized citizens are individuals who were not born U.S. citizens but became citizens through a formal process, which includes residing in the United States for some time, applying for naturalization, paying fees, completing an interview, passing a test, and taking an oath of allegiance.[2] 8 U.S.C. § 1427. Indiana has a diverse, growing community of naturalized citizens. In 2023, the most recent year for which Census data are available, an estimated 161,600 naturalized U.S. citizens lived in Indiana, and 77,600 immigrants were eligible for naturalization.[3] Additional naturalized citizens join Indiana's population every year. In the 2025 fiscal year, DHS approved an estimated 6,518 naturalization applications from Indiana, with an estimated 5,307 applications left pending in the last quarterly reporting.[4] Thousands more will become naturalized citizens in 2026, with naturalization ceremonies scheduled in Indiana from weeks to mere days before the Indiana voter registration deadline.[5] As of 2022, naturalized citizens comprised 42% of Indiana's population of people born outside the United States.[6]

Derived citizens are individuals who were not born in the United States but became citizens automatically when, as minors, their parents naturalized as U.S. citizens, or they were adopted by

---

[1] Exhibit numbers are as referenced in the accompanying Declaration of Attorney William R. Groth.

[2] *10 Steps to Naturalization*, U.S. Citizenship & Immigr. Servs. (Sep. 10, 2025), https://perma.cc/2W4T-DF6D.

[3] *Immigrants in Indiana*, Am. Immigr. Council, https://perma.cc/QZ99-CYDS (last visited Apr. 30, 2026) (the American Immigration Council analysis uses data from the 1-year sample of the 2023 American Community Survey).

[4] Dep't of Homeland Sec., *Form N-400, Application for Naturalization, by Category of Naturalization, Case Status, and USCIS Field Office Location (Fiscal Year2025, Quarter 1)* (Apr. 30, 2025), https://www.uscis.gov/sites/default/files/document/data/n400_performancedata_fy2025_q1.xlsx (reporting 1,499 applications approved between October 1, 2024 and December 31, 2024); Dep't of Homeland Sec., *Form N-400, Application for Naturalization, by Category of Naturalization, Case Status, and USCIS Field Office Location (Fiscal Year, Quarter 2)* (Jun. 30, 2025), https://www.uscis.gov/sites/default/files/document/data/n400_performancedata_fy2025_q2.xlsx (reporting 1,450

3

U.S. citizens. Children born abroad to military or federal government employee parents are also derived citizens, subject to several eligibility requirements. 8 U.S.C. § 1431. U.S. Department of Homeland Security ("DHS") records indicate that hundreds of Hoosiers who are derived citizens apply for citizenship documentation annually,[7] though "most do not" because they are not required to acquire such documentation.[8]

Only U.S. citizens can vote in state and federal elections. All Indiana voter registrants must affirm under penalty of perjury that they are U.S. citizens. 52 U.S.C. § 20508(b)(2); I.C. § 3-7-22-5(1)(A). No state, including Indiana, faces any appreciable problem with noncitizen voting.[9] To the contrary, Defendant Morales has publicly stated that "Indiana has been a model for election

---

application approved between January 1, 2025 and March 31, 2025); Dep't of Homeland Sec., *Form N-400, Application for Naturalization, by Category of Naturalization, Case Status, and USCIS Field Office Location (Fiscal Year, Quarter 3)* (Oct. 8, 2025), https://www.uscis.gov/sites/default/files/document/data/n400_performancedata_fy2025_q3.xlsx (reporting 2,053 application approved between April 1, 2025 and June 30, 2025); Dep't of Homeland Sec., *Form N-400, Application for Naturalization, by Category of Naturalization, Case Status, and USCIS Field Office Location (Fiscal Year, Quarter 4)* (Mar. 20, 2026), https://www.uscis.gov/sites/default/files/document/data/n400_performance_data_fy2025_q4_v1.xlsx (reporting 1,516 applications approved and 5,307 pending between July 1, 2025 and September 30, 2025).

[5] *See* N.D. Ind., *2026 Naturalization Ceremonies* (2025), https://perma.cc/PV6B-T7VN (listing one ceremony five days before the 2026 General Election deadline).

[6] *U.S. Census Bureau American Community Survey Five-Year Estimates: Table S0502*, U.S. Census Bureau https://perma.cc/5LNQ-F7ZR (last visited Apr. 30, 2026).

[7] DHS archival data indicate that from July 1, 2012, to June 30, 2013, DHS received hundreds of N-600 and N-600K applications quarterly and approved 605 applications during this period. Dep't of Homeland Sec., *USCIS Certificate of Citizenship Form N-600 Performance Data (Fiscal Year 2013, 3rd Qtr)* (Jan. 22, 2014), https://perma.cc/5ERM-YFEA (reporting 142 applications received and 175 applications approved between April and June 2013); Dep't of Homeland Sec., *USCIS Certificate of Citizenship Form N-600 Performance Data (Fiscal Year 2013, 2nd Qtr)* (Sep. 19, 2013), https://perma.cc/HB76-MQS6 (reporting 152 applications received and 88 applications approved between January and March 2013); Dep't of Homeland Sec., *USCIS Certificate of Citizenship Form N-600 Performance Data (Fiscal Year 2013, 1st Qtr)* (June 28, 2013), https://perma.cc/T7Q6-A5UG (reporting 175 applications received and 204 applications approved between October and December 2012); Dep't of Homeland Sec., *USCIS Certificate of Citizenship Form N-600 Performance Data (Fiscal Year 2012, 4th Qtr)* (Dec. 18, 2012), https://perma.cc/A7QL-E7LM (reporting 113 applications received and 138 applications approved between July and September 2012).

[8] Sean Leong, *U.S. Naturalizations: 2021*, at 1 n.2, U.S. Dep't of Homeland Sec'y, https://perma.cc/TB2C-YNHW (last visited May 5, 2026).

[9] As Plaintiffs alleged in their Complaint, Compl. ¶¶ 84-87, instances of noncitizen voting nationwide are incredibly rare, and there is no evidence that Indiana faces a unique problem with noncitizen voting. *See* Alex Nowrasteh, *Noncitizens Don't Illegally Vote in Detectable Numbers,* Cato Inst. (Nov. 25, 2020), https://perma.cc/9RVF-B2X2; *Noncitizen Voting: The Missing Millions* 1, Brennan Ctr. (May 5, 2017), https://perma.cc/9HLE-SELP.

laws" and that he did not anticipate "learning that many non-citizens have landed on [Indiana's] voter registration rolls."[10]

Nevertheless, Indiana has enacted two provisions that unlawfully impede registration of naturalized and derived citizens.[11] The Current-Voter Citizenship Crosscheck Requirement requires the Indiana Election Division ("IED") Co-Directors to compare Indiana's statewide database of individuals registered to vote before July 1, 2025, with the BMV database of individuals with temporary credentials (*i.e.*, temporary driver's licenses and temporary identification cards). I.C. § 3-7-38.2-7.3(b). To do this, Defendants entered into a data-sharing agreement with BMV to obtain, (i) a "Yes" or "No" indication on whether every registrant or applicant was issued a BMV temporary credential, and (ii) the date the BMV last issued the credential.[12] Pursuant to the agreement, BMV also shares whether that BMV customer was a lawful permanent resident or has a temporary lawful status.[13] This distinction is meaningful, because the evidence is inconsistent as to whether lawful permanent residents are issued temporary or regular credentials.[14] If lawful permanent residents are issued temporary credentials, or if BMV data indicating they were at some point a lawful permanent resident are used as a trigger under the Challenged DPOC Provisions, that would dramatically increase the number of naturalized and derived citizens at risk of erroneous removal.

