**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| LEAGUE OF WOMEN VOTERS OF INDIANA    et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | |
| vs. | ) | Case No. 1:25-cv-02150-MPB-MJD |
| | ) | |
| MORALES et al, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

John E. Oberdorf
Bradley S. Davis
Drew Green
OFFICE OF ATTORNEY GENERAL TODD ROKITA
Indiana Government Center South, 5th Floor
302 West Washington Street
Indianapolis, IN  46204-2770
Phone/Fax: (317) 317-640-1133/(317) 232-7979
E-mail:  John.Oberdorf@atg.in.gov

**TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

    I.  A preliminary injunction would be inappropriate under Purcell. . . . . . . . . . . . . . .   5

    II.  The Court lacks subject matter jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

        A.  Plaintiffs lack standing to seek an injunction. . . . . . . . . . . . . . . . . . . . . . . . . .   8
        B.  A preliminary injunction against Defendants would not redress Plaintiffs'
purported injury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

        C.  Plaintiffs' claims as to the Current-Voter Crosscheck Requirement are moot. .   14
    III. Plaintiffs are unlikely to succeed on their claims under the National Voter
Registration Act and the Civil Rights Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16
        A.  The Challenged Statutes do not discriminate against naturalized and derived
citizens. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17
        B.  The Challenged Statutes are consistent with the requirements for federal and
state voter registration forms. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18
            i.  The Challenged Statutes do not require registrants to provide
additional information when they register. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18
            ii.  The Challenged Statutes do not change the state voter registration
form, which remains equivalent to the federal form. . . . . . . . . . . . . . . . . . . . . . . . . . . .   21
            iii.  The Challenged Statutes do not require registrants to provide any
information on the state form that is unnecessary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22
        C. The Challenged Statutes implement a uniform and nondiscriminatory voter
registration program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

        D. Defendants have not violated the public disclosure requirements of the NVRA.   24

    IV. Plaintiffs do not satisfy the remaining equitable factors. . . . . . . . . . . . . . . . . . . . .   25
        A.  The delay in Plaintiffs' request for injunctive relief demonstrates a clear lack
of urgency. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

        B.  Plaintiffs have not shown they will suffer irreparable harm. . . . . . . . . . . . . . . .   26

        C.  The balance of the equities and public interest weigh against an injunction. . . .   27

        D.  Plaintiffs' request for injunctive relief is overbroad. . . . . . . . . . . . . . . . . . . . . .   29

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30

**INTRODUCTION**

The Constitution empowers the States to determine the "time, places and manner" of elections. U.S. Const. art. 1 § 4, cl. 1. Pursuant to that authority, the Indiana Legislature instituted a system to voting of ineligible voters, specifically noncitizens. The implemented system requires county election officials to compare voter registration data with Bureau of Motor Vehicle information indicating the citizenship status of the individual. Specifically, the BMV shares whether the registrant's BMV driver's license or identification reflects temporary lawful status. That credential is only available to noncitizens.  If the BMV data indicates that the registrant is a noncitizen, the county official is to issue notice to the individual notifying them of the discrepancy and requesting documentary proof of citizenship. If the person fails to provide documentation and chooses not to appeal the county official's decision, their registration is cancelled. These new laws, referred to in this litigation generally as the Challenged Statutes, were enacted in May of 2025 and made effective as of July 1, 2025.

More than a year after one statute became effective, and more than ten months after the other statute became effective, Plaintiffs seek to enjoin their continued implementation. Their motion should be denied for at least four reasons.

*First*, the motion is barred by *Purcell v. Gonzalez*, 549 U.S. 1 (2006). The primary election has already occurred, and the deadline to register to vote in the general election is less than four months away. The Supreme Court and Seventh Circuit have repeatedly held that federal courts should not alter election rules on the eve of an election.

*Second*, the Court lacks subject matter jurisdiction to consider Plaintiffs' motion. Plaintiffs lack standing to request an injunction because they fail to show any concrete injury to their organizations. Also, the injunctive relief Plaintiffs seek would not redress their supposed injury

1

because Defendants do not perform the functions Plaintiffs seek to enjoin. Furthermore, Plaintiffs' specific claim regarding Defendants' role in the Current-Voter Crosscheck is moot because Defendants have already completed their role in that process.

*Third*, Plaintiffs are unlikely to succeed on their underlying claims. The Challenged Statutes do not require additional information from registrants, do not change the voter registration form, and do not require any unnecessary information from registrants. Additionally, the Challenged Statutes do not discriminate against any class. Further, the Defendants have not violated the public disclosure requirements of the NVRA.

*Fourth*, the equitable factors counsel against a preliminary injunction. Plaintiffs unnecessarily delayed their formal request for injunctive relief despite their claims of urgency. Also, Plaintiffs fail to demonstrate any irreparable harm if an injunction is not granted. Further, the public interest strongly disfavors an injunction so close to the general election because an injunction would sow confusion and undercut the legislative process. Finally, the request is overbroad, because Plaintiffs seek relief not for themselves but for nonparties. Undoing the voter crosscheck processes would not provide any relief to Plaintiffs, exceeding the Court's authority.

## BACKGROUND

Effective July 1, 2025, the Indiana General Assembly required election officials to implement additional procedures to verify the citizenship of registered voters. Section 17 of Indiana Public Law 65-2024, codified at Indiana Code § 3-7-38.2-7.3, requires the Election Division to compare the voter registration system with the Bureau of Motor Vehicles' list of temporary credentials. Specifically, the Election Division must crosscheck voter registrations with the temporary BMV credentials listed under either Indiana Code sections 9-24-11-5(c) or 9-24-16-3(f), both of which

2

list the types of evidence the BMV accepts to show temporary lawful status, all of which are direct indicators of noncitizen status.

If the Election Division determines that evidence exists showing the individual may not be a citizen of the United States, the Division will notify the county election office in which the individual has registered. Ind. Code § 3-7-38.2-7.3(b). The county will then send a notice to the registrant requiring the individual to provide documentary proof of citizenship ("DPOC") within thirty days of receipt of the notice. Ind. Code § 3-7-38.2-7.3(c). If the individual is unable to provide proof of citizenship, the county shall cancel that voter registration. Ind. Code § 3-7-38.2-7.3(d). An individual whose registration is cancelled under this process may appeal in person or by mail, after which the county election board must conduct a hearing and notify the county voter registration office of its findings regarding the individual's citizenship. Ind. Code § 3-7-38.2-7.3(e). Evidence provided by an individual to prove citizenship is confidential. Ind. Code § 3-7-38.2-7.3(f).

In addition to the new requirements for existing voter registrations, the state legislature also codified a similar requirement on new registrations at Indiana Code § 3-7-26.3-37. If a new voter registration uses an identification number from a temporary credential issued by the BMV, the county voter registration official must send a notice requesting proof of citizenship (as defined at Indiana Code § 3-7-38.2-7.3(a)) within thirty days of receipt. If the individual fails to provide proof of citizenship, the county shall reject the registration. Ind. Code § 3-7-26.3-37(c).

