UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LEAGUE OF WOMEN VOTERS OF INDIANA, COMMON CAUSE INDIANA, HOOSIER ASIAN AMERICAN POWER, EXODUS REFUGEE IMMIGRATION, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 1:25-cv-02150-MPB-MJD |
| DIEGO MORALES in his official capacity as Secretary of State for Indiana, J. BRADLEY KING in his official capacity as Co-Director of the Indiana Election Division, ANGELA M. NUSSMEYER in her official capacity as Co-Director of the Indiana Election Division, | ) | |
| Defendants. | ) | |

**ORDER GRANTING MOTION TO DISMISS PURSUANT TO RULE 12(b)(1)**

Last July, two Indiana legislative enactments designed to identify ineligible voter registrants and applicants took effect. Ind. Code §§ 3-7-26.3-37, -38.2-7.3. The first statute instructs each Indiana county's voter registration official to "send a notice requesting proof of citizenship . . . to each individual who uses an identification number from a temporary credential . . . as part of the individual's voter registration application." *Id.* § 3-7-26.3-37(a). A temporary credential is a temporary driver's license or identification card issued by the Indiana Bureau of Motor Vehicles (BMV) to legal aliens. *Id.* §§ 9-24-11-5(c), -16-3(f); (Docket No. 1 ("Compl.") at ECF p. 3). An individual who receives the proof-of-citizenship request from his county official must provide that proof within thirty days, or else the individual's voter registration must be rejected. *Id.* § 3-7-26.3-37(b), (c). The second statute operates similarly, but with respect to current registrants. It instructs the co-directors of the Indiana Election Division to "compare the

statewide voter registration system with the bureau of motor vehicles list of temporary credentials[.]" *Id.* §§ 3-7-38.2-7.3(b), -11-1. "If evidence exists that a registered voter is not a citizen of the United States, the [co-directors] shall notify the county voter registration office of the county in which the individual is registered to vote that the registered voter may not be a citizen of United States." *Id.* § 3-7-38.2-7.3(b). Then the notified county official must notify the registered voter, and the voter must provide proof of citizenship within thirty days, as with the first statute, or else his registration will be cancelled. *Id.* § 3-7-38.2-7.3(c), (d). Citizenship can be proved with a birth certificate, passport, naturalization documentation (or photocopy of any of these), a certificate of naturalization number, a document or method of proof established under the Immigration Reform and Control Act of 1986, or the voter's consular report of birth abroad. *Id.* §§ 3-7-38.2-7.3(a), -26.3-37(a).

Both these statutes are attacked as inconsistent with and therefore unlawful under the Civil Rights Act of 1964, 52 U.S.C. § 10101 et seq., which forbids state officials from applying "any standard, practice, or procedure different from the standards, practices, or procedures applied . . . to other individuals" when assessing voter eligibility, *id.* § 10101(a)(2)(A), and the National Voter Registration Act of 1993 (NVRA), 52 U.S.C. § 20501 et seq., which, along similar lines, requires that states' programs to maintain accurate voter registration rolls for elections to federal office be "uniform [and] nondiscriminatory," *id.* § 20507(b)(1). But it is not unlawful to withhold the right to vote in federal elections from noncitizens—the opposite is true. 18 U.S.C. § 611(a)). So it cannot be unlawful under federal law to "discriminate" between noncitizens and citizens in this way. Indeed, Plaintiffs posit a different kind of discrimination. They say the challenged statutes unlawfully discriminate between natural-born citizens and naturalized and derived citizens, individuals born outside the United States who become citizens

either through the naturalization process or automatically upon their parents' naturalization. (Compl. at ECF p. 2). The theory is that a naturalized or derived citizen is not required to obtain a permanent BMV credential immediately upon his naturalization (or immediately upon his acquiring citizenship, in the case of the derived citizen), (*id.* at ECF pp. 2, 4), and so some naturalized and derived citizens will be required to prove their citizenship when they register to vote, or when the current-voter crosscheck is applied to them. That this burden of proving citizenship will never fall on natural-born citizens, but could fall on naturalized or derived citizens, is characterized as unlawful discrimination under 52 U.S.C. § 10101(a)(2)(A) and 52 U.S.C. § 20507(b)(1). (Docket No. 62 at ECF pp. 25–27). Plaintiffs also claim that the challenged statutes' proof-of-citizenship requirement violates provisions of the NVRA governing the forms states use to register voters. (Compl. at ECF pp. 41–45). There is no constitutional challenge.