---

[10] Marilyn Odendahl, *'Arbitrary and Capricious': SOS Morales and AG Rokita Face Public Access Complaint for Not Releasing Names of Nearly 600,000 Registered Voters*, The Indiana Citizen (Nov. 1,2024), https://perma.cc/HNK2-NGVA.

[11] All Indiana residents who are U.S. citizens and are at least 18 years old, or will turn 18 before the next general, special, or municipal election, are eligible to register to vote in local, state, and federal elections, unless they are currently incarcerated for a criminal conviction. I.C. § 3-7-13-1; 3-7-13-4. Those who are first-time voters, who have changed residence, whose registration has been canceled, or who have become eligible to vote after disenfranchisement must complete a voter registration application. I.C. § 3-7-13-8.

[12] Ex. 1, LWVI000288 at 27, Data Sharing Agreement Between State Agencies (2025).

[13] *Id.* at 23.

[14] *Id.* (indicating that a lawful permanent resident would not have a temporary credential); *contra* Ex. 7, Victoriano Decl. ¶¶ 3; 6 (declarant entered the United States as a lawful permanent resident but was flagged as having a temporary identification).

5

Once a person is flagged by BMV, the IED Co-Directors notify county voter registration officials of any registered voter in their jurisdiction flagged as possessing a temporary credential. The county officials then notify those voters that they must provide DPOC to the county within 30 days. I.C. § 3-7-38.2-7.3(b), (c).[15] The voters must provide: a birth certificate, U.S. passport, naturalization records, or another proof of citizenship established under the Immigration Reform and Control Act of 1986, 8 U.S.C. § 1101 *et seq.*. I.C. § 3-7-38.2-7.3(a). The voter's registration must be canceled if the voter does not provide DPOC within 30 days.[16] I.C. § 3-7-38.2-7.3(d).[17] Flagged voters may only return documentation by mail or in person; documentation sent via email or fax is not accepted.[18] If a person provides DPOC in the form of a naturalization number, election officials send that number to the Secretary of State to check against an external database.[19] County registrars do "not have discretion on whether to send [a notice] to a voter" if they are flagged, "even if the official has personal information that the individual is a U.S. citizen."[20]

Similarly, the New-Registrant Citizenship Crosscheck Requirement requires county voter registration officials to send similar notices to people who apply to register on or after July 1, 2025, and who use an identification number from a temporary credential. I.C. § 3-7-26.3-37. Flagged

---

[15] *See* Ex. 2, LWVI000440, IED, VRG-26 Proof of Citizenship Notice and Instructions (2025).

[16] In practice, Defendants and county officials cancel registration applications 42 days after the print date of a notice to be sent to a registrant or applicant. Election officials systematically cannot cancel a registration in the statewide registration system until this 42-day period has lapsed. Ex. 3, LWVI000280, at 4, Memorandum from Civix to SVRS Users, December 2025 Build, Part I - Citizenship (Dec. 2025).

[17] Under the Current-Voter Citizenship Crosscheck Requirement, a voter may appeal the cancellation in person or by mail to the county election board. I.C. § 3-7-38.2-7.3(e). After receiving an appeal, the county election board is required to (1) conduct a hearing, (2) make a finding about the voter's citizenship status, and (3) send a copy of its decision to the county voter registration office of the county in which the individual resides. *Id.* The Current-Voter Citizenship Crosscheck requirement does not provide a timeline or deadline for the voter's appeal or for the county election board's hearing or ultimate decision. It does not specify the process for county registrars or election boards to verify that the voter received the initial notice, which starts the 30-day clock to provide DPOC. It also does not specify what the individual's voter registration status is while the appeal is pending and before the county election board issues its decision.

[18] Ex. 4, LWVI000309, at 5, Office of the Sec'y of State - IED, Proof of Citizenship VRG 58.3 (2025).

[19] Ex. 5, LWVI000367, Email from Dustin Renner, Election Dir., Sec'y of State to County Clerks (July 16, 2025 4:18 PM).

[20] IED, 2026 Indiana Voter Registration Guidebook at 29 (2026), https://perma.cc/ARS5-CUUX.

applicants will receive notices even if they submit DPOC with their voter registration application.[21]

If the applicant does not provide DPOC within 30 days, the official must reject the voter registration application, and the voter cannot appeal. *Id*. The New-Registrant Citizenship Crosscheck Requirement applies to those who register to vote for the first time and to previously registered voters who update their voter registration or re-register. I.C. §§ 3-7-39-6; 3-7-13-5; 3-7-38.2-1.

The 30-day window during which flagged individuals must provide DPOC creates additional problems as election deadlines approach. For instance, the State recognizes that voters' registration applications may still be unresolved *after* the election has already passed: Indiana's registration deadline is 29 days before Election Day, *see* I.C. 3-7-33-3.7, and Defendants advise county officials that "the 30+ day [window] must run out [for flagged individuals] before the[ir] application can be rejected. This could be *before Election Day or after*."[22] Flagged individuals who register near the deadline will be suspended in an indeterminate registration status that will prevent them from being able to vote.

## II.    THE CHALLENGED DPOC PROVISIONS ERRONEOUSLY FLAG NATURALIZED AND DERIVED U.S. CITIZENS AS NONCITIZENS.

Using BMV data about temporary credentials is not an accurate or reliable way to verify citizenship status. The BMV issues temporary credentials to certain individuals who, when receiving the credential, are noncitizens and lawfully in the United States. I.C. §§ 9-24-11-5(c); 9-24-16-3(f).[23] These credentials remain valid until their expiration date, even if the credential holder

---

[21] Ex. 4, LWVI000309, at 5, Office of the Sec'y of State - IED, Proof of Citizenship VRG 58.3 (2025).

[22] *Id*. at 6-7 (emphasis added).

[23] Although under Indiana law, individuals who have "temporary lawful status" are issued temporary credentials, *see* I.C. §§ 9-24-11-5(c); 9-24-16-3(f), it appears that some individuals were flagged as having been issued temporary credentials when they were lawful permanent residents. *See e.g.*, Ex. 7, Declaration of Luciana Indiana Lugado Victoriano ¶¶ 7-9; 15; Ex. 8, Declaration of Carola Susanne Clark ¶¶ 8-9; 14-15; Ex. 9, Declaration of Ariadna Rubi Tejeda Sánchez ¶¶ 7-8; 11-12.

7

becomes a U.S. citizen,[24] and temporary credential holders are not required to notify the BMV when they obtain citizenship.[25] Accordingly, the BMV typically is only notified of a temporary credential holder's U.S. citizenship when their license or identification card is renewed —which may occur years after the individual becomes a citizen.