On October 21, 2025, Plaintiffs, four organizations, filed their "Complaint for Declaratory and Injunctive Relief." Dkt 1. Plaintiffs seek declaratory relief that the two Challenged Statutes (Indiana Code sections 3-7-38.2-7.3 and 3-7-26.3-37) violate the National Voter Registration Act (NVRA), the Civil Rights Act of 1964 (CRA), a permanent preliminary injunction barring

3

enforcement of the Challenged Statutes and a court order requiring Defendants to notify county election officials of the injunction, and an order requiring Defendants to produce individualized voter information. Dkt. 1 ¶¶ 242-246. Plaintiffs further seek costs and fees. Dkt. 1 ¶ 248.

Plaintiffs completed service on Secretary of State Diego Morales on November 14, 2025. Dkt. 14. Plaintiffs completed service on the Election Division Co-Directors Bradley King[1] and Angela Nussmeyer on November 19, 2025. Dkt. 15-16. On November 28, 2025, Plaintiffs moved for expedited discovery, claiming that they would move "imminently" for a preliminary injunction. Dkt. 17, p. 14. Nevertheless, a lengthy discovery period followed. Plaintiffs filed their Motion for Preliminary Injunction on May 8, 2026. Dkt. 84. Specifically, Plaintiffs seek an injunction ordering Defendants to "direct election officials to cease issuing any notices" pursuant to the Challenged Statutes, re-process and accept any registration applications that failed to comply with the Challenged Statutes, reinstate the registrations of current voters who failed to comply with the Statutes, send a mailer to each registrant who received a notice under the Statutes, and make public the details of the order in a press release. Dkt. 84 ¶¶ 1-5. The Court gave Defendants until June 5, 2026, to complete depositions related to the injunction request and until June 15, 2026, to respond to Plaintiff's motion. Dkt. 88 ¶¶ 1-5. Plaintiffs were given until June 22, 2026, to reply to Defendants' response. Dkt. 88 ¶ 6. The Court extended Defendant's response to June 17, 2026, at the request of the parties. Dkt. 92.

---

[1] Bradley King resigned as Co-Chair of the Election Division effective May 6, 2026, and Joseph Mclain was subsequently appointed in his place. When a public officer resigns, the officer's successor is automatically substituted as a party. Fed. R. Civ. P. 25(d). The substitution is automatic even if the Court does not order it. *Id.* Consequently, Co-Chair Joseph Mclain is now a party to this action in place of Bradley King.

4

**ARGUMENT**

A preliminary injunction is an "extraordinary" remedy. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). To prevail, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. Failure to establish all four factors is fatal to a request for a preliminary injunction. *See id.* The party seeking injunctive relief bears the burden of showing that such relief is warranted. *Nken v. Holder*, 556 U.S. 418, 433 (2009). Here, all four factors counsel against a preliminary injunction. Further, the *Purcell* doctrine counsels against such a significant change to election procedure so close to the general election.

## I.    A preliminary injunction would be inappropriate under *Purcell.*

Indiana's voter registration deadline for the 2026 General Election is now less than four months away—closer still by the time briefing concludes and the Court issues an order on Plaintiffs' motion. Plaintiffs waited too long to request their injunction, and if it is granted, it would place extensive burdens on election officials and procedures.

Since *Purcell v. Gonzalez*, 549 U.S. 1 (2006), the Supreme Court has "repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020). The Supreme Court recognizes the great effort required by election officials to manage the election process. "[S]tate and local election officials need substantial time to plan for elections. Running elections state-wide is extraordinarily complicated and difficult. Those elections require enormous advance preparations by state and local officials, and pose significant logistical challenges." *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring, in grant of applications for stays).

5

The Court has further recognized the potential for chaos when courts interfere in that process. "When an election is close at hand, the rules of the road must be clear and settled. Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters." *Id.* at 880–81.

The Supreme Court is generally reluctant to approve injunctions in the weeks and months leading up to an election. *See e.g.*, *Abbott v. League of United Latin Am. Citizens*, 146 S.Ct. 418, 419 (2025) (staying an injunction issued eleven months before election day); *Merrill*, 142 S. Ct. at 879 (staying injunction issued seven weeks before primary elections); *Ardoin v. Robinson*, 142 S. Ct. 2892, 2892–93 (2022) (staying an injunction where primary elections were still five months away). And the Seventh Circuit and this Court have likewise employed *Purcell* to stay injunctions on the eve of an election. *See, e.g.*, *Democratic Nat'l Comm. v. Bostelmann*, 977 F.3d 639, 642 (7th Cir. 2020) (staying injunction granted six weeks before election); *Common Cause Indiana v. Lawson*, 978 F.3d 1036, 1042 (7th Cir. 2020) (staying injunction granted five weeks before election); *Common Cause Indiana v. Lawson*, 977 F.3d 663, 664 (7th Cir. 2020) (staying injunction granted five weeks before election); *Am. Council of Blind of Indiana v. Indiana Election Comm'n*, No. 1:20-CV-03118-JMS-MJD, 2022 WL 702257, at *6 (S.D. Ind. Mar. 9, 2022) (finding that part of the requested injunction would be unduly disruptive where the election was "less than eight weeks away."). Courts are especially wary when the requested relief would lead to voter confusion. *See, e.g.*, *Tennessee Conf. of the NAACP v. Lee*, 105 F.4th 888, 899-900 (6th Cir. 2024) (explaining that an injunction conflicting with the state form's instructions would cause serious confusion for registrants).

Most recently, the Seventh Circuit stayed an injunction against an Indiana statute prohibiting the use of student IDs to vote during the May primary election. *See Count US IN v. Morales*, 172

F.4th 974, 976 (7th Cir. 2026) (per curiam). The Seventh Circuit recognized the "risk of disruption to Indiana's primary election as very serious," as voting in the primary election had already begun. *Id.* In the present matter, the registration deadline for Indiana's general election is October 5th, less than four months away—well within the period in which other federal courts have applied Purcell to deny or stay a preliminary injunction. Any change now would inevitably lead to voter confusion, especially for those that the Challenged Statutes have already affected. If the Court were to issue an injunction, state and local election officials would face extreme burdens. Indiana's ninety-two county voter registration offices perform a litany of election-related duties, including processing candidate petitions and new voter registrations, voter list maintenance, and more. *See, e.g.,* Ind. Code art. 3-7-27 *et seq*. Cancelling a process that is ingrained into the officials' day-to-day workload could be extraordinarily burdensome. Plaintiffs go further, asking the Defendants to order election officials to undo the work they have already done under the Challenged Statutes. And these requests come long after the Challenged Statutes became effective, despite an intervening primary election, and with little sense of urgency from the Plaintiffs. By delaying their request to file a preliminary injunction, Plaintiffs run headlong into *Purcell* without justifying such a delay.