Defendants Secretary of State Diego Morales and Indiana Election Division Co-Directors Joseph McLain[1] and Angela Nussmeyer filed a Motion to Dismiss Plaintiffs' Complaint pursuant to Federal Rules 12(b)(1) and 12(b)(6), (Docket No. 29), which is pending before the Court. For the following reasons, Defendants' Motion, (Docket No. 29), is **GRANTED** to the extent that Plaintiffs' Complaint is dismissed for want of facts that establish their Article III standing.

The statutes' challengers—Plaintiffs League of Women Voters of Indiana, Common Cause Indiana, Hoosier Asian American Power, and Exodus Refugee Immigration—are of course not naturalized or derived citizens harmed by the new requirements but rather four organizations

---

[1] Co-Director McLain was automatically substituted for his predecessor, Bradley King, when King resigned his position in May 2026. Fed. R. Civ. P. 25(d). The Clerk is **DIRECTED** to update the case caption to reflect the fact that Joseph McLain, having succeeded Bradley King as co-director of the Indiana Election Division, is the correct defendant in this action.

dedicated to protecting and expanding voting and other civil rights, "upholding the core values of American democracy," educating and mobilizing Asian American voters, and serving immigrants in Indiana, respectively. (Compl. at ECF pp. 6–7). It is curious that none of the Plaintiffs is a natural person whose registration was allegedly wrongly denied or cancelled, especially because Plaintiffs put forth the declarations of four such individuals, (Docket Nos. 84-7; 84-8; 84-9; 84-10), and the challenged statutes were in place during the primary election just a few months ago. But this is just a curiosity, not a defect. Organizations may sue on their own behalf to rectify their own injuries. *E.g.*, *Wis Voter All. v. Millis*, 166 F.4th 627, 636 (7th Cir. 2026). Here, the injury each Plaintiff claims it has suffered is the time, money, and effort it is compelled to spend counteracting the harm the proof-of-citizenship requirements impose on the individuals each group serves. (Compl. at ECF pp. 21, 25, 28, 31). Plaintiffs explain how they have diverted scarce resources to this end, to the detriment of their other priorities, (*id.* at ECF pp. 21–32), and the Court assumes Plaintiffs' allegations are true for the purposes of a Rule 12(b)(1) motion, *e.g.*, *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 279 (7th Cir. 2020).

The diversion-of-resources theory on which Plaintiffs rely to establish their standing to sue derives chiefly from *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). There an organization called HOME, which operated a housing counseling service, sued a property management company that falsely told one of HOME's black employees that the company had no apartments available for rent in one of its apartment complexes. *Id.* at 368, 378–79. HOME and some other plaintiffs claimed that the company violated the Fair Housing Act, which guarantees all persons, regardless of race, truthful information about housing availability. *Id.* at 373. HOME said it was injured by the defendant-company's lie because HOME "had to devote

significant resources to identify and counteract" the defendant's discriminatory practices. *Id.* at 379. The Court agreed with HOME and articulated a test for organizational standing:

> If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests.

*Id.* The Seventh Circuit applied *Havens* in *Common Cause Indiana v. Lawson*, 937 F.3d 944 (7th Cir. 2019). In that case, organizational plaintiffs claimed they were injured by the defendants' enforcement of a voter-rolls maintenance law because they devoted or planned to devote time and resources to combatting effects of the law. *Id.* at 951–52. Plaintiff Common Cause Indiana held training sessions to educate voters and community advocates about how to navigate the law's requirements, thereby diverting its members' time and attention away from the rest of its advocacy agenda. *Id.* at 952. The Court observed, "[A] voting law can injure an organization . . . by compelling it to devote resources to combatting the effects of that law that are harmful to the organization's mission." *Id.* at 950 (citation modified) (quoting *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) (citing *Havens*, 455 U.S. at 378)). *Lawson* is the chief case on which Plaintiffs rely to establish their standing and the only binding case to which they analogize their circumstances. (Docket No. 62 at ECF pp. 7–12).