Thus, the BMV database includes outdated information about whether an individual is currently a U.S. citizen, misidentifying many current citizens as noncitizens. Courts have confronted this very problem in other cases challenging the use of outdated point-in-time agency databases as the basis for citizenship determinations for voter registration. *See, e.g.*, *Fish v. Schwab*, 957 F.3d 1105, 1134 (10th Cir. 2020) (reviewing evidence that "administrative anomalies" in similar database could account for "many—or perhaps even most" voters flagged as noncitizens under state procedure).

In fact, Indiana's own records of flagged individuals show that the Challenged DPOC Provisions likely misidentified many naturalized and derived citizens as noncitizens. *See* Ex. 10, McDonald Rep., 3. Approximately 977 eligible Indiana citizens have already been incorrectly identified as potential noncitizens but have provided DPOC to fix this misidentification. *Id.* That misidentification subjected them to discriminatory burdens and potential disenfranchisement never imposed on individuals born as U.S. citizens. Discovery received as of May 5, 2026, revealed that the Challenged DPOC Provisions flagged approximately 3,234 people to send a notice for proof

---

[24] In Indiana, a temporary credential expires at the earlier of the date the holder's lawful residence authorization expires or six years after the date the credential was issued. If the holder's lawful residence authorization does not have an expiration date, the temporary credential expires one year after issuance. IC § 9-24-12-11(c); Ind. Bur. of Motor Vehicles, *Identification Cards*, https://perma.cc/2GML-LRSV (last visited Dec. 22, 2025); Ind. Bur. of Motor Vehicles, *Renewing a Driver's License, Learner's Permit, or Identification Card*, https://perma.cc/J3PP-9RJH (last visited Dec. 22, 2025). By comparison, an individual who has been granted asylum becomes eligible for citizenship four years after getting their permanent resident card ("green card"), and the spouse of a U.S. citizen becomes eligible for citizenship three years after getting their green card.

of citizenship. *Id*. Of these 3,234 voters flagged, election officials have received a final decision on 2,602 persons. *Id.*

Among the records with final determinations, 1,270 records had a registration date before July 1, 2025, and were flagged under the Current-Voter Citizenship Crosscheck Requirement. *Id*. Among those voters, 78.1% of registrations—approximately 975 registrants with previously valid voter registrations—were canceled for failure to provide DPOC. *Id.* at 4. Similarly, 782 records are voter registration applicants, flagged under the New-Registrant Citizenship Crosscheck Requirement. And 63.2% of applicants—494 individuals—were rejected. *Id.* Those numbers include people incorrectly flagged as noncitizens. Plaintiffs have identified several naturalized Indiana citizens who were improperly subjected to the Challenged DPOC Provisions. Their declarations are attached. Ex. 6, Decl. of Beatrix Hilde Shelby ¶¶ 5-8; 12-15; Ex. 7, Decl. of Luciana Indiana Lugado Victoriano ¶¶ 7-9; 15; Ex. 8, Decl. of Carola Susanne Clark ¶¶ 8-9; 14-15; Ex. 9, Decl. of Ariadna Rubi Tejeda Sánchez ¶¶ 7-8; 11-12. Merely because they were not born in the United States, all these individuals were required to find, assemble, copy, and submit DPOC that U.S.-born citizens were not required to submit.

## III.    THE CHALLENGED DPOC PROVISIONS IMPOSE DISCRIMINATORY HARDSHIPS ONLY ON NATURALIZED AND DERIVED CITIZENS

The Challenged DPOC Provisions create real hardships and barriers for naturalized and derived citizens attempting to register and exercise their right to vote. By placing the burden on the registrant to take additional steps to maintain or complete their registration beyond affirming their citizenship under penalty of perjury—steps no U.S.-born citizen must take—the Challenged DPOC Provisions cause many eligible voters to have their voter registration rejected or canceled. Ex. 10, McDonald Rep., at 3-4.

A registrant who is flagged and sent a notice must actually receive that notice in order to respond to it. Ex. 10, McDonald Rep., at 14. There are many reasons why a notice sent to a registrant may not actually be received by the registrant, through no fault of their own. *Id.* Even registrants who do physically receive the notice may not understand the notice, as the notice is only provided in English and many non-U.S.-born citizens are English-Language Learners. *Id.* at 14-15. And persistent mail delays mean registrants may not receive the notice with enough time to send it back by the deadline, even if they already have DPOC. *Id.* at 14.

Registrants and registration applicants who do not have DPOC may bear substantial costs to obtain it within 30 days of receiving a notice. Naturalized citizens who do not have copies of their naturalization certificates and derived citizens who rely on their parents' naturalization documentation must pay close to $1,170 to receive a new certificate of citizenship or $555 to replace or amend a certificate. This process takes on average seven months—well past the 30-day deadline to provide DPOC.[26] A citizen who wishes to obtain a passport to use as DPOC would still face substantial expenses. A new passport can cost up to $165, plus an additional $60 for expedited processing.[27] Even if a citizen submits an application immediately upon receiving the notice and pays for expedited processing, they may not receive a passport by the 30-day deadline to avoid rejection or cancellation of registration.[28]

---

[26] Brandon Smith, *Officials, Advocates Flag Privacy, Voter Suppression Concerns For Election Security Bill*, WFYI Indianapolis (Feb. 13, 2025), https://perma.cc/M2CS-34UH; U.S. Dep't of Homeland Sec., *Our Fees Chart*, U.S. Citizenship and Immigr. Servs. (July 31, 2020), https://perma.cc/3NYC-K3CY (documenting the filing fee for amended certificates); *Check Case Processing Times*, U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigr. Servs., https://egov.uscis.gov/processing-times/ (last visited May 8, 2026) (current wait time is 7.5 months on average); *Hearing on HB1133, HB1264, and HB1376 Before the H. Comm. on Elections and* Apportionment, 2024 Leg., 124th Sess. (Ind. Jan. 17, 2024), https://iga.in.gov/session/2024/video/committee_elections_and_apportionment_0500/.

[27] U.S. Dep't of State, Bur. of Consular Affairs, *Passport Fees*, https://perma.cc/9BDE-2ANH (last visited Mar. 31, 2025); U.S. Dep't of State, Bur. of Consular Affairs, *Get Your Processing Time*, https://perma.cc/L988-P8Y5 (last visited Mar. 31, 2025).

[28] *See, e.g.*, *Processing Times for U.S. Passports*, U.S. Dep't of State (Jan. 28, 2026), https://perma.cc/D4H3-FDZY.

Derived citizens are especially likely to face challenges in complying with the Challenged DPOC provisions. Derived citizens become citizens without receiving *any* form of DPOC because citizenship is bestowed automatically by law once a parent naturalizes. Child Citizenship Act of 2000, 8 U.S.C. § 1431 *et seq.*[29] No federal or state law requires derived citizens to obtain proof of citizenship. And obtaining proof can be even more costly than for naturalized citizens. Derived citizens who want a certificate of citizenship must pay a $1,385 paper application fee and expect to wait about 5 to 40 months for the DHS Indianapolis office to process their application.[30] Thus, derived citizens are forced to obtain documentation through similarly costly means, like a U.S. passport, to obtain DPOC.