## II.     The Court lacks subject matter jurisdiction.

Article III of the Constitution limits federal court jurisdiction to "cases" and "controversies." Standing is one element of that limitation which serves to prevent courts from usurping the powers of the other branches of government. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). Plaintiffs must show an "actual or imminent threat of suffering a concrete and particularized 'injury in fact,'" that the injury is "fairly traceable" to the defendant's actions, and that a favorable decision will prevent or redress the injury. *Common Cause Indiana v. Lawson*, 937

7

F.3d 944, 949 (7th Cir. 2019). To establish an injury in fact, the plaintiff must show "an invasion of a legally protected interest." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Again, plaintiffs purported injury must be "actual or imminent"; a party does not establish Article III standing by alleging an injury that is merely "conjectural or hypothetical." *Keep Chicago Livable v. City of Chicago*, 913 F.3d 618, 625 (7th Cir. 2019). The mere possibility of harm is insufficient for a preliminary injunction; the harm must be likely. *Winter v. Natural Resources Defense Counsil, Inc.*, 555 U.S. 7, 22 (2008).

### A. Plaintiffs lack standing to seek an injunction.

Plaintiffs "bear[] the burden of establishing standing as of the time [they] brought th[e] lawsuit and maintaining it thereafter." *Carney v. Adams*, 592 U.S. 53, 59, 141 S.Ct. 493, 208 L.Ed.2d 305 (2020). At the preliminary injunction stage of litigation, the plaintiffs must make a "clear showing" that they are "likely" to establish each element of standing. *See Winter*, 555 U.S. at 7, 22 (emphasis deleted). Where discovery has occurred, the plaintiffs cannot rest on "mere allegations," but must instead point to factual evidence. *See Murthy v. Missouri*, 603 U.S. 43, 58 (2024); s*ee also Lujan*, 504 U.S. at 561, 112 S.Ct. 2130.

Organizational standing allows plaintiff-organizations "to sue on their own behalf for injuries they have sustained." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, n. 19 (1982)). To properly invoke organizational standing, a plaintiff "must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *Wisconsin Voter Alliance v. Millis*, 166 F.4th 627, 636-37 (7th Cir. 2026) (quoting *Hippocratic Med.*, 602 U.S. at 393–94). Thus, in establishing the "injury" prong of standing, an organization cannot simply "convert ordinary program costs into an injury in fact." *Common Cause Indiana v. Lawson*, 937 F.3d 944, 956 (7th Cir. 2019) (quoting

8

*National Taxpayer's Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995)). Plaintiff-organizations are barred from "manufactur[ing their] own standing" by simply "expending money to gather information and advocat[ing] against the defendant's action." *Hippocratic Med.*, 602 U.S. at 394. Only "concrete evidence and demonstrable injury to the organization's activities" resulting in a "drain on the organization's resources" will suffice. *Havens*, 455 U.S. at 379.

The Supreme Court's recent decision in *Hippocratic Medicine* declined to find that *Havens* supported organizational standing in every instance where "an organization diverts its resources in response to a defendant's actions." *Hippocratic Med.*, 602 U.S. at 395 (citing *Havens*, 455 U.S. 363). This impermissible theory of standing would enable every organization in the country "to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies." *Id*. According to the Supreme Court, *Havens* was the exception, not the norm. *See id*. at 396 ("*Havens* was an unusual case, and this Court has been careful not to extend the *Havens* holding beyond its context."). Havens was a business operating two apartment complexes, and the plaintiff was an issue-advocacy organization that also operated a housing counseling business. *Id*. at 368, 395-96. Thus, "when Havens gave [plaintiff]'s employees false information about apartment availability, [plaintiff] sued Havens because Havens 'perceptibly impaired [plaintiff]'s ability to provide counseling and referral services for low- and moderate-income homeseekers.'" *Id*. at 395 (quoting *Havens*, 455 U.S. at 379). This direct interference was enough to grant standing. *Id.* But the facts at issue here are distinguishable because Defendants are merely enforcing a law, not impairing Plaintiffs' businesses. The Defendants have not acted in a way that perceptibly impairs the Plaintiffs' core business activities.

Plaintiffs are attempting to pass off their educational outreach efforts as a detrimental drain on their resources, but merely spending money to educate citizens about a new law fails to show a

9

direct and concrete injury that confers standing.  The Plaintiffs are a collection of advocacy organizations working to educate and assist U.S. citizens in their voter registration process. Dkt. 1 at ¶¶ 19-22. And the Plaintiffs clearly disagree with the Challenged Statutes and their underlying policies. Dkt. 1 at ¶¶ 81-87. Yet, using money to educate the populous and advocate against new laws is exactly the kind of manufactured standing that *Hippocratic Medicine* denounces. *See Hippocratic Med.*, 602 U.S. at 394. If Plaintiffs have standing to sue in every instance where they expend money to further their mission of educating voters, they could create standing to sue every time an election law was enacted, revised, or repealed. Plaintiffs have failed to show that their business activities were directly affected or impaired by the Defendants. No Plaintiff has been contacted by a registrant for help proving citizenship pursuant to the Challenged Statutes. Borja Dep. 94:10-15; Hanson Dep. 22:7-10; Vaughn Dep. 37:23-38; VanTyle Dep. 17:2-7. Rather, Plaintiffs can only speculate that people will begin reaching out to them for assistance despite nearly a year elapsing between the time the Challenged Statutes were enacted and the Plaintiffs' preliminary injunction motion was filed. VanTyle Dep. 19:6-13; Dkt. 1; Dkt. 84. The sole reason for Plaintiffs alleged response to the Statutes is speculation. Moreover, the trivial amount of time and resources used by Plaintiffs to educate potential registrants about the challenged statutes fails to rise to the level of a "demonstrable injury" resulting in a "drain on the [Plaintiffs'] resources." *Havens*, 455 U.S. at 379.

Likewise, Plaintiffs have failed to provide any "evidence of concrete disruptions" caused by the Challenged Statutes. Hanson Dep. 27:18-22; 29:9-14. No Exodus activities have been curtailed in response to the Challenged Statutes. VanTyle Dep. 23:10-23. Common Cause did create a one-page flyer on the Challenged Statutes to pass out to registrants. Vaughn Dep. 24:5-15. Developing the flyer took "four to five hours" and its distribution cost a total of about $600.

10

Vaughn Dep. 26:13; 27:21-23. In one instance, Common Cause spent two hours talking to churchgoers about the Challenged Statutes after Mass. Vaughn Dep. 44:1-10. LWVIN also created a flyer over the course of "a few hours" to educate registrants about the Challenged Provisions. Hanson Dep. 19:7-15; 21:12. Comparable to the CCIN flyer, LWVIN's flyer took information from the Challenged Statutes with no other contributing sources. Hanson Dep. 21:4-10. No other materials covering the Challenged Statutes were created by LWVIN. Hanson Dep. 26:13-19. Aside from the flyer, LWVIN contacted other groups to encourage them to recommend that people find and provide proof of citizenship if prompted. Hanson Dep. 25:4-21. HAAP, like LWVIN and CCIN, created a two-page excerpt in an eight-page document to educate registrants about the new laws. Borja Dep. 24:2-22; 41:2-4. HAAP also created and presented a slide deck to further community education about the Challenged Statutes. Borja Dep. 35:2-8. In fact, HAAP's work with the Challenged Statutes has revolved entirely around "educating community members about the new laws" and "what to do, step by step" if a registrant were to be flagged under one of the Challenged Statutes' provisions. Borja Dep. 29:16-25. HAAP had already performed some of this work in 2024, when they started informing community members about the Statutes. Borja Dep. 86:7-21.