But the diversion-of-resources theory of organizational standing was circumscribed recently by the Supreme Court in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) ("*AHM*"). In that case, medical associations that opposed abortion sued the FDA for relaxing regulations governing an abortion drug. *Id.* at 372–73. Invoking *Havens*, the *AHM* plaintiffs claimed FDA's actions "caused" them to conduct studies on the drug so that they could inform their members and the public about the drug's risks, and "forced" them to draft citizen

petitions about the drug to FDA, which resulted in an expenditure of "considerable resources" on the organizations' part "to the detriment of [the plaintiffs'] other spending priorities." *Id.* at 394. The Court rejected the plaintiffs' arguments and their interpretation of *Havens*. The Court confirmed that an organization cannot "manufacture" its own standing by "divert[ing] its resources in response to a defendant's actions." *Id.* at 394–95. Were the contrary true, the Court cautioned, an organization would acquire standing by spending a single dollar opposing government policy. *Id.* at 395. The Court then clarified the principle for which *Havens* stands. HOME was not only an issue-advocacy organization but a "housing counseling organization," and it was injured by the lie the defendant-company perpetrated on HOME's housing inquirer because that lie "directly affected and interfered with HOME's core business activities[.]" *Id.* To drive the point home, the Court drew an analogy: the company's lie injured HOME in the way a manufacturer's sale of defective goods harms the buyer of those defective goods. *Id.*; *see People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1100 (D.C. Cir. 2015) (Millett, J., dubitante); *Ariz. All. for Retired Ams. v. Mayes*, --- F.4th ---, 2026 WL 2277101, at *16 (9th Cir. Aug. 7, 2026) (Bress, J., concurring).

Three takeaways from *AHM* are relevant here. First, the *AHM* Court did not reiterate *Havens's* "drain on the organization's resources" language. *Havens*, 455 U.S. at 379. Instead, the Court "distance[d] itself" from that concept by "redefin[ing] the injury in [*Havens*] as an informational, rather than a financial, harm." *Millis*, 166 F.4th at 639 (Brennan, C.J., concurring). The harm HOME suffered was the false housing information that HOME was "sold" by the defendant, because, under those circumstances, "HOME could not carry out its core business activities[.]" *Id.* Moreover, and relatedly, the *AHM* Court's analogy to the buyer/seller dynamic recharacterized the "paradigmatic *Havens* injury" as a non-financial, intangible injury, *id.* at 642,

"not a self-inflicted harm caused by redirecting resources," *id.* at 640. Second, the Court described *Havens* as an "unusual" case that the Court "has been careful not to extend . . . beyond its context." *AHM*, 602 U.S. at 396.

Third, the orthodoxy of *Lawson*, Plaintiffs' primary authority, (Docket No. 62 at ECF pp. 7–12), is now in doubt. *AHM* imposes a more rigorous standard for organizational standing than *Lawson* does. *AHM* requires that a challenged action "directly affect[] and interfere[]" with an organization's "core business activities," *AHM*, 602 U.S. at 395, but the *Lawson* test is whether the challenged action "compel[s the organization] to devote resources to combatting the effects of [a] law that are harmful to the organization's mission." *Lawson*, 937 F.3d at 950 (citation modified); *see also id.* at 954–55. Organizational "mission" is not the language of *AHM*—*AHM* uses "core business activities," a narrower and less "elastic" concept. *Millis*, 166 F.4th at 641 (Brennan, C.J., concurring). Nor is *Lawson's* diversion-of-resources (or devotion-of-resources) test, *Lawson*, 937 F.3d at 950, the language of *AHM*. As discussed above, and as Chief Judge Brennan points out, *AHM* "distance[d]" itself from that concept by reconceptualizing HOME's injury as a non-financial, informational injury. *Millis*, 166 F.4th at 639 (Brennan, C.J., concurring).