Even when citizens have access to DPOC, the process of submitting it imposes hardship that no U.S.-born citizen must endure.[31] Naturalized citizens may struggle to provide DPOC within the tight deadline when traveling away from home, juggling hectic work and family lives, moving, battling severe medical issues, or experiencing other hurdles. For example, Ms. Sánchez, a young mother of two, faced difficulties finding time to submit DPOC while juggling family and work responsibilities. Ex. 9, Sánchez Decl. ¶ 15. Ms. Clark, unclear whether her copied DPOC required additional authentication, had to navigate the stress and confusion of providing DPOC between returning from vacation and a busy work schedule. Ex. 8, Clark Decl. ¶ 16-18. Ms. Shelby

---

[29] *See also* U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigr. Servs., *Policy Manual, Chapter 4 - Automatic Acquisition of Citizenship after Birth (INA 320)*, https://perma.cc/6GB4-Y8ZB (last visited Dec. 22, 2025); U.S. Dep't of State, Bureau of Consular Affairs, *Obtaining U.S. Citizenship for a Child Born Abroad*, https://perma.cc/4BTW-JJBR (last visited Dec. 22, 2025).

[30] U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigr. Servs., *Form N-600, Application for Certificate of Citizenship*, https://www.uscis.gov/g-1055?form=n-600 (last visited May 5, 2026); U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigr. Servs., *N-600K, Application for Citizenship and Issuance of Certificate Under Section 322*, https://www.uscis.gov/g-1055?form=n-600k (last visited May 5, 2026); U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigr. Servs., *Case Processing Times*, https://egov.uscis.gov/processing-times (last visited May 5, 2026).

[31] Kevin Morris & Cora Henry, *Millions of Americans Don't Have Documents Proving Their Citizenship Readily Available*, Brennan Ctr. for Just. (June 11, 2024), https://perma.cc/TK86-HMXN.

11

struggled to provide DPOC while navigating health issues, multiple surgeries, moving residences, acclimating to a new state, transportation limitations, and lack of technology. Ex. 6, Shelby Decl. ¶¶ 17, 20-23. Because of the Challenged DPOC Provisions, all these naturalized U.S. citizens faced burdens that are never shared by others when registering to vote.

## IV.   THE CHALLENGED DPOC PROVISIONS HARM PLAINTIFFS.

By imposing discriminatory DPOC requirements on Indiana voters and threatening Indiana voters with disenfranchisement, the Challenged DPOC Provisions irreparably harm Plaintiffs. Plaintiffs devote their volunteer and staff time to the core missions of protecting and expanding voting rights by removing barriers to registration and participation, with a particular focus on serving immigrant, refugee, and marginalized communities in Indiana through education, outreach, and civic engagement. *See* Dkt. 17-2 ("CCIN Decl.") ¶¶ 2, 4; Dkt. 17-3 ("LWVIN Decl.") ¶¶ 2, 4; Dkt. 17-4 ("Exodus Decl.") ¶¶ 2, 5; Dkt. 17-5 ("HAAP Decl.") ¶¶ 2, 4. Plaintiffs must divert scarce resources from furthering those core missions to address the Challenged DPOC Provisions by responding to voters' questions and concerns, assisting improperly flagged voters in responding to notices, and adapting their education campaigns. To continue providing services consistent with their core mission, Plaintiffs must marshal new resources or divert them from other core projects. *See* CCIN Decl. ¶¶ 7-11; LWVIN Decl. ¶¶ 9-12; Exodus Decl. ¶¶ 6-7; HAAP Decl. ¶¶ 6-8. The need for an immediate injunction is especially urgent given the upcoming November 3, 2026, General Election, with a registration deadline of October 5, 2026. Without prompt relief, Plaintiffs will be forced to continue diverting their limited resources away from their core missions while eligible Indiana voters face the imminent threat of disenfranchisement.

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

balance of equities tips in his favor, and that an injunction is in the public interest." *Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 795 (7th Cir. 2013) (*quoting Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Here, a preliminary injunction is necessary to prevent irreparable injury to Plaintiffs and protect the fundamental right to vote.

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A. The Challenged DPOC Provisions Discriminate Against Naturalized and Derived Citizens in Violation of the NVRA and the CRA.

By classifying voter registrants and registration applicants who possess a temporary credential as presumptively ineligible to vote, Defendants discriminate against Hoosiers on the basis of national origin. The Challenged DPOC Provisions violate both the NVRA and the CRA because they impose discriminatory burdens on naturalized and derived citizens which are never imposed on individuals born U.S. citizens. *See* Dkt. 62, at 25-28.

NVRA Section 8(b) requires that voter registration and list maintenance systems be "uniform" and "nondiscriminatory." 52 U.S.C. §§ 20507(b)(1). A State violates the NVRA's "uniform [and] nondiscriminatory" requirement when a voter-roll maintenance program targets or singles out specified classes of voters for disparate treatment. *See Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 703 (N.D. Ohio 2006). Thus, programs like the Challenged DPOC Provisions, which burden only naturalized and derived citizens, violate the NVRA's uniform and nondiscriminatory provision. *See, e.g.*, *Mi Familia Vota*, 129 F.4th at 714 (holding that a registration provision that would subject only naturalized citizens to scrutiny was discriminatory in violation of NVRA Section 8(b)).

Similarly, the CRA's "Different Practices Provision" prohibits the differential application of standards, practices, or procedures to voter registration processes for any elections—federal, state, and local. 52 U.S.C. § 10101(a)(2)(A). Voting officials violate the Different Practices

Provision when they "apply different standards, practices, and procedures to naturalized citizens than those standards, practices, and procedures they apply to U.S.-born citizens" rather than a "method that could be applied to both naturalized and U.S.-born citizens." *Mi Familia Vota*, 129 F.4th at 723; *see also Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 334 (4th Cir. 2012) (finding that discriminatory voter registration laws can have a direct and "damaging effect on voter participation" and "disproportionately harm voter participation by various groups, including racial minorities").

The Challenged DPOC Provisions discriminate on their face. As discussed *supra*, classifying registrants and registration applicants because of their use of temporary credentials subjects only naturalized and derived citizens to erroneous disenfranchisement based on frequently outdated BMV data. The data only flag people as having temporary credentials who were lawful permanent residents or had a temporary lawful status when they last obtained their BMV credential.[32] Under Indiana law, Hoosiers who obtain temporary credentials as noncitizens and who then become U.S. citizens are not required by Indiana law to update their credentials based on their change in citizenship status or to notify the BMV when they become citizens. As such, if a naturalized or derived citizen does not inform the BMV of a citizenship status change—even after affirming their citizenship to election officials on their registration form, and even if they were to proactively provide DPOC when registering to vote—that citizen may linger on the list of those with temporary credentials until that credential expires. Using a temporary credential flag as the basis for requiring DPOC subjects only naturalized and derived U.S. citizens to additional burdens and potential disenfranchisement.

---

[32] Ex. 1, LWVI000288, at 23, Data Sharing Agreement Between State Agencies (2025).

14

Courts have recognized that subjecting non-U.S.-born citizens to such discriminatory DPOC requirements violates the NVRA, the CRA, or both. In *Mi Familia Vota*, the Ninth Circuit held that a state law subjecting only naturalized citizens to scrutiny was discriminatory in violation of NVRA Section 8(b). 129 F.4th at 714. As with the Challenged DPOC Provisions here, officials would "only ever conduct" a citizenship check on naturalized citizens. For the same reason, the Court held that the challenged provision violated the CRA's Different Practices Provision. *Id* at 723. The same is true of the Challenged DPOC Provisions.