Exodus admitted that they had not created any materials addressing the Challenged Statutes. VanTyle Dep. 20:14-17. Instead, Exodus has spent "5 to 10 minutes every other week" educating their staff about new voting issues at weekly staff meetings. VanTyle Dep. 21:4-11. The Plaintiff-organizations also tabled at many issue-advocacy events across the state, and while discussion of the Challenged Provisions covered a portion of their time spent at those events, a majority of the Plaintiffs' activities while tabling included discussions about other topics like advertising other programs, mid-cycle redistricting, and general election rules. Vaughn Dep. 31:23-

11

32:5; 42:17-25; Hanson Dep. 6:8-15; Borja Dep. 64:16-22. Unlike the other Plaintiffs, Exodus has not attended any such events. VanTyle Dep. 22:1-3.

Plaintiffs impermissibly regard these ordinary program costs as equivalent to an injury to their organizational activities. *See Common Cause Indiana v. Lawson*, 937 F.3d 944, 956 (7th Cir. 2019) (An organization cannot "convert ordinary program costs into an injury in fact.").  Plaintiffs have already established that they share a mission that centers around voter education and advocacy. Dkt. 1 at ¶¶ 19-22. Thus, educating organizational staff and potential voters about a new set of election laws cannot be a cognizable injury that confers standing. Otherwise, any time the Plaintiffs disagreed with a new law, they would be permitted to challenge the law so long as they spent any amount of time or money on educating voters, which is an activity Plaintiffs would be engaged in regardless of the new laws' existence. Also, the timing of these activities is important, because some of Plaintiffs' alleged diversions occurred after this litigation was filed. *See, e.g.,* Borja Dep. 84:17-85:3. Plaintiffs cannot claim standing based on events that occurred after they initiated this case.

Furthermore, organizational standing does not exist in every instance where "an organization diverts its resources in response to a defendant's actions." *Hippocratic Med.*, 602 U.S. at 395 (citing *Havens*, 455 U.S. 363). Even if Plaintiffs have diverted some of their resources in response to the Challenged Provisions, there is no apparent need for resource diversion in this case. No one has contacted Plaintiffs to ask for assistance with the Challenged Statutes, and Plaintiffs can only assume that someone will in the future. Borja Dep. 94:10-15; Hanson Dep. 22:7-10; Vaughn Dep. 37:23-38; VanTyle Dep. 17:2-7.  Even if an individual had reached out, two of the organizations would merely refer individuals to a hotline. Hanson Dep. 18:9-11; Borja Dep. 29:23-30:1. Even Common Cause, which has been more proactive this year in helping people register (Vaughn Dep.

12

20:7-12), did not report any instances of individuals requesting assistance. Further, Common Cause does not even consider the Challenged Statutes the subject of any of their organizational goals for 2026, despite the Statutes allegedly remaining part of their ongoing work. Vaughn Dep. 48:4-13. No organization has alleged a plan to address the Challenged Statutes that is different from what they are already doing, which is entirely based on speculation. Plaintiffs have failed to make a clear showing that they are likely to establish the injury prong of standing, and this fact bars their right to sue Defendants in this Court. *See Winter*, 555 U.S. at 7, 22 (emphasis deleted).

### B. A preliminary injunction against Defendants would not redress Plaintiffs' purported injury.

Plaintiffs' requested injunction also commands the Defendants to perform statutory functions expressly left to county election officials, who Plaintiffs elected not to sue. Plaintiffs request Defendants "[d]irect election officials to cease issuing any notices" under the Challenged Statutes, process and reinstate voter registrations, and send remedial mailers to registrants. Dkt. 84 at 3; Dkt. 85 at 28–29. But sending VRG-26 notices and approving, denying, or cancelling the registrations of applicants who failed to provide DPOC are functions left exclusively to county election boards, not the Defendants. *See* Ind. Code § 3-7-38.2-7.3; Ind. Code § 3-7-26.3-37. And as this Court has found, the Election Division's guidance to county election boards is "advisory only, as the administration of any election and its oversight is the responsibility of the County Election Board." *Indiana Democratic Party v. Rokita*, 458 F.Supp.2d 775, 785–86 (S.D. Ind. 2006). "County Election Boards can take, and have taken, positions about election laws and procedures contrary to the position advanced by the State Election Division." *Id.* The Election Division cannot compel county election boards to perform, or not perform, administrative functions expressly left to said boards. Additionally, Plaintiffs' request that Defendants publicly announce the Court's order and train local election officials "emphasizing the equal eligibility of all U.S. citizens to register

13

to vote without providing DPOC" will not compel any nonparty to comply with the proposed injunction. *See Haaland*, 599 U.S. at 294 ("Redressability requires that the court be able to afford relief *through the exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion."). Where officials who are tasked with implementing or enforcing challenged statutes "are 'not parties to the suit . . . there is no reason they should be obliged to honor an incidental legal determination the suit produced.'" *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 568 (1992)). Simply put, nonparty officials are "not bound by the judgment." *Id.* at 293 (citing *Taylor v. Sturgell*, 553 U.S. 880, 892–93 (2008)). To acquire the relief they now seek, Plaintiffs should have sued the county election officials who perform the tasks they seek to enjoin. They elected not to and the Defendants cannot correct Plaintiffs' error by compelling nonparties to comply with an injunction they are not subject to.

### C. Plaintiffs' claims as to the Current-Voter Crosscheck Requirement are moot.

Defendants Mclain and Nussmeyer, as the officials enforcing that statutory provision, have already fulfilled their obligations under the statute. Article III of the U.S. Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." *Chafin v. Chafin*, 568 U.S. 165, 171 (2013). "[T]o invoke the jurisdiction of a federal court, a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Id.* at 172 (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)). This doctrine "prevent[s] federal courts from resolving questions that cannot affect the rights of the parties before them." *Ruggles v. Ruggles*, 49 F.4th 1097, 1099 (7th Cir. 2025). The live case or controversy requirement endures throughout the litigation, from the time the suit is filed through its ultimate disposition. *Id.* Thus, "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome," the case becomes moot. *Id.* In other words, a case

14

becomes moot when it is no longer possible for the court to grant any effectual relief to the prevailing party." *Id.*

The Current-Voter Crosscheck Requirement, contained in § 3-7-38.2-7.3(b), only compels the "NVRA official," the Co-Directors of the Indiana Election Division, Ind. Code § 7-7-11-1, to "compare the statewide voter registration system with the bureau of motor vehicles list of temporary credentials issued," then notify the "county registration office of the county in which the individual is registered to vote that the registered voter may not be a citizen of the United States." Once IED notifies the county registration office, all further action is taken by the county registration office, including the maintenance to the statewide voter registration list that Plaintiffs complain of. *See id.* § 3-7-38.2-7.3(c)–(e); *id.* § 3-7-26.3-11. Moreover, IED's actions under the Current-Voter Crosscheck Requirement are only taken with respect to voters who registered prior to July 1, 2025, as all new registrants thereafter are governed by the New-Registrant Crosscheck Requirements contained in a separate statute. *See* Ind. Code § 3-7-26.3-37; Dkt. 1 ¶ 52. Thus, once IED, pursuant to § 3-7-38.2-7.3(b), searches for and notifies county officials of registered voters with the relevant temporary BMV credentials, IED Defendants have fulfilled all obligations under the Current-Voter Crosscheck Requirement.