*AHM's* circumscription of organizational standing has been recognized by the Seventh, Sixth, Second, and Fifth Circuits. The Seventh Circuit recently cast doubt on the diversion-of-resources theory *Lawson* says it gleaned from *Havens*, describing *Lawson* as "arguably in tension" with *AHM*. *Reps. Comm. for Freedom of the Press v. Rokita*, 147 F.4th 720, 729 n.3 (7th Cir. 2025) (citing the portion of *Lawson* that discusses the *Havens* diversion test and why the plaintiffs satisfied it). The Sixth Circuit held that its "diversion-of-resources theory of standing," which permitted a plaintiff to sue a defendant "over an action that the defendant took against a

third party if the entity voluntarily spent resources to challenge that action," was "disavowed" by *AHM*. *Tenn. Conf. of Nat'l Ass'n for the Advancement of Colored People v. Lee*, 139 F.4th 557, 563 (6th Cir. 2025). The Second Circuit has done likewise. It walked back its interpretation of *Havens*, which permitted organizational standing when an organization "diverts its resources away from its current activities," on the grounds that *AHM* had "revisited the issue and clarified that *Havens* has been overread." *Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, 167 F.4th 605, 617 (2d Cir. 2026) (citation omitted). The Fifth Circuit has taken an even stronger stand against the diversion-of-resources theory, describing it as having been "repudiated" by *AHM*, and holding forthrightly, "A legal-services organization cannot have Article III standing merely because a new law . . . requires it to understand the legal change" or "adjust resources in response[.]" *United States v. Texas*, 173 F.4th 659, 665–66 (5th Cir. 2026).

It is not hard to see why *AHM* restored bite to organizational standing. Under the pre-*AHM* diversion-of-resources theory, organizational standing was "prefabricated," since combatting the effects of a law an organization deems harmful is precisely "what an organization dedicated to a cause does[.]" *Mayes*, 2026 WL 2277101, at *15. (Bress, J., concurring). This lax, "effectively limitless" test "greatly eased the path for challenges to governmental actions, because organizations are ready-made litigants," and unlike real people "lack the complications associated with claims brought by individual plaintiffs who are actually subject to the challenged laws," such as "lack of standing, mootness, [and] unwillingness to be part of a lawsuit[.]" *Id.* The concurring judges in *Mayes* illustrate this point with a hypothetical:

> The government changes the asylum laws to make them less favorable to asylum-seekers. An organization dedicated to helping immigrants gain asylum sues to challenge the new rule. Because the new policy makes asylum more difficult to obtain, the organization claims it will need to spend more to help its clients, at the expense of other endeavors. Presto. The organization can sue, in its own right, to challenge the new policy.

*Id.* This hypothetical is strikingly similar to what Plaintiffs allege here. They say that the State changed voting laws to make it harder for some to vote, and that they must expend scarce resources to help the individuals they serve navigate these laws, to the detriment of their other priorities. (Compl. at ECF pp. 21–32; Docket No. 62 at ECF pp. 7–12 (relying on *Havens* and *Lawson* to establish standing)). These allegations no longer suffice to establish organizational standing because they do not pass muster under *AHM*.

Plaintiffs' Complaint does not adequately allege that Defendants' enforcement of the challenged statutes directly affects or interferes with their core business activities. On both these fronts, the allegations are deficient. As for the latter, it is true that each Plaintiff says that to combat the effects of the challenged statutes it has diverted resources away from "other core activities." (Compl. at ECF pp. 21, 25, 28, 31). But the language of *AHM* is "core business activities," not "core activities" or "signature activity," (*id.* at ECF p. 20). This difference is not merely semantic. The qualifier "business" is important. *AHM* stressed that HOME was a "housing counseling service," 602 U.S. at 395—that is, a business of some sort, even if not a profit generating one. Highlighting this dimension of HOME's work was "critical[]" to *AHM's* reasoning, *id.*, because it illustrated why HOME was injured by the defendant-company's lie: the defendant "sold" HOME false information on an issue about which HOME was statutorily entitled to the truth. *Millis*, 166 F.4th at 639–40 (Brennan, C.J., concurring). In other words, "[t]he injury in *Havens* was an injury to the organization in its functioning *as an organization*[.] . . . The defendants' actions . . . impeded [HOME] from doing the very thing it was supposed to do as a counseling organization." *Mayes*, 2026 WL 2277101, at *18 (Bress, J., concurring). Here, Plaintiffs do not say what their "core business activities" are, so they have failed to allege facts as to this prong of the *AHM* organizational-standing test.