Likewise, in *United States v. Florida*, the U.S. District Court for the Northern District of Florida held that the Secretary of State's list maintenance program likely violated NVRA Section 8(b) because the "methodology made it likely that the properly registered citizens who would be required to respond and provide documentation would be primarily newly naturalized citizens." 870 F. Supp. 2d 1346, 1350 (N.D. Fla. 2012) (hereinafter "Florida"). Just like the Challenged DPOC Provisions, the Florida program swept in any person who "(1) as a noncitizen, obtained a driver's license and accurately disclosed to the Department of Highway Safety and Motor Vehicles that the person was not a citizen, (2) became a naturalized citizen, (3) registered to vote, accurately disclosing to the Supervisor of Elections that the person was a citizen, and (4) had not yet renewed the driver's license and so had not updated DHSMV's records to reflect the new citizenship status." *Florida*, 870 F. Supp. 2d at 1347-48. "The program was likely to have a discriminatory impact on these new citizens." *Id*. at 1350. And in *Texas League of United Latin American Citizens v. Whitley*, 2019 WL 7938511 (W.D. Tex. Feb. 27, 2019), the District Court in the Western District of Texas denied defendants' motions to dismiss plaintiffs' NVRA claims where the Texas Secretary of State enforced a similar program that erroneously identified naturalized citizens. 2019 WL 7938511 at *2. The Challenged DPOC Provisions "disproportionately impact[] duly qualified

15

registration applicants, while only nominally preventing noncitizen voter registration" in direct violation of the NVRA. *Fish v. Kobach*, 309 F. Supp. 3d 1048, 1112-13 (D. Kan. 2018), *aff'd*, 957 F.3d 1105 (10th Cir. 2020). As in *Whitley*, Defendants here are discriminatorily burdening "perfectly legal naturalized Americans" with "ham-handed and threatening correspondence from the state." 2019 WL 7938511 at *1.

The NVRA and the CRA prohibit Indiana from "impos[ing] burdensome [voter registration] demands in a discriminatory manner." *Florida*, 870 F. Supp. 2d at 1350. Because the Challenged DPOC Provisions impose discriminatory burdens on naturalized and derived citizen voters alone, this Court should enjoin the Challenged DPOC Provisions.

**B. The Challenged DPOC Provisions Violate the NVRA's Requirements for Federal and State Voter Registration Forms.**

Defendants also violate NVRA Sections 5, 6, 7, and 9, 52 U.S.C. §§ 20504, 20505, 20506, 20508, by requiring registrants to provide unnecessary information on Federal or State Forms. Compounding their discriminatory impact, the procedural burdens imposed by the Challenged DPOC Provisions are redundant and cumbersome, directly violating NVRA provisions that guide the implementation of Federal and State registration forms.

**i. Defendants Are Violating the NVRA's Federal Form Compliance Provision.**

The Challenged DPOC Provisions violate NVRA Section 6 by mandating that naturalized and derived citizen registrants with temporary credentials provide DPOC, which is not required by the NVRA's optional Federal registration form ("Federal Form") for voting in Federal elections. *See* Dkt. 62, at 20-23. NVRA Section 6 requires states, including Indiana, to "accept and use" the Federal Form for the registration of voters for federal elections in addition to the state registration form. 52 U.S.C. § 20505(a)(1). As the NVRA specifies, the Federal Form promulgated by the Federal Election Commission, *id.*, does not require that applicants provide DPOC. *See League of*

16

*United Latin Am. Citizens v. Exec. Off. of the President (LULAC)*, 780 F. Supp. 3d 135, 209-10 (D.D.C. 2025) (holding that assessing citizenship of federal form registrants through requiring DPOC is irreconcilable with the NVRA's mandatory language that agencies "shall" provide a form to voters who use their services), *appeal filed*, No. 26-5102 (D.C. Cir. Apr. 2, 2026). The Federal Form seeks to allow only citizens to register to vote by requiring applicants to swear or affirm under penalty of perjury that they are a U.S. citizen.[33] States may not unilaterally seek to amend the Federal Form. *Arizona v. Inter Tribal Council of Ariz. (ITCA), Inc.*, 570 U.S. 1, 15 (2013).

As a result, Indiana may not apply the requirements contained in the Challenged DPOC Provisions to individuals who register to vote using the Federal Form. "[A] state-imposed requirement of evidence of citizenship not required by the Federal Form is 'inconsistent with' the NVRA's mandate that States 'accept and use' the Federal Form" because "the NVRA forbids States to demand that an applicant submit additional information beyond that required by the Federal Form" for registration for Federal elections. *ITCA*, 570 U.S. at 15.

Congress has rejected a DPOC requirement in connection with the Federal Form. In 1993, while considering the NVRA, "[b]oth houses of Congress debated and voted on the specific question of whether to permit states to require documentary proof of citizenship in connection with the Federal Form, and ultimately rejected such a proposal." *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1195 n.7 (10th Cir. 2014) (citing congressional records). Congress determined that such a requirement was "*not necessary or consistent with the purposes of this Act*," could "permit registration requirements that could effectively eliminate, or seriously interfere with, the mail registration program of the Act," and "could also adversely affect the administration of

---

[33] *See* U.S. Election Assistance Comm'n, *Register To Vote In Your State By Using This Postcard Form and Guide* (OMB Control No. 3265-0015), https://perma.cc/7QU3-V5WL (last visited May 5, 2026).

the other registration programs." H.R. Rep. No. 103-66, at 23 (1993) (Conf. Rep.) (emphasis added).

Yet the Challenged DPOC Provisions require DPOC from any registrant, including a registrant submitting a Federal Form, who is flagged as having a temporary credential. By imposing requirements on voters who register using the Federal Form beyond what is required by the form itself, Defendants are violating NVRA Section 6.

### ii.    Defendants Are Violating the NVRA's State Form Compliance Provisions.

By requiring that flagged registrants or registration applicants provide DPOC, Defendants also violate the portions of the NVRA pertaining to registration for Federal elections using Indiana's state registration form ("State Form"). *See* Dkt. 62, at 23-25. The NVRA makes clear that states may not subject registrants to unnecessary requirements to prove their voting eligibility.

The Challenged DPOC Provisions violate NVRA Sections 5, 6, 7 and 9 because they require unnecessary information. The State does not need to require a prospective voter who obtained a temporary credential to provide DPOC to ensure that the voter is eligible to register to vote. Both before and since the enactment of the Challenged DPOC Provisions, Indiana has required applicants to attest that they are U.S. citizens under penalty of perjury on the State Form. There is no evidence that such a requirement insufficiently deters noncitizens from voting.[34] By requiring that flagged registrants provide DPOC, the Challenged DPOC Provisions mandate that registrants provide information that is not "necessary" to establish their citizenship status. 52 U.S.C. §§ 20508(b)(1); 20504(c)(2)(B)(ii).