As Plaintiffs recognize, *see* Dkt. 1 ¶¶ 44–49, all further actions with respect to existing registered voters are taken by county voter registration offices, who Plaintiffs have elected not to sue. Preliminarily enjoining IED Defendants from enforcing the Current-Voter Crosscheck Requirement thus would not provide any "effectual relief" to the Plaintiffs because there is simply nothing left to enjoin IED Defendants Mclain and Nussmeyer from doing with respect to the Current-Voter Crosscheck Requirement. *See* Dkt. 30-1 ¶ 6; Dkt. 30-2 ¶ 6. Plaintiffs seek to stop a party from taking an action already completed, so their request is moot.

III.    **Plaintiffs are unlikely to succeed on their claims under the National Voter Registration Act and the Civil Rights Act.**

Election administration is generally entrusted to the States except where Congress intervenes. U.S. Const. art. I § 4, cl. 1. States possess "broad power" in that administration. *Washington State Grange v. Washington State Republican Party*, 522 U.S. 442, 451 (2008). Congress has, however, chosen to exercise its authority through the NVRA and the CRA, establishing administrative requirements and procedures. Here, Plaintiffs allege that the challenged statutes require documentation only from registrants who are naturalized or derived citizens. Dkt. 1 ¶ 223. However, the crosscheck procedures for both registered voters and new registrations require notice to be issued to any registrant who "uses an identification number from a temporary credential issued under IC 9-24-11-5(c) or IC 9-24-16-3(f)." Ind. Code § 3-7-26.3-37(a); Ind. Code § 3-7-38.2-7.3(b). These credentials are issued to any person with temporary lawful status, including those with nonimmigrant visa status, pending application for asylum, pending or approved application for temporary protected status in the United States, approved deferred action status, or a pending application for adjustment of status. Ind. Code § 9-24-16-3(f); Ind. Code § 9-24-11-5(c).

This is not a discriminatory program against naturalized or derived citizens because it applies to anyone with a temporary BMV credential. Naturalized and derived citizens who have a regular credential will not be required to provide documentation of citizenship. Even if a voting citizen were to be flagged based on a temporary credential, they would be notified and given opportunity to provide documentation to fix the problem. These procedures are clearly intended to ensure that a citizen with a temporary credential is not erroneously removed as an eligible voter. It is not discrimination simply because differently situated registrations are not treated alike. The Challenged Statutes use BMV data that denotes temporary status, itself an indicator that a person

16

is not a citizen, and uses that information in determining citizenship. The Challenged Statutes hold no ramifications for any specific protected class, because the affected group are simply temporary credential holders. Further, there is a reason for the Statutes. The Legislature was evidently concerned that non-citizenship registrations may cause issues both for those that maintain voter registration systems and for those who work polling places on Election Day (and after). The crosscheck programs allow voting officials to address potential voter fraud well ahead of the day of the election. The Challenged Statutes avoid any potential last-minute issues by requiring election officials to conduct maintenance beforehand.

### A. The Challenged Statutes do not discriminate against naturalized and derived citizens.

Plaintiffs allege that the challenged statutes violate the different practices provision of the Civil Rights Act of 1964. The provision bars any person acting "under color of law" from applying any "standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals . . . who have been found by State officials to be qualified to vote" in determining whether a person is qualified to vote. 52 U.S.C. § 10101(a)(2)(A). Even so, groups that are differently situated may be treated differently. For example, a Michigan procedural requirement that applied to registered voters whose original state identification was returned as undeliverable did not have to also apply to registered voters whose replacement identification was returned undeliverable. *U.S. Student Ass'n Found. v. Land*, 585 F. Supp. 2d 925, 949 (E.D. Mich. 2008).  There was sufficient distinction between those two groups because those whose original ID was returned undeliverable are less likely to actually reside in Michigan than somebody who already had an ID and was requesting a replacement. *Id.* at 950. Here, since a temporary BMV credential is a direct indicator of noncitizen status, it is logical to differentiate a person with that credential from a person with a permanent BMV credential.

17

Plaintiffs' argument is that the challenged statutes violate the CRA because they place requirements "that no registered voter applicants who are born as U.S. citizens will be subject to." Dkt. 1 ¶¶ 229-230. Again, the crosscheck procedures do not apply different procedures to naturalized or derived citizens. Every voter registration is evaluated for eligibility; under the crosscheck system, it is purely incidental that some naturalized or derived citizens may be asked to provide documentation. Furthermore, the crosscheck procedure does not leave room for county officials to apply a different procedure than what is applied equally to every voter registration across the state. This is in stark contrast to *Mi Familia Vota v. Fontes*, in which county recorders were tasked with "researching" the citizenship status of voters and determining their eligibility. *Mi Familia Vota v. Fontes*, 129 F.4th 691, 705 (9th Cir. 2025). The Challenged Statutes leave to the county officials no discretion in determining whether a person is eligible. Instead, Indiana officials must specifically follow the statewide procedures. This avoids the potential discrimination and subjective results that concerned the court in *Mi Familia*. *Id*. at 714. Therefore, Plaintiffs' arguments are unlikely to succeed because the challenged statutes do not discriminate against naturalized and derived citizens.

### B. The Challenged Statutes are consistent with the requirements for federal and state voter registration forms.

#### i. The Challenged Statutes do not require registrants to provide additional information when they register.

Plaintiffs allege that the Challenged Statutes violate section six of the NVRA by "impos[ing] an additional requirement" on those registering with the federal form. Dkt. 1 ¶¶ 197-198. Section six states, in relevant part, that a voter registration form may not require more than "identifying information and other information … as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration." 52 U.S.C. §

20508(b)(1).  The NVRA places requirements on the voter registration form but does not "regulate [the] qualifications of voters." *Ass'n of Cmty. Orgs. for Reform Now v. Miller,* 912 F. Supp. 976, 985 (W.D. Mich. 1995). Additionally, the language of the NVRA does not support the conclusion that states are prohibited from requiring additional information when processing voter registration forms, *Gonzalez v. State of Arizona,* 435 F. Supp. 2d 997, 1001 (D. Ariz. 2006), or conducting voter list maintenance. *See* 52 U.S.C. § 20507(b).

To vote in Indiana, an individual must "(1) be at least eighteen (18) years of age at the next general, municipal, or special election; (2) be a United States citizen; and (3) reside in a precinct continuously before a general, municipal, or special election for at least thirty (30) days; to register to vote in that precinct[.]" Ind. Code § 3-7-13-1. Once the requirements of Indiana Code § 3-7-13-1 are met, Indiana law prescribes multiple avenues for people to register to vote. Prospective voters may register (1) simultaneously with their application for an Indiana driver's license (Ind. Code § 3-7-14-5); (2) in person at county registration offices (Ind. Code § 3-7-19-2); or (3) by mail registration form (Ind. Code § 3-7-22-1). When an individual registers to vote by mail, they have the option to choose to register using either the federal form promulgated by the federal Election Assistance Commission, Ind. Code § 3-7-22-2, or the individual may register to vote using the state form issued by the Indiana Election Division, Ind. Code § 3-7-22-3.