Plaintiffs similarly conflate their "missions" with "core business activities," but *AHM* suggests differences between these concepts. Plaintiffs repeatedly reference their organizational missions, (Compl. at ECF pp. 4, 19–25, 27–32), and argue they have suffered an injury because Defendants have "frustrate[d]" their missions, (Docket No. 62 at ECF pp. 7–12). They cite *Lawson* to support their theory, but as explained above, it is unclear what remains of *Lawson* after *AHM*. As Chief Judge Brennan observed, *Lawson's* "core mission" concept is "far more elastic," and thus more permissive, than *AHM's* "core business activities." *Millis*, 166 F.4th at 640–41 (Brennan, C.J., concurring) (citing *Reps. Comm.*, 147 F.4th at 729 n.3). It is Plaintiffs' obligation to conform their allegations to the binding language of *AHM*, and they have not done so.

There is also a dearth of adequate allegations as to the first prong of the *AHM* organizational-standing test—the "directly affect[s] or interfere[s]" component. Plaintiffs' allegations here are all in the diversion-of-resources vein. (Compl. at ECF pp. 21, 25, 28, 31; Docket No. 62 at ECF pp. 7–12). But that is not the language of *AHM*. *AHM* "distance[d]" itself from the diversion theory, *Millis*, 166 F.4th at 639 (Brennan, C.J., concurring), and, with the buyer/seller analogy, reframed the organizational standing inquiry as whether an organization has been harmed "in its functioning as an organization," *Mayes*, 2026 WL 2277101, at *18 (Bress, J., concurring). Allegations that an organization has diverted resources to undo the frustration of its mission do not amount to an injury "that is analogous to HOME's injury" in *Havens*. *Id.* at *17; *see Millis*, 166 F.4th at 642 (Brennan, C.J., concurring). So, Plaintiffs' allegations do not establish that their alleged injury is analogous to HOME's.

In sum, *AHM* changed the law of organizational standing. Plaintiffs have failed to plead facts that establish their standing to bring this action. Put another way, even if everything

Plaintiffs say about their injury is true, those allegations do not amount to a cognizable Article III injury under *AHM*. Any evidence Plaintiffs marshal in support of their standing theory, then, is inconsequential. The theory, not the evidence, is the problem.

Defendants' Motion to Dismiss pursuant to Rule 12(b)(1), (Docket No. 29), is therefore **GRANTED**. Plaintiffs' Complaint, (Docket No. 1), is **DISMISSED without prejudice**, and with leave to amend. *E.g.*, *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 935 F.3d 573, 581 (7th Cir. 2019). The Seventh Circuit has observed that dismissal without prejudice with leave to amend "is the norm . . . when it comes to the plaintiff's original complaint," *White v. Ill. State Police*, 15 F.4th 801, 808 (7th Cir. 2021), and there is no indication that granting leave to amend here would be futile, *see Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519–520 (7th Cir. 2015). Therefore, Plaintiffs shall have twenty-eight days from the date of this Order to file an amended complaint. If Plaintiffs do not do so, or they indicate that they do not intend to do so, the Court will dismiss this action without prejudice and enter judgment accordingly. *See MAO-MSO Recovery*, 935 F.3d at 581.

Because the Court has dismissed Plaintiffs' Complaint, there are no claims pending before the Court, so there are no claims on which to grant injunctive relief. Plaintiffs' Motion for Preliminary Injunction, (Docket No. 84), is therefore **DENIED as moot**. *See Garcia v. Mid-Atl. Mil. Fam. Cmtys. LLC*, No. 2:20cv308, 2021 WL 1429474, at *3 (E.D. Va. Mar. 4, 2021) (dismissing complaint, granting leave to amend, and dismissing as moot motion for preliminary injunction); *Mcclellon v. United States*, No. 25-CV-2988, 2026 WL 880490, at *5–6 & n.6 (S.D.N.Y. Mar. 31, 2026) (quoting *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 121 (2d. Cir. 2025)) (same); *see also Kammerer v. PennyMac Loan Servs. LLC*, No. CV-24-437, 2025 WL 904493, at

*6 (D. Ariz. Mar. 25, 2025) (same with respect to pending motion for temporary restraining order).

The Clerk is **DIRECTED** to update the case caption to reflect the fact that Joseph McLain, having succeeded Bradley King as co-director of the Indiana Election Division, is the correct defendant in this action.

**IT IS SO ORDERED**.

Dated: September 10, 2026

Matthew P. Brookman, Judge
United States District Court
Southern District of Indiana

Distribution:

Electronic service on all counsel.