---

[34] Plaintiffs are unaware of any instance where a single person was prosecuted for voting as a noncitizen in Indiana. Instances of noncitizen voting nationwide are exceedingly rare. *See, e.g.*, Jude Joffe-Block, *6 Facts About False Noncitizen Voting Claims and the Election*, NPR (Nov. 5, 2024), https://perma.cc/952D-XH5C (two studies showing rates of noncitizen voting of 0.0001% and 0.00024%); Alex Nowrasteh, *Noncitizens Don't Illegally Vote in Detectable Numbers*, Cato Inst. Blog (Nov. 25, 2020), https://perma.cc/GHP4-QV8X; Peter Charalambous, *Election Fact Check: Noncitizens Can't Vote, and Instances are 'Vanishingly Rare'*, ABC News (Oct. 28, 2024), https://perma.cc/7FR6-BEET.

18

NVRA Section 6 requires Indiana officials to register eligible voters by mail for Federal elections with a State Form that "meets all of the criteria stated in" Section 9 of the NVRA. 52 U.S.C. § 20505(a)(2). Indiana has created a State Form that allows Hoosiers to register by mail.[35] NVRA Section 9 further explains that the State Form for registering by mail "may require only such identifying information . . . and other information . . . as is necessary" for the State to assess voter eligibility. *Id.* § 20508(b)(1). Similarly, Section 4 requires Indiana to offer eligible citizens the option to register to vote for Federal elections "simultaneously with an application for a motor vehicle driver's license" pursuant to the procedures set forth in Section 5. 52 U.S.C. § 20503(a)(1). Section 5(c)(2)(B), in turn, specifies that these simultaneous voter registration applications "may require only the minimum amount of information necessary to . . . enable State election officials to assess the eligibility of the applicant and to administer [the] voter registration." 52 U.S.C. § 20504(c)(2)(B)(ii).

In requiring naturalized and derived citizen voters to provide DPOC to register for Federal elections, Defendants also violate Section 7 of the NVRA. Section 7 requires Indiana to offer voter registration for Federal elections at public assistance offices, disability assistance offices, and other state-designated offices. Those "office[s] that provide[] service or assistance in addition to conducting voter registration" are required to either use the Federal Form or a state registration form that is "equivalent" to the Federal Form. 52 U.S.C. § 20506(a). Because the Federal Form deems an oath or affirmation of citizenship under penalty of perjury sufficient and does not demand DPOC, *see ITCA*, 570 U.S. at 15, requiring flagged individuals to provide DPOC if they register for all elections—including Federal elections—using the State Form at public assistance and

---

[35] *See* Ind. Sec'y of State, IED, *Voter Registration*, https://perma.cc/L9E7-MERT (last visited Apr. 30, 2026).

disability services offices renders Indiana's State Form not "equivalent" to the Federal Form and violates NVRA Section 7.

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF.

The Challenged DPOC provisions harm Plaintiffs, frustrate their missions, and require them to divert scarce resources because they impose additional barriers to voter registration and participation targeting naturalized and derived citizens to whom Plaintiffs, in significant part, dedicate their work.

Courts have consistently recognized that, when organizational plaintiffs must divert limited resources to address and rectify injury to voters, that injury constitutes irreparable harm. *See Ind. State Conf. of NAACP v. Lawson*, 326 F. Supp. 3d 646, 662 (S.D. Ind. 2018) ("[W]here organizational plaintiffs are compelled to divert and expend their resources to address a defendant's allegedly wrongful conduct, this is "enough to satisfy their burden of showing a likelihood of suffering irreparable harm." (citation omitted)), *aff'd sub nom. Common Cause Ind. v. Lawson*, 937 F.3d 944 (7th Cir. 2019); *LULAC*, 780 F. Supp. 3d at 211 (finding likelihood of irreparable harm when law caused organizational plaintiffs "to divert resources from their other electoral efforts around the country to counteract the provision's negative effects . . . ."); *N.C. State Conf. of the NAACP v. N.C. State Bd. of Elections*, 2016 WL 6581284, at *9 (M.D.N.C. Nov. 4, 2016) (finding irreparable harm when organization had to "divert its finite and limited resources away from its planned voter-protection and education efforts"); *League of Women Voters of Mo. v. Ashcroft*, 336 F. Supp. 3d 998, 1005 (W.D. Mo. 2018) (collecting cases).

As Plaintiffs argued in their Opposition to Defendants' Motion to Dismiss, the Challenged DPOC Provisions have already imposed irreparable harm because Plaintiffs have been forced to devote critical resources to remedy the effects of the Challenged DPOC Provisions on their core

missions. *See* Dkt. 62, at 12-13. Plaintiffs will continue to be irreparably harmed absent injunctive relief because their efforts to address the Challenged DPOC Provisions' effects by assisting voters are ongoing and are only likely to increase as more naturalized and derived citizens register to vote in advance of the November 3, 2026, general election. *See* CCIN Decl. ¶ 11; LWVIN Decl. ¶¶ 11, 13; Exodus Decl. ¶¶ 6, 8; HAAP Decl. ¶ 7.

Specifically, Plaintiffs have, and must continue, to retrain staff and volunteers to understand the new laws, respond to member and voter questions and concerns, and assist voters in registering to vote and maintaining their registration. CCIN has had to steer resources from its core activities, dedicating one of its two staff members to serve as a liaison with organizational partners impacted by the Challenged DPOC Provisions, teaching partners who work with immigrant communities about the Challenged DPOC provisions, and leading numerous community events in response to the Challenged DPOC Provisions. CCIN Decl. ¶¶ 6-9. LWVIN has had to focus its efforts more broadly on outreach to organizations serving immigrant communities in Indiana to ensure that they have information about how the Challenged DPOC Provisions may impact them and their communities. LWVIN Decl. ¶¶ 6-8. LWVIN has had to delay, suspend, and forgo other programs, activities, and priorities to divert resources in response to the Challenged DPOC Provisions. *Id.* ¶¶ 8,11. HAAP has had to divert resources away from its core activities and devote substantial time to educate its members and the public about the Challenged DPOC Provisions and how to resolve voter registration rejections and cancellations. HAAP Decl. ¶¶ 6-8. Similarly, Exodus has been obligated to divert resources to civic education because of the Challenged DPOC Provisions. Exodus Decl. ¶ 6.

Plaintiffs will continue to divert significant staff and volunteer time, financial resources, and organizational focus to assist voters and address the confusion, fear, and risk of

21

disenfranchisement that the Challenged DPOC Provisions create, unless this Court enjoins the Challenged DPOC Provisions. *See* CCIN Decl. ¶ 11; LWVIN Decl. ¶¶ 11, 13; Exodus Decl. ¶¶ 6, 8; HAAP Decl. ¶ 7.

### III.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF GRANTING A PRELIMINARY INJUNCTION.

The balance of equities weighs heavily in favor of preliminarily enjoining the Challenged DPOC Provisions. In considering whether to grant preliminary relief, courts must balance "'competing harms' that the parties would suffer from the grant or denial of injunctive relief, as well as 'the public interest' at large." *Ind. Right to Life Victory Fund v. Morales*, 112 F.4th 466, 472 (7th Cir. 2024) (quoting *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013)). Without preliminary relief, Plaintiffs—and the public—will suffer irreparable harm, while the State will be allowed to enforce an unnecessary and redundant law.