The federal voter registration form and the Indiana voter registration form are practically identical, and county voter registration offices are required to accept both the federal and the state voter registration forms. Ind. Code §§ 3-7-22-2, -3. The Indiana voter registration form does not require registrants to provide documentary proof of citizenship with the registration form. The state form merely requires registrants to fill out an attestation stating that they are eligible to vote and meet the citizenship requirement. Ind. Code § 3-7-22-5.  Once the Indiana registrant fills out

19

the state form and it is delivered to their county of residence, the county voter registration office determines whether the registrant is eligible to vote and notifies the registrant via mail to the mailing address on the registration form. Ind. Code § 3-7-33-5(c)(2). It is only after determining that registration is flagged as having a BMV credential indicating possible non-citizenship that notice is sent requiring proof of citizenship. Ind. Code § 3-7-26.3-37. No additional information is required to accompany the registration form, nor is any requested unless the criteria of Indiana Code § 3-7-26.3-37(a) are met.

Contrast this with the process at issue in *Arizona v. ITCA.* That case concerned an Arizona law that required state officials to "reject" the federal form when it was unaccompanied by documentation proving citizenship. *Arizona v. Inter Tribal Council of Arizona (ITCA), Inc.*, 570 U.S. 1, 9 (2013). There, the form was rejected if the registrant failed to include information dictated by the state; here, the county accepts the registration and must request documentation confirming that the registrant is a citizen (an affirmation present on both the state and federal form) if the registrant has a temporary credential from the BMV, an indicator that the registrant may not be a naturalized or derived citizen. Ind. Code § 3-7-26.3-37. The current-registrant citizenship crosscheck process is even further distinguished, since it is a back-end maintenance program that never interacts with the acceptance of voter registration forms.  Under Indiana Code § 3-7-38.2-7.3, lists of already-registered voters are compared against the BMV's list of temporary credentials. Ind. Code §3-7-38.2-7.3(b). Thus, because voters are not submitting new registrations, and state officials are not accepting or rejecting voter applications, the current-registrant citizenship crosscheck is more akin to voter list maintenance. Therefore, both challenged statutes comply with section five of the NVRA.

**ii.  The Challenged Statutes do not change the state voter registration form, which remains equivalent to the federal form.**

Plaintiffs next allege that the Challenged Statutes require information from registrants that is not necessary to establish citizenship, and therefore, the state registration form is not "equivalent" to the form described in 52 U.S.C. § 20508(a)(2) as required under 52 U.S.C. § 20506(a)(6)(A)(ii). Again, the Challenged Statutes make no change to the voter registration form. Registrants only need to provide documentation when notified that further information is needed. Ind. Code § 3-7-26.3-37(a).

The processes established in the Challenged Statutes are more akin to the administration procedures allowed under 52 U.S.C. § 20507, which is back-end maintenance, than a change to the registration form. For example, States are permitted to remove eligible voters from their voter lists when a registrant has changed residences and subsequently failed to respond to a notice sent from the State to the registrant. 52 U.S.C. § 20507(d)(1)(B). States are further mandated to conduct and complete voter removal programs designed to "systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. section 20507(c)(2)(A). The Challenged Statutes affect the eligible voter lists only after a voter's registration has been accepted and the voter has been added to Indiana's voter list. The current-registrant citizenship crosscheck and new-registrant citizenship crosscheck only come into operation after the registrant has submitted (and county officials have accepted) the registrant's state form. Thus, the Challenged Statutes are more appropriately categorized as a voter roll maintenance program, rather than a substantive change to Indiana's state registration form.

21

### iii. The Challenged Statutes do not require registrants to provide any information on the state form that is unnecessary.

Plaintiffs further allege that challenged statutes violate sections 5, 6, 7 and 9 of the NVRA by requiring information that is not "necessary" on the state registration form. Dkt. 1 ¶ 216. The NVRA mandates that the registration form, whether a person is registering simultaneously with an application for a driver's license or via a paper or online voter registration form, may only require the minimum information necessary "to assess the eligibility of the applicant and to administer voter registration." *See* 52 U.S.C. § 20504(c)(2)(B); 52 U.S.C. § 20508(b)(1). While, the Challenged Statutes do not require additional information from registrants, insofar as Plaintiffs claim that it does, the only information implicated by the Statues is citizenship status. Courts have found that Congress did not intend for "minimum information necessary" to always equate to the citizenship attestation on the voter registration form. *Fish v. Kobach*, 840 F.3d 710, 741 (10th Cir. 2016). Here, the Statutes simply require confirmation of citizenship when there is evidence to the contrary.

Nevertheless, the Challenged Statutes comply with the requirements of those sections. Under the voter registration crosscheck procedure, it is only after the registrant submits the registration form to the county voter registration office and crosscheck is conducted that the office may determine that the statute requires documentary proof of citizenship. The registrant may then be notified that proof of citizenship is required. The necessary-information provisions of the NVRA are not violated by the Challenged Statute because no further information is requested on the registration form. Under the Challenged Statutes, Indiana still accepts and uses the federal mail voter registration form as required by 52 U.S.C. § 20505(a)(1). Further, the Challenged Statutes do not make the form inequivalent for the purposes of 52 U.S.C. § 20506(a)(6)(A), which requires that voter registration agencies distribute the federal mail voter registration form (or a state

22

equivalent) described in 52 U.S.C. § 20508(a)(2). Put simply, the Challenged Statutes do not affect either form.

### C. The Challenged Statutes implement a uniform and nondiscriminatory voter registration program.

Moreover, Plaintiffs allege that the challenged statutes violate Section 8(b) of the NVRA, which requires any State program that maintains accurate and current voter registration rolls must be "uniform, nondiscriminatory and in compliance with the Civil Rights Act of 1965." 52 U.S.C. § 20507(b)(1). Generally, state law must comport with the constitutional principle that the law cannot treat some groups differently than others. *Engquist v. Oregon Dep't of Agric.,* 553 U.S. 591, 601 (2008). However, as long as a law does not implicate a fundamental right nor target a suspect class, the law will be upheld if there is a rational basis for the classification. *United States v. Skrmetti*, 605 U.S. 495, 509 (2025). A program is uniform and nondiscriminatory if it applies to "everyone in the process." *See Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 707 (N.D. Oh. 2006). Programs that apply only to a "selected class" of persons do not meet the requirements of § 20507(b)(1). *Id*. The Civil Rights Act of 1965 bars voting qualifications based on race or color. 52 U.S.C. § 10301(a).

Here, Plaintiffs allege that the challenged statutes require documentation only from registrants who are naturalized or derived citizens. Dkt. 1 ¶ 223. However, the crosscheck procedures for both registered voters and new registrations require notice to be issued to any registrant who "uses an identification number from a temporary credential issued under IC 9-24-11-5(c) or IC 9-24-16-3(f)." Ind. Code § 3-7-26.3-37(a); Ind. Code § 3-7-38.2-7.3(b). These credentials are issued to any person with temporary lawful status, including those with nonimmigrant visa status, pending application for asylum, pending or approved application for temporary protected status in the

23

United States, approved deferred action status, or a pending application for adjustment of status. Ind. Code § 9-24-16-3(f); Ind. Code § 9-24-11-5(c).