### A.    The Challenged DPOC Provisions Harm the Public Interest.

As shown *supra*, Plaintiffs have been and will be irreparably harmed by the Challenged DPOC Provisions and need preliminary relief. A preliminary injunction would preserve Plaintiffs' ability to continue to further all aspects of their core missions of supporting the participation of eligible voters in Indiana elections. Absent a preliminary injunction, those missions will be irreparably hampered.

But the harm of the Challenged DPOC Provisions is not limited to Plaintiffs. It extends to members of the public, which includes the approximately 3,234 people who were flagged by the state. Inevitably, hundreds more will become citizens in advance of the October 5, 2026, voter registration deadline. Ex. 10, McDonald Rep., 3. Many of these citizens may not possess DPOC, or, even if they do possess DPOC, may not receive notice or may be unable to provide DPOC by the deadline and will be disenfranchised despite being eligible to vote. "The public interest is best

22

served by protecting the right to vote and not disenfranchising eligible voters." *Ind. NAACP*, 326 F. Supp. 3d at 664. Yet through the enforcement of the Challenged DPOC Provisions, naturalized and derived citizen voters face "the imminent and irrevocable consequence of disenfranchisement," *id*., and discrimination. Further, both naturalized and derived citizen voters and other eligible voters face the consequences of Plaintiffs having fewer resources to devote to voter education, registration, engagement, and assistance.

The Challenged DPOC Provisions risk disenfranchising naturalized and derived Indiana voters. Approximately 977 eligible Indiana citizens have already been erroneously identified as potential noncitizens but have provided DPOC to rectify this error. Ex. 10, McDonald Rep., 3; *see also* Ex. 8, Clark Decl. ¶ 17-22; Ex. 9, Sánchez Decl. ¶¶ 8; 11-13; 18-19; Ex. 7, Victoriano Decl. ¶¶ 9; 13-15; 25-26. Others are still working to become registered voters. Each U.S. citizen forced to provide DPOC who were verified by Defendants have already suffered irreparable harm from such discriminatory treatment. As discussed, those Indiana citizens—and others who will be flagged under the Challenged Provisions—must navigate difficulties such as prohibitive costs, *supra* p.10-11, medical and health-related barriers, Ex. 6, Shelby Decl. ¶¶ 9; 17; 21-23, work schedules, Ex. 8, Clark Decl. ¶ 18, and child care, Ex. 9, Sánchez Decl. ¶ 15, to provide DPOC within thirty days after receiving notice. These hardships persist for many flagged individuals whose registrations were rejected or canceled, who are currently in an incomplete status, or who will be rejected, canceled, or left in an incomplete status by November 3, 2026. Those barriers lead to voter disenfranchisement.

Accordingly, courts have found that other states' DPOC requirements predictably cause voter disenfranchisement, a quintessentially irreparable harm. *See Fish v. Kobach*, 840 F.3d 710, 755 (10th Cir. 2016) (affirming finding of irreparable harm where "over 18,000 U.S. citizens in

Kansas will be disenfranchised" by a DPOC requirement); *LULAC*, 780 F. Supp. 3d at 203 (finding a "substantial risk" that DPOC citizenship requirement for federal elections would disenfranchise citizens). This Court need not wait for the inevitable disenfranchisement that the Challenged DPOC Provisions will cause to occur in Indiana before issuing an injunction. *See League of Women Voters of United States v. Newby*, 838 F.3d 1, 8 (D.D.C. 2016) (enjoining Alabama and Georgia's proof of citizenship laws based on "similar obstacles to registration" in other states); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *Common Cause Ind. v. Lawson*, 327 F. Supp. 3d 1139, 1155 (S.D. Ind. 2018) (collecting cases), *aff'd*, 937 F.3d 944 (7th Cir. 2019). As this Court recognized in *Common Cause Ind. v. Lawson*, "[b]ecause an individual cannot vote after an election has passed, it is clear that the wrongful disenfranchisement of a registered voter would cause irreparable harm." 327 F. Supp. 3d at 1155. The elimination of the right to vote is an "irreparable injury and one that cannot easily be redressed." *Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1346 (N.D. Ga. 2018). To avoid such injury before the November 3, 2026, General Election, preliminary relief is urgent and necessary.

The Challenged DPOC Provisions also harm the public interest by blatantly discriminating on the basis of national origin. The Provisions relegate naturalized and derived citizens to second-class status, placing the burden on *voters* to prove their eligibility to vote, thereby burdening their participation in the democratic process in a way individuals born as citizens are never subject to. *See Am. Council of Blind of Ind. v. Indiana Election Comm'n*, 2022 WL 702257, at *9 (S.D. Ind. Mar. 9, 2022) (finding harm necessitating preliminary injunction when "discrimination" against plaintiffs "interferes with [their] ability to vote"). As a result of the Challenged DPOC Provisions, Indiana erroneously brands naturalized and derived citizens as noncitizens and compels them to re-prove what they—just like all Indiana voters born as citizens—have already attested to under

24

penalty of perjury. *See* Ex. 8, Clark Decl. ¶¶ 1, 15; Ex. 6, Shelby Decl. ¶¶ 1, 15; Ex. 9, Sánchez Decl. ¶¶ 1, 12; Ex. 7, Victoriano Decl. ¶¶ 1, 15.

Indeed, requiring DPOC and creating barriers to voting for only naturalized and derived citizens is also directly contrary to the purposes of the NVRA and the CRA. *See, e.g.*, H.R. Rep. No. 103-9, at 2 (1993), *reprinted in* 1993 U.S.C.C.A.N. 105, 106 (recognizing the history of "[r]estrictive registration laws and administrative procedures" including "selective purges, elaborate administrative procedures and annual reregistration requirements" which suppress voter participation, particularly among voters of color); *South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966) (recognizing congressional intent in passing CRA to prevent selective disqualification of voters); *Pa. State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa.*, 97 F.4th 120, 126 (3d Cir. 2024) (recognizing congressional intent in passing CRA to prevent selective disqualification of voters).

Moreover, by limiting the resources that Plaintiffs are able to provide to eligible voters in the general public, the Challenged DPOC Provisions harm all eligible voters. *See* CCIN Decl. ¶¶ 4-5 (describing work training volunteers and staff members to "help voters at risk of being disenfranchised"); LWVIN Decl. ¶ 6 (describing work performed to assist "traditionally underrepresented and underserved communities who benefit the most from additional education and assistance, including voters of color, first-time voters, low-income voters, newly naturalized citizen voters, young voters, and voters impacted by the criminal legal system"); Exodus Decl. ¶ 5 (describing work "to eliminate barriers to voting, by helping naturalized citizens register to vote"); HAAP Decl. ¶ 4 ("HAAP seeks to eliminate barriers to voting and supports the right to vote"). Defendants' enforcement of the Challenged DPOC Provisions "make[s] it substantially more difficult for groups like the [Plaintiffs] to register otherwise qualified voters," *Newby*, 838 F.3d at

12-13. Because "the public interest . . . favors permitting as many qualified voters to vote as possible," *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012), that reduction in registration efforts harms the general public and weighs in favor of enjoining the Challenged DPOC Provisions. To that end, courts have not hesitated to issue and uphold preliminary injunctions barring discriminatory and unnecessary voting restrictions in order to protect the public's interest in robust access to voting. *See, e.g., Newby*, 838 F.3d at 12; *League of Women Voters of N.C.*, 769 F.3d at 247; *Ind. NAACP*, 326 F. Supp. 3d at 664.