This is not a discriminatory program against naturalized or derived citizens because it applies to anyone with a temporary BMV credential. Naturalized and derived citizens who have a regular credential will not be required to provide documentation of citizenship. Even if a voting citizen were to be flagged based on a temporary credential, they would be notified and given opportunity to provide documentation to fix the problem. These procedures are clearly intended to ensure that a citizen with a temporary credential is not erroneously removed as an eligible voter. It is not discrimination simply because differently situated registrants are not treated alike. The Challenged Statutes use BMV data that denotes temporary status, itself a strong indicator that a person is not a citizen and uses that information in determining citizenship. Plaintiffs are unlikely to prevail on their claim because the Statutes implement a program that is applied uniformly to every registrant with a temporary credential.

### D. Defendants have not violated the public disclosure requirements of the NVRA.

Plaintiffs' complaint as to Count 5, regarding the disclosure of records, is similarly flawed. The public disclosure requirements of the NVRA requires the State to make available records "concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). There is no requirement under the NVRA for the State to disclose the "individualized voter information" of voters affected by the Challenged Statutes that Plaintiffs seek. Dkt. 1 ¶ 235. The NVRA does not require the disclosure of unredacted documents. *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1344 (N.D. Ga. 2016). The text of §20507(i)(2), listing only "names and addresses," supports the conclusion that Congress intended to protect other types of information from disclosure. *Id.*

24

Congress did not intend to erode Federal and State law protecting against the disclosure of private, personal information. *Id.* at 1345. Indiana law explicitly bars the disclosure of documentary proof of citizenship to the public, and plaintiffs have not brought a preemption claim. *See* Ind. Code § 3-7-38.2-7.3(f). It stands to reason that the NVRA is not intended to allow for the release of private, sensitive information such as that which appears on proof of citizenship.

## IV.    Plaintiffs do not satisfy the remaining equitable factors.

### A.  Plaintiffs' delay in seeking a preliminary injunction bars relief.

Furthermore, Plaintiffs waited a period of seven months from initially indicating that they were requesting a preliminary injunction and actually filing their motion. Dkt. 1 ¶ 244; Dkt. 84. Plaintiffs were advised by the Court at multiple in-person conferences that they could file a motion and initiate preliminary injunction proceedings, during which time they could conduct expedited discovery and briefing. Against this advice, Plaintiffs waited months, failing to request their desired relief before the primary election in May of 2026. A "lengthy, unexplained delay in seeking relief" raises serious questions about the purported urgency of the request. *Finch v. Treto*, 606 F. Supp. 3d 811, 836 (N.D. Ill. 2022), *aff'd in part, dismissed in part*, 82 F.4th 572 (7th Cir. 2023); *see also Redbox Automated Retail, LLC. v. Xpress Retail LLC.*, 310 F. Supp3d 949, 953 (N.D. Ill. 2018).

In the context of an election, "[a]s time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made." *Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990). "[T]his means that any claim against a state electoral procedure must be expressed expeditiously" or it will be barred by laches. *Id.* "[B]elated election litigation risks giving voters incentive to remain away from the polls." *Trump v. Wisconsin Elections Comm'n*, 983 F.3d 919, 925 (7th Cir. 2020). When the Seventh Circuit says

25

"expeditiously," it really means it—election claims have been barred for delays as short as eleven weeks. *See Fulani*, 917 F.2d at 1031. The court has also upheld the denial of a preliminary injunction motion based on a three-month delay. *See Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053, 1060 (7th Cir. 2016). It has even held that a delay as short as two months weighs against a request for injunctive relief related to an election. *See Bowes v. Indiana Sec'y of State*, 837 F.3d 813, 818 (7th Cir. 2016). If Plaintiffs are to be taken at their word, they believe the Challenged Statutes to be legally violative on their face in October of 2025. Given the lack of urgency in filing their motion, Plaintiffs' request should be denied.

### B. Plaintiffs have not shown they will suffer irreparable harm.

No Plaintiff has identified any concrete plan in response to the Challenged Statutes, only claiming that they must "marshal new resources or divert them from other core projects." Dkt. 84, p. 12. Their claims, that the Challenged Statutes have forced them to react, do not withstand any scrutiny. HAAP abandoned a plan based entirely on their belief that they would have to dedicate time educate people on the Statutes. Borja Dep. 84:17-85:3. Notably, this plan was formulated and shared in October and abandoned less than a month later. *Id*. Simply, any diversion of resources by Plaintiffs is overly speculative. Furthermore, Plaintiffs offer no specific or concrete plans for responding to the Challenged Statutes. Plaintiffs' failure to provide any specific future harm or response thereof, is fatal to their motion.

No Plaintiff has been contacted by a registrant who asked for help proving citizenship pursuant to the Challenged Statutes. Borja Dep. 94:10-15; Hanson Dep. 22:7-10; Vaughn Dep. 37:23-38:3. This fact, in and of itself, raises serious questions over the merit of Plaintiffs' alleged actions in response to the Challenged Statutes. The Challenged Statutes have been in effect since July 1, 2025, and no affected registrant has contacted any Plaintiff asking for assistance. There is no

26

concrete reason to believe that affected registrants would suddenly start contacting Plaintiffs now. Plaintiffs' speculative claims are further weakened because, in the period between Plaintiffs initially indicating they would seek a preliminary injunction and their motion being filed, Indiana held a primary election for which almost five million Hoosiers registered to vote.[2] If Plaintiffs are to be believed, there would surely have been at least a few registrants subject to the Challenged Statutes that would have sought help from one of the Plaintiffs.

Since Plaintiffs have not been contacted previously, there is no logical reason to believe that registrants will start contacting Plaintiffs now. There is no evidence supporting Plaintiffs' assertion that an injunction is necessary to avoid any ongoing harm. It is also not clear that any Plaintiff's actions reflect their allegations. As noted above, at least one of the Plaintiffs does not consider responding to the Challenged Statutes to be a goal for the organization for this year. Vaughn Dep. 48:4-13. Nor has any Plaintiff specified a future plan to respond to the Challenged Statutes. Since no Plaintiff makes any evidence-backed claim that they will incur any irreparable harm as a result of the Statutes, a preliminary injunction is not appropriate.

### C. The balance of the equities and public interest weigh against an injunction.

The balance of equities and public interest merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, the public interest and equities strongly disfavor entering an injunction altering Indiana's voter registration processes in the few months before the general election. "The public interest in the maintenance of order in the election process is not only important, it is compelling." *Democratic Nat'l Comm. v. Bostelmann*, 451 F. Supp. 3d 952, 971

---

[2] *Indiana Election Results*, Ind. Election Div. (June 10, 2026), https://enr.indianavoters.in.gov/site/index.html.