Absent an injunction, the risk of harm is imminent. The need for injunctive relief is urgent given that the upcoming registration deadline for the November 3, 2026, election is less than five months away, on October 5, 2026. Relief would come too late if voters were required to wait months or years for the Court to enjoin the Challenged DPOC Provisions in the regular course of litigation. As explained *supra*, at 11-12, Indiana voters who are naturalized or derived citizens may not have time to engage in the costly and time-consuming process of obtaining DPOC, respond to a notice, or reregister to vote before the upcoming registration deadline. This Court must preliminarily enjoin the Challenged DPOC Provisions in the ordinary course of litigation to prevent the disenfranchisement of eligible voters in the November 3, 2026, General Election.

## B. Enjoining the Challenged DPOC Provisions Would Not Harm Defendants because the Challenged DPOC Provisions Are Unnecessary.

Conversely, enjoining the Challenged DPOC Provisions would not harm Defendants because the Challenged DPOC provisions do not actually advance the interests of the State or public.

Indiana has already enacted methods for ensuring that the voter rolls are adequately maintained and do not include ineligible voters. Both federal and state voter registration applications require that every voter affirm their citizenship under penalty of perjury before

26

registering to vote. Federal law deters noncitizen voting by making noncitizen voting in federal elections a crime punishable by up to one year in prison. *See* 18 U.S.C. § 611. "Defendants still have numerous ways that comply with the NVRA to clean up the state's voter registration rolls" without risking disenfranchisement of eligible voters, so an injunction "will not impose any new or additional harm or burdens on the Defendants concerning their efforts to maintain accurate voter registration rolls and to ensure fair elections." *Ind. NAACP*, 326 F. Supp. 3d at 664. In light of these existing protections, and the lack of any evidence that noncitizen voting is a problem in Indiana or nationally, *see supra* note 9, at 4, the State does not face any harms that justify the demonstrable and imminent harms in burdening and disenfranchising eligible naturalized and derived citizens.

For example, in *Newby*, the D.C. Circuit recognized that an injunction would undermine a state interest if it allowed fraudulent noncitizen registration, but reversed the denial of a preliminary injunction where there was "precious little record evidence that it would do so." 838 F.3d at 13. There, Kansas represented that only 18 noncitizens had tried to or successfully registered to vote, and the court held that was insufficient evidence that an injunction would harm a state interest. Here, Defendants have likewise presented no evidence—publicly or through discovery in this action— that any more than "a tiny fraction of one percent of registered voters were noncitizens." *Id*. When balanced against the "significant harm on Plaintiffs and their members through the disenfranchisement of rightfully registered voters," *Ind. NAACP*, 326 F. Supp. 3d at 664, the State's interest in enforcing such unnecessary and redundant laws is minimal at best. *See also U.S. Student Ass'n Found. v. Land,* 546 F.3d 373, 388 (6th Cir. 2008) (concluding public interest weighed in favor of preliminary injunction because "the risk of actual voter fraud

[was] miniscule when compared with the concrete risk that Michigan's policies will disenfranchise eligible voters").

The Challenged DPOC Provisions impose discriminatory burdens on naturalized and derived citizens and harm the Plaintiffs and the public at large in significant ways, far outweighing any harm that Defendants may assert would result from a preliminary injunction. Given the large numbers of U.S. citizens that have already been erroneously identified as noncitizens, and the high likelihood that many more citizens will be erroneously flagged and potentially disenfranchised due to the Challenged DPOC Provisions, the balance of the equities and the public interest far outweigh any supposed harm to the State and bear strongly in favor of the Court issuing a preliminary injunction enjoining enforcement of the Challenged DPOC Provisions.

## CONCLUSION AND REQUESTED PRELIMINARY RELIEF

Because the Challenged DPOC Provisions unnecessarily discriminate against and disenfranchise naturalized and derived U.S. Citizens, Plaintiffs respectfully request that the Court preliminarily enjoin the enforcement and implementation of the Challenged DPOC Provisions. Specifically, Plaintiffs respectfully request that the Court enter a preliminary injunction ordering Defendants to:

1) Direct election officials to cease issuing any notices, including VRG-26 notices, pursuant to the Challenged DPOC Provisions;

2) Re-evaluate and accept and fully process any voter registration applications submitted on or after July 1, 2025, that were rejected due to applicants' not having provided DPOC within 30 days of receiving a notice, pursuant to the New-Registrant Citizenship Crosscheck Requirement;

28

3) Reinstate the voter registration of voters who were lawfully registered to vote before July 1, 2025, and had their registrations canceled due to their failure to comply with the Current-Voter Citizenship Crosscheck Requirement;

4) Send, within five days of the Court's Order, a remedial mailer to each registrant who received a notice pursuant to the Challenged DPOC Provisions, had their registration canceled or their application rejected due to not having provided DPOC, informing the registrant or voter of their current status;

5) Post, within five days of the Court's Order, template copies of the remedial mailer described in Paragraph 5, along with a copy of the Order, on the SOS and IED websites, and issue a press release in the customary manner of the SOS and IED announcing the Court's Order;

6) Make all reasonable and practicable efforts, immediately, to educate local officials, poll workers, and the general public of the requirements of the Court's Order, including, but not limited to, providing emergency guidance and training to local election officials, including poll worker training, and updating any and all public-facing information, guidance, election administrator's manual, voter registration guidebook, newsletters, FAQs, or similar, emphasizing the equal eligibility of all U.S. citizens to register to vote without providing DPOC; and

7) Submit, within five days of the Court's Order, a report detailing every voter who received a notice pursuant to the Challenged DPOC Provisions, had their application rejected due to not having provided DPOC, or was removed from the voter rolls due to the Challenged DPOC Provisions, including identifying information, to be kept confidential pursuant to the Protective Order.

Dated: May 8, 2026                                   Respectfully submitted,


*Counsel for Plaintiffs*

*/s/ William R. Groth*
William R. Groth (Ind. Bar No. 7325-49)
Daniel Bowman (Ind. Bar No. 31691-49)
Bowman Legal Services, LLC
9292 N Meridian Street, Suite 311
Indianapolis, IN 46260
(317) 912-3220
daniel@bowmanlegalservices.com
wgroth@fdgtlaborlaw.com

*/s/ Aneel Chablani*
Aneel Chablani*
Ami Gandhi (Ind. Bar No. 38542-53)
Conner Kozisek*
Chicago Lawyers' Committee for Civil
Rights
25 East Washington Street, Suite 1300
Chicago, IL 60602
(312) 630-9744
achablani@clccrul.org
agandhi@clccrul.org
ckozisek@clccrul.org

*/s/ Robert Weiner*
Robert N. Weiner*
Ryan Snow*
Grace Thomas*
Samantha Heyward*
Lawyers' Committee for Civil Rights Under
Law
1500 K Street NW, Suite 900
Washington, DC 20005
(202) 662-8600
rweiner@lawyerscommittee.org
rsnow@lawyerscommittee.org
gthomas@lawyerscommittee.org
sheyward@lawyerscommittee.org
*Counsel for Plaintiffs*
*\*Appearing Pro hac vice*

30