27

(W.D. Wis. 2020) (quoting *Diaz v. Cobb*, 541 F. Supp. 2d 1319, 1335 (S.D. Fla. 2008)); *see Benisek v. Lamone*, 585 U.S. 155, 160 (2018) (holding that due regard for the public interest in orderly elections supports denying a request for preliminary injunction). Granting Plaintiffs' motion would sow confusion among voters, undermine orderly election administration, and override a legitimate, democratically adopted measure supported by public consensus.

The Challenged Statutes have been effect for almost a year. As Plaintiffs have stated, county election officials have been engaged in the process of verifying citizenship just as long. Dkt. 85, p. 2. A court order at this point would create confusion for officials who would have to completely change their process. *See supra* Part I. Plaintiffs' request not only would require county election officials to stop processing registrations in the manner that they have been, but it would also require officials to re-evaluate already cancelled registrations, re-process some of those registrations, and mail new notices notifying registrants of those changes. Dkt. 85, p. 29. This process would be onerous and confusing, particularly because some registrants whose registrations were cancelled have re-registered and have complied with the Challenged Statutes. Victoriano Dep. 7:10-20; Pl's Ex. 9 ¶ 19, *see also* Sanchez Dep. 7:23-8:4; Shelby Dep. 9:4-10:21. Plaintiffs' request would result in many duplicative registrations that would have to be reconciled with active registrations, creating further work. The voters subject to this process would also be confused, having received multiple contradictory notices and potentially having already re-registered and supplying proof of citizenship. *See Tennessee Conf. of the NAACP,* 105 F.4th 889-900.

Furthermore, the Indiana Secretary of State has discovered instances of noncitizens who successfully registered and voted in Indiana elections. Prentice Decl. ¶ 6. This underscores the need for the State to protect its elections from unlawful interference. Clearly, the Indiana Legislature intended as much in enacting the Challenged Statutes. An injunction would also

28

"clearly inflict[] irreparable harm on the State" by overriding democratically adopted laws. *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). Under the Constitution, "state legislatures . . . bear primary responsibility for setting election rules." *Democratic Nat'l Comm. v. Wisconsin State Legislature*, 141 S. Ct. 28, 29 (2020) (Gorsuch, J., concurring); *see Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (alteration in original) (citations omitted)). The Challenged Statutes are the product of the democratic process and reflective of public interests in the State of Indiana. A preliminary injunction would entirely obviate the significant public effort that went into the Challenged Statutes.

Additionally, the irreparable harm to voters and the public interest alleged by Plaintiffs is unsubstantiated. Every example cited by Plaintiffs of a registration being cancelled was after the registrant either lost the form or simply failed to respond due to personal factors. Victoriano Dep. 5:8-7:2; Sanchez Dep. 5:19-7:3; Shelby Dep. 7:25-8:12. In every case, the registrant was able to re-register, provide documentary proof of citizenship, and their registration was confirmed. Victoriano Dep. 7:10-20; Pl's Ex. 9 ¶ 19, *see also* Sanchez Dep. 7:23-8:4; Shelby Dep. 9:4-10:21. No declarant sought assistance from Plaintiffs, nor has any Plaintiff been contacted for assistance. Borja Dep. 94:10-15; Hanson Dep. 22:7-10; Vaughn Dep. 37:23-38; VanTyle Dep. 17:2-7. Plaintiffs' alleged injuries are entirely self-inflicted and are insufficient to warrant an injunction against the clear state interests at stake.

### D.  Plaintiffs' request for injunctive relief is overbroad.

Finally, Plaintiffs' requested injunction is impermissibly broad. By and large, Plaintiffs' requested relief applies not to themselves, but to individual registrants affected by the Challenged Statutes who are not before the Court. Plaintiffs request Defendants to provide relief to those

29

individuals flagged under the Challenged Statutes, including instructing county election officials from sending any more VRG-26 notices, accept new registration applications submitted without DPOC, reinstate registrants who failed to provide DPOC, and send "remedial mailer[s]" to those flagged under the Challenged Statutes. Dkt. 84 at 3; Dkt. 85 at 28–29. These would address purported injuries by nonparties, not any injury suffered by the Plaintiffs, who are not subject to the Challenged Statutes. But federal courts lack authority to "grant relief to nonparties," as Plaintiffs request. *Trump v. CASA, Inc.*, 606 U.S. 831, 844 (2025); *Doe v. Rokita*, 54 F.4th 518, 519 (7th Cir. 2022). A preliminary injunction that goes beyond the four Plaintiffs would exceed this Court's authority and would be an impermissible end-run around the Supreme Court's decision in *Trump v. CASA*. Furthermore, as discussed in Part II(B) *supra*, Plaintiffs seek to enjoin Defendants from official acts that are outside of the parties' purview. The requested remedy is outside of the scope of this litigation.

## CONCLUSION

Plaintiffs' Motion for Preliminary Injunction should be denied. Their motion would require the Court to interfere in the electoral process mere months before the General Election. The Supreme Court and Seventh Circuit have repeatedly held that federal courts should not alter election rules on the eve of an election. The Court also lacks subject matter jurisdiction to consider Plaintiffs' motion because the Plaintiffs lack standing, the injunctive relief Plaintiffs seek would not redress their supposed injury, and because Plaintiffs' specific claim regarding Defendants' role in the Current-Voter Crosscheck is moot because. Furthermore, Plaintiffs are unlikely to succeed on their underlying claims. The Challenged Statutes do not require additional information from registrants, do not change the voter registration form, and do not require any unnecessary information from registrants. Additionally, the Challenged Statutes do not discriminate against any class. The

30

equitable factors weigh against an injunction because Plaintiffs unnecessarily delayed their formal request for injunctive relief despite their claims of urgency and failed to demonstrate any irreparable harm. The public interest also strongly disfavors an injunction so close to the general election because an injunction would sow confusion and undercut the legislative process. Finally, the request is overbroad, because Plaintiffs seek relief not for themselves but for nonparties. Undoing the voter crosscheck processes would not provide any relief to Plaintiffs, exceeding the Court's authority.

<table>
<tr><td></td><td>Respectfully submitted,</td></tr>
</table>

Respectfully submitted,

THEODORE E. ROKITA
Attorney General of Indiana
Attorney No. 18857-49

Date: June 17, 2026          By:     */s/ John E. Oberdorf*
                                     John E. Oberdorf
                                     Bradley S. Davis
                                     Drew Green

Office of Attorney General Todd Rokita
Indiana Government Center South, 5th Floor
302 West Washington Street
Indianapolis, IN  46204-2770
Phone/Fax: (317) 317-640-1133/(317) 232-7979
E-mail:  John.Oberdorf@atg.in.gov

31

**CERTIFICATE OF SERVICE**

I certify that on June 17, 2026, I transmitted via electronic mail a copy of the foregoing to all parties, c/o their respective counsel.

By:      */s/ John E. Oberdorf*
         John E. Oberdorf
         Deputy Attorney General
         Attorney No. 37951-49


OFFICE OF ATTORNEY GENERAL TODD ROKITA
Indiana Government Center South, 5th Floor
302 West Washington Street
Indianapolis, IN 46204-2770
Telephone: 317-232-6217 (Oberdorf)
Facsimile: (317) 232-7979
E-mail: John.Oberdorf@atg.in.